# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

**CRAIG T. GOLDBLATT**
**JUDGE**



**824 N. MARKET STREET**
**WILMINGTON, DELAWARE**
**(302) 252-3832**

February 2, 2023

## <u>BY FIRST-CLASS MAIL</u>

David C. Weiss
United States Attorney
 For the District of Delaware
U.S. Attorney's Office
1313 N. Market Street
Wilmington, DE  19801

  Re: Referral pursuant to 18 U.S.C. § 3057

Dear Mr. Weiss:

I am writing to refer a matter to your office under 18 U.S.C. § 3057(a).  That statute states that:

> Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed. Where one of such officers has made such report, the others need not do so.

For the reasons set forth in my opinion in *Miller v. Mott*, Bankr. D. Del. No. 23-50004 (CTG) (Memorandum Opinion dated January 31, 2023), I have concluded that there are reasonable grounds to believe that various principals of the debtor Team Systems International may have violated one or more of subsections (1), (2), (3), (7), (8), and (9) of 18 U.S.C. § 152.  The facts and circumstances that led me to refer this matter

David C. Weiss
February 2, 2023
Page 2

to your office are set forth in full in my opinion, a copy of which is enclosed with this letter.

I appreciate your office's attention to this matter.

Sincerely,

Craig T. Goldblatt
United States Bankruptcy Judge

Enclosure

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>      Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG)<br><br>**Related Docket No. 272** |
| GEORGE L. MILLER, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>DEBORAH EVANS MOTT, STEVEN M. ACOSTA, CHRISOPHER MOTT, JOHN S. MACIOROWSKI, ADDY ROAD LLC, BRENT ROAD LLC, BENJAMIN P. SMITH, JESSICAL M. SMITH, and TSI GULF COAST, LLC, and<br><br>JOHN DOES 1-100,<br><br>      Defendants. | Adv. Proc. No. 23-50004 (CTG)<br><br>**Related Docket No. 3** |

## <u>MEMORANDUM OPINION</u>

George Miller, the chapter 7 trustee appointed in the bankruptcy case filed by debtor Team Systems International, has brought this lawsuit against the debtor's owners as well as certain of their family members and legal entities they own. The trustee contends that the defendants were the recipients of fraudulent conveyances

by the debtor.[1]  The complaint also asserts claims against the defendants for, among other things, breach of fiduciary duty, the imposition of a constructive trust, and an accounting.

In aid of that relief, the trustee seeks a preliminary injunction that would impose an asset freeze on real property and cash that the trustee contends was improperly transferred to each defendant from the debtor.

At the conclusion of an evidentiary hearing held on January 23, 2023, this Court concluded that it would be appropriate to enter a preliminary injunction, though one that is more narrowly tailored than the sweeping injunction the trustee originally sought.  The parties submitted to the Court various forms of order seeking to implement that direction.  The parties proposed that the motion be addressed in three separate orders.  (1) The trustee and the Smiths have entered into a stipulation resolving the motion, which the Court has approved.[2]  (2) Defendant TSI Gulf Coast, LLC has not responded to the motion.  The Court entered a preliminary injunction against that entity.[3]  (3) As to the remaining defendants, the Court entered an injunction substantially in the form proposed by the trustee, which is narrower and

---

[1] Miller is referred to as the "trustee."  Debtor Team Systems International, LLC is referred to as the "debtor."  The defendants are Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith and TSI Gulf Coast, LLC.  The complaint also names unknown defendants, "John Does 1-100."

[2] D.I. 27.  In that stipulation, defendant Jessica Smith represents that Brent Road LLC has been dissolved and has no assets.  In light of that representation, that entity accordingly is not subject to an injunction.

[3] D.I. 26.

2

more focused than the one originally sought.[4]  This Memorandum Opinion sets forth the reasons supporting the entry of these preliminary injunctions.

## Factual and Procedural Background

This bankruptcy case has been contentious from the start.  It has already been the subject of two fairly extensive written opinions, the first when the Court converted the case to one under chapter 7 and the second when it held that the debtor's judgment creditors had failed to elect a chapter 7 trustee and that the interim trustee thus became the trustee.[5]  While the Court will spare the reader a retelling of the entire story, certain issues that arose in earlier stages of the case are directly relevant to the dispute now before the Court.

But first, a prefatory note about the facts described below.  As mentioned above, the Court held a hearing on the motion for a preliminary injunction on January 23, 2023, during which the Court heard witness testimony and admitted certain documents into evidence.  The Court's decision on the motion, however, is also informed by the context of the broader bankruptcy case, during which the Court conducted at least two other evidentiary hearings.  In the context of a motion for a preliminary injunction, the Court is satisfied that Third Circuit law permits it to consider material beyond the evidence that was formally admitted during the hearing.  The Third Circuit explained in *Koa Pharmaceuticals* that, in deciding

---

[4] *See* D.I. 25.

[5] The first opinion, *In re Team Sys. Int'l LLC*, 640 B.R. 296 (Bankr. D. Del. 2022), is referred to as *"TSI I."*  The second opinion, *In re Team Sys. Int'l LLC*, No. 22-10066 (CTG), 2022 WL 2792006 (Bankr. D. Del. July 15, 2022), is referred to as *"TSI II."*  The "judgment creditors" are GPDEV, LLC and Simons Exploration, Inc.

whether to enter a preliminary injunction, courts are not limited to considering only evidence that is strictly admissible but may also "exercise their discretion" to consider "affidavits or other hearsay materials" based on the "facts and circumstances of a given case."[6]  In the circumstances of this case, the Court believes that evidence that the Court heard earlier in the case is appropriately considered in the context of this motion.  For the benefit of any reviewing court, however, to the extent the Court is relying on evidence from outside the contours of the evidentiary hearing on the motion, it will endeavor to cite to the source of the evidence that informs the Court's analysis.

### 1.  The Florida Litigation

Debtor filed its bankruptcy in January 2022 as a voluntary case under subchapter V of chapter 11.  The debtor was a small business government contractor whose work, as the first-day declaration explains, was done by its members, Deborah Evans Mott, Christopher Mott, John Maciorowsky, and Steven Acosta.[7]  At the time of the filing, the debtor did not have any employees.[8]

The bankruptcy filing was precipitated by judgments totaling approximately $6.3 million obtained by the judgment creditors in a breach of contract action in the

---

[6] *Koa Pharmaceuticals v. Andrx Corp.* 369 F.3d 700, 719 (3d Cir. 2004).  *See also* Charles Alan Wright and Arthur Miller, *Federal Practice and Procedure* § 2949 ("inasmuch as the grant of a preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had").

[7] *In re Team Systems International*, Bankr. D. Del. No. 22-10066 (CTG), D.I. 3 ¶ 18.  Materials filed on the docket of the main bankruptcy case are cited as "Main Case D.I. __."

[8] *Id.*

U.S. District Court for the Northern District of Florida.  That litigation was itself quite contentious and featured more than its share of allegations of misconduct.  The debtor was a party to a contract with the Federal Emergency Management Agency under which the debtor was to provide water bottles to support emergency operations.  The judgment creditors served as brokers, connecting the debtor to the water suppliers (companies like Niagara and Nestle).  The judgment creditors were entitled, under a written contract with the debtor, to a 25 percent commission on the "net income TSI actually realizes from amounts paid by the government agencies."[9]

The question of *which* payments from government agencies were covered by this contract was ambiguous.  There was no question that the contract covered payments for water obtained from Niagara Bottling.  But the parties disputed whether it also covered water procured from Nestle Waters.[10]  A jury ultimately resolved that dispute in favor of the judgment creditors.[11]

In view of the issues that have arisen in the dispute now before the Court, it bears note that on at least two occasions, the district court expressed concern about the authenticity of documents submitted to the court by the debtor.  *First*, in March 2019 the district court denied a motion by the debtor to dismiss the case for lack of subject-matter jurisdiction.  The asserted basis for federal jurisdiction over the action was diversity of citizenship under 28 U.S.C. § 1332.  The debtor contended that

---

[9] *TSI I*, 640 B.R. at 303 (citing the parties' underlying contract).

[10] *Id.* at 304.

[11] *Id.*

Steven Acosta was then a member of the limited liability company. That mattered because Acosta was a California resident, as was one of the plaintiffs. Because a limited liability company is a citizen of each state in which a member is a citizen, if Acosta were then a member of the limited liability company, the district court would have lacked subject-matter jurisdiction over the lawsuit because complete diversity of citizenship would have been lacking.

In support of the argument that Acosta was a member of the limited liability company, the district court explained that "the defendant has proffered a curious document it says was a resolution making Mr. Acosta a member."[12] The district court, however, rejected the argument, concluding that it "is more likely than not that the document was created after the jurisdictional issue arose and is not authentic."[13]

*Second*, a dispute arose regarding the debtor's production of documents demonstrating the expenses it had incurred in connection with the government contracts. When the debtor (after a change of counsel) produced documents that it had earlier represented did not exist, the plaintiffs sought an evidentiary hearing to establish that the documents had been fabricated. The debtor avoided such a hearing only by stipulating to the plaintiffs' calculation of revenues and expenses. The district court commented, however, that the plaintiffs had "made a strong showing that something was amiss."[14]

---

[12] *GPDEV, LLC and Simons Exploration, Inc. v. Team Systems International, LLC*, N.D. Fla. No. 18-00442, (the "Florida Litigation") D.I. 58 at 4.

[13] *Id.* at 4-5. It appears that Acosta thereafter became a member of the LLC. He is identified as such on the debtor's Statement of Financial Affairs. Main Case D.I. 29 at 8.

[14] Florida Litigation, D.I. 243 at 3. *See also TSI I*, 640 B.R. at 304.

### 2. Motion to dismiss or convert the bankruptcy case

Following the entry of judgment in the district court, the judgment creditors sought discovery in aid of their efforts to enforce the judgment. Those efforts were blocked by the filing of the debtor's bankruptcy case and the imposition of the automatic stay.

The judgment creditors accordingly moved to dismiss the bankruptcy case on the ground that it was filed in bad faith.[15] After a three-day evidentiary hearing, the Court concluded that "cause" existed to convert or dismiss under § 1112(b) of the Bankruptcy Code. By the conclusion of the evidentiary hearing, however, the judgment creditors and other parties participating in the hearing agreed that converting the case to one under chapter 7 would better serve the interests of creditors and the estate than dismissal.[16] The Court accordingly entered an order converting the case.[17]

In determining that the debtor had failed to demonstrate that the case was filed to achieve a proper reorganizational purpose, the Court made a number of factual findings based on the record before it. Three of those findings are relevant to the motions now before the Court. Because these findings are set forth in greater detail in the *TSI I* opinion, the Court will only briefly summarize them here.

*First*, it came to light, through documents that were produced in the bankruptcy case, that certain purported business records produced in the Florida

---

[15] Main Case D.I. 41.

[16] *See TSI I*, 640 B.R. at 320-321.

[17] Main Case D.I. 151.

Litigation had been fabricated. As the *TSI I* opinion explains, documents produced in the Florida Litigation purported to show that approximately $43,000 in expenses paid to a company called "All Aqua" was for the transport of water. Documents produced in the bankruptcy case, however, showed that All Aqua does not ship water bottles. It installs custom swimming pools and hot tubs. In fact, the $43,000 the debtor paid to All Aqua was for the installation of a pool and spa at a house owned by defendants Mott and Maciorowski in Ormond Beach, Florida. When Mott was confronted with this evidence at her deposition, her answers were evasive, saying only that she lacked "firsthand knowledge of this."[18]

*Second*, the Court pointed out that the debtor had made a number of substantial prepetition transfers to its insiders and, more troubling, had taken steps to conceal the fact of those transfers. While the Court noted that solvent entities are entirely free to distribute profits to their owners, evidence of surreptitious transfers was relevant to the good faith analysis.[19] In that regard, the Court pointed out that documents produced to the law firm of Tunnel and Raysor were described in the debtor's purported business records as being for legal services provided to the debtor. Indeed, Mott testified at her deposition that the firm wrote "a memo on the diversity issues in the Florida case" and "provided contract review services."[20] That sworn testimony, however, was false. In truth, the more than $925,000 that the debtors

---

[18] *Id.* at 313-314.

[19] *Id.* at 314.

[20] *See id.*

8

paid to Tunnel and Raysor was for the acquisition of a house in Bethany Beach owned by Addy Road LLC, an entity owned by Mott and a defendant in this lawsuit.[21]

*Third*, the Court concluded that the validity of the debtor's alleged receivable from FEMA was doubtful at best. The likelihood of recovery on this receivable was important to the motion to dismiss or convert. The debtor's story was that it was on the verge of recovering nearly $20 million due to it from FEMA, and that the purpose of the bankruptcy was only to provide a short breathing spell from creditors' collection activity while it sought to collect on those receivables. The debtor said that it would then be in a position to confirm a plan that paid creditors in full. Had the debtor provided credible evidence backing up that claim, the Court would have been unlikely to find that cause existed to dismiss or convert the case. While nothing in the Court's opinion purported to adjudicate the debtor's claim against FEMA – as the *TSI I* opinion noted, contract claims against the federal government are subject to a specialized procedure under the Contract Disputes Act that would exclude this Court from exercising jurisdiction over such a claim – for purposes of resolving the motion to convert or dismiss, the Court noted that none of the evidence presented in the evidentiary hearing supported the debtor's claim that it was likely to recover on this claimed FEMA receivable.[22]

---

[21] *Id.*

[22] *Id.* at 316-318 & n.120.

9

### 3. Trustee election dispute

Following the conversion of the case, the judgment creditors sought to elect a chapter 7 trustee under § 702 of the Bankruptcy Code.[23]   The Court ultimately concluded that the trustee whom they had elected was not statutorily eligible to serve as a trustee, and that the result of the judgment creditors' failure to elect an eligible trustee at the § 341 meeting was that the interim trustee becomes the trustee.[24]

One issue that the Court resolved along the way, however, bears on the present motion.  The trustee filed objections to the judgment creditors' claims immediately before the § 341 meeting.[25]  He then argued that because the claims were disputed, the judgment creditors were not permitted to participate in a trustee election under § 702 of the Bankruptcy Code.

This Court rejected that argument.  Specifically, the Court concluded that rather than treating the claims as "disputed" (and thus ineligible to vote) on account of the trustee's objection, it made more sense to go ahead and resolve that objection on the merits.  The Court did so and concluded that the claims should be allowed. The rationale is straightforward.  The judgment creditors held judgments.  While the debtor had appealed those judgments, the debtor had tried and failed to obtain a stay pending appeal.   The Court thus concluded, applying ordinary principles of preclusion, that the judgments were entitled to preclusive effect notwithstanding the

---

[23] Main Case D.I. 167.

[24] *TSI II*, 2022 WL 2792006.

[25] Main Case D.I. 164 & 165.

10

fact that they were on appeal.[26]  The Court explained that if the appeal (which was and is subject to the automatic stay) ultimately proceeds and is successful, the allowance of the claims may be subject to reconsideration under § 502(j).  But unless and until the judgments are reversed, they are binding and enforceable, and thus entitled to preclusive effect in the claims allowance process.[27]  On that basis, the trustee's objections to the claims were overruled and the claims were allowed.

### 4. The trustee's need to obtain the Court's assistance to obtain Mott and Acosta's cooperation

Following conversion, a dispute arose between the trustee and Mott and Acosta over the debtor's obligation to turn over its books and records to the trustee, as the conversion order required.  The trustee ultimately filed a motion asking the Court to hold Mott and Acosta in contempt for their failure to comply with the Court's conversion order.  In that motion, the trustee also asked this Court to enjoin the members from transferring or encumbering three real properties that the trustee believed were acquired using debtor funds.[28]  The Court held a hearing on that motion on June 30, 2022.

While the Court declined to impose contempt sanctions on Mott and Acosta based on the record before it, the Court designated Mott and Acosta, under Fed. R. Bankr. P. 9001(5)(A), as having the duties of the debtor, thereby requiring that Mott

---

[26] *Id.* at *9.

[27] *Id.*

[28] Main Case D.I. 186 ¶ 28.  These properties are identified in the trustee's first motion for a preliminary injunction as the "Ormond Beach Property," the "Bethany Beach Property," and the "Blue Springs Property."

11

and Acosta comply with all obligations imposed on the debtor by the Bankruptcy Code.[29] The order also specifically directed Mott and Acosta to turn over to the trustee a computer owned by the debtor that the trustee said that Mott and Acosta had refused provide.[30]

In addition, during the hearing on the motion to dismiss or convert, the judgment creditors presented evidence suggesting that specific real estate had been acquired by the debtor's insiders using estate funds and that those insiders had sought to conceal those transfers. Based on that evidence, the Court granted the trustee's request for a preliminary injunction restraining the debtor's transfer or encumbrance of the three real properties identified in the original motion for a period of six months.[31]

### 5. New evidence of insider transfers and the concealment thereof

Following his appointment, the trustee sought and obtained orders authorizing him to take discovery, under Rule 2004, of various of the debtor's insiders as well as third-party financial institutions.[32] The information obtained in that discovery suggests that the debtor's fabrication of business records and concealment of transfers to insiders was more prevalent than the Court had previously appreciated based on the prior hearings.

---

[29] Main Case D.I. 222 ¶ 1-2.

[30] *Id.* ¶ 2(b).

[31] *Id.* ¶ 3.

[32] Main Case D.I. 265, 268.

12

Simply by way of example, William Homony, who is a consultant to the trustee, testified at the January 2023 evidentiary hearing on the motion for a preliminary injunction that the debtor's principals produced a bank statement for one of the debtor's accounts, for February 2020, to the trustee in the form below:

Transaction History

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|--------|-----------------|-------------|-------------------|---------------------|--------------------|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| Totals | | | $5,265.46 | $3,500,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

As one can see, it appears that information about the $3 million transfer from February 27, 2020 (as circled in red above – that circling having been added by the Court) may have been whited out. The issue of these redactions arose in connection with the motion to dismiss or convert, where it appears that the same set of documents had been produced. Indeed, the judgment creditors' witness testified about the very redaction set forth above.[33]

But the trustee has now taken the additional step of obtaining the original bank statement through a Rule 2004 subpoena served on the bank. And here is what that shows:

---

[33] *See* Main Case March 9, 2022 Hr'g Tr. at 91. ("So, there's clearly you know a redaction and you can kind of see the smudging here of the account information for the account number that it went to and the payee. This is the $3 million one.")

13

**Transaction History**

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT XXXXXX4075 ADDY ROAD LLC | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| **Totals** | | | **$5,265.46** | **$3,500,000.00** | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

The unredacted statement shows that the recipient of the $3 million transfer was Addy Road LLC, the same entity that holds title to the house in Bethany Beach. That entity is owned by Mott.

Similar redactions appear in one of the debtor's May 2021 bank statements, concealing the identity of the recipient of two transfers totaling $250,000:

**Transaction History**

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000563 | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000564 | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| **Totals** | | | **$41.96** | **$350,000.00** | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

The unredacted version of those statements, obtained from the bank through the Rule 2004 subpoena, show that Mott was the recipient of those transfers:

14

## Transaction History

| Date * | Check/Serial # | Description | Deposits/Credits | Withdrawals/Debits | End of Day Balance |
|---|---|---|---|---|---|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000563 BNF DEBORAH EVANS MOTT | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000564 BNF DEBORAH  MOTT | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| **Totals** | | | **$41.96** | **$350,000.00** | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

These efforts to conceal transfers of $250,000 made to Mott in May 2021 are particularly worrisome in view of the January 2022 Statement of Financial Affairs filed in this case.[34] The fourth question on that statement calls for the disclosure of any payments made within one year of the filing that benefited any insider. In its answer, the debtor did not disclose any transfer to Deborah Mott:

---

[34] Main Case D.I. 29.

15

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. Christopher Mott<br>415 East Pine Street<br>Orlando, FL 32801<br>Member | 3/31/21<br>6/9/21<br>6/18/21<br>6/23/21<br>6/28/21<br>7/20/21<br>7/23/21<br>7/30/21<br>8/3/21<br>8/11/21<br>8/30/21 | $42,352.00 | K-1 2020 Distributions and Expense Reimbursements |
| 4.2. John Maciorowski<br>705 Riverside Drive<br>Ormond Beach, FL 32176<br>Member | 8/31/21 | $10,000.00 | Expense Reimbursement |
| 4.3. Steven Acosta<br>3901 Blue Sage Drive<br>Prosper, TX 75078<br>Member | 4/15/21<br>6/16/21<br>6/30/21<br>7/30/21<br>8/3/21<br>8/31/21 | $119,804.00 | K-1 2020 Distributions and Expense Reimbursement |

Mott herself, however, signed the Statement under penalty of perjury:

**Part 14:** Signature and Declaration

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **January 26, 2022**

/s/ Deborah Evans Mott                                      Deborah Evans Mott
Signature of individual signing on behalf of the debtor      Printed name

Position or relationship to debtor    **Member**

The record established in the January 2023 evidentiary hearing revealed more. Payments made in connection with the purchase of a home for more than $1.8 million in Bethesda, Maryland for Mott's daughter and son-in-law are falsely described in

16

the debtor's business records as payments made for legal services provided by the law firm for which Mott's son-in-law works. Payments for the purchase of automobiles are described in the debtor's business records as payments to subcontractors. A summary chart, attached to the complaint, identifies the transfers made to each of the defendants identified in the complaint, as shown from the underlying bank statements. Those underlying bank statements were themselves admitted into evidence at the preliminary injunction hearing.

Homony also testified that when Mott and Acosta provided the trustee with the debtor's computer as this Court had ordered in connection with the trustee's motion for contempt sanctions, the computer's hard drive had been wiped clean. In fairness, that testimony was hearsay – Homony testified about what a computer consultant told him – though it came into evidence without objection. Even so, as described above,[35] in connection with a court's consideration of a motion for a preliminary injunction, a court has some latitude to consider evidence that is not presented in admissible form but that the Court believes is likely to be admitted into evidence in connection with an ultimate trial on the merits.

### 6. The complaint and motion for a preliminary injunction

The trustee filed the complaint seeking to avoid and recover more than $14.5 million in transfers to the defendants on January 10, 2023. That same day, the trustee moved for a preliminary injunction that would (1) continue the freeze on the alienation of the three properties that were the subject of the Court's initial asset

---

[35] *See supra* at 3-4.

freeze; (2) enjoin the transfer or encumbrance of the Bethesda, Maryland home now owned by Mott's daughter and son-in-law; and (3) enjoin the defendants from disposing of other assets in amounts equal to the alleged transfers they received. While the trustee sought a hearing on the motion for a preliminary injunction on January 13, 2023, in view of the seriousness of the allegations and significance of the relief sought, the Court set the hearing for January 23, 2023. The defendants (except for Gulf Coast LLC, which is allegedly owned by Acosta and has not yet appeared in this case) responded to the motion and the Court held the evidentiary hearing on that date.

At the conclusion of that hearing, the Court stated that it would extend the preliminary injunction as to the three real properties; that in the absence of any showing of wrongdoing by the Smiths or suggestion that the property was at risk of being transferred, it would not enjoin the transfer of the real property that had been bought for them but would require notice to the trustee before any such transfer were made; and that it would enter a preliminary injunction against the transfer of cash by the defendants who were members of the debtor or entities controlled by such members. The Court added, however, that – particularly in light of the possibility that the assets frozen might exceed the claims against the debtor's estate – an appropriate injunction would need to be more surgical than the one first proposed by the trustee.

The parties thereafter met and conferred. Following the submission of proposed orders from the parties, the Court entered the orders that are docketed at

18

D.I. 25, 26, and 27. Those orders state that the reasons for those injunctions would be set forth in greater detail in this Memorandum Opinion.

## Jurisdiction

The Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) as a case "arising under" the Bankruptcy Code and "related to" the bankruptcy case. As a case within the district court's bankruptcy jurisdiction, it has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference.[36] For the purposes of considering a motion for a preliminary injunction, the Court does not believe it necessary or appropriate to address the question whether the underlying claims are "core" or "non-core."

## Analysis

**I.     Entering an asset freeze would be consistent with the Supreme Court's decision in *Grupo Mexicano*.**

**A.     *Grupo Mexicano* holds that a federal court may not enter an asset freeze for the benefit of a general unsecured creditor holding a legal claim.**

The Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.* holds that a federal court may not freeze a defendant's assets when the plaintiff asserts what is only a legal claim against the defendant.[37] The Court goes on to explain, however, that such an injunction *is* available in a case in which the plaintiff seeks equitable relief.

---

[36] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[37] 527 U.S. 308, 333 (1999).

The Supreme Court reasoned that federal courts have "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act."[38]  The reason that a federal court hearing a purely legal claim cannot enter a pre-judgment asset freeze is that, historically, a general unsecured creditor "had no cognizable interest, either at law or in equity, in the property of [the] debtor, and therefore could not interfere with the debtor's use of that property."[39]

The Supreme Court further explained that courts have greater authority to freeze assets for the benefit of a creditor that has obtained a judgment.  The creditor would then have the authority to obtain a judgment lien, which would give the creditor an interest in the assets on which it had obtained such a lien.[40]  A court hearing a legal claim *may* impose an asset freeze on an asset in which the plaintiff has a specific interest.  But until a judgment is entered, a general unsecured creditor has no interest in any particular asset of the debtor, and thus may not obtain a judgment interfering with the debtor's use of that asset.

This limitation on a court's authority has no application, however, to the extent the underlying lawsuit seeks equitable relief.  As the *Grupo Mexicano* Court explained, the Supreme Court had permitted a prejudgment asset freeze in *Deckert v. Independence Shares Corp.*[41]  There, the plaintiffs had acquired certificates

---

[38] *Id.* at 318 (quotations omitted).

[39] *Id.* at 319-320.

[40] *Grupo Mexicano*, 527 U.S. at 322.

[41] 311 U.S. 282 (1940).

entitling them to invest in a trust of common stocks. The plaintiffs claimed that the sale was fraudulent and that the defendant was likely to dissipate its assets. That asset freeze was permissible, the *Grupo Mexicano* Court later explained, because "the Securities Act [under which the lawsuit in *Deckert* was brought] permitted equitable relief" and the "bill stated a cause of action for the equitable remedies of recission of the contracts and restitution of the consideration paid."[42]

Unlike cases in which a plaintiff asserts a legal claim, a plaintiff seeking equitable relief need not show that the specific asset it seeks to freeze is one in which the plaintiff has an interest. The Supreme Court's decision in *Deckert* authorized a pre-judgment asset freeze on the defendants' bank accounts without any showing that the specific funds being frozen were "traceable" to the alleged fraudulent sale of securities.[43] And *Grupo Mexicano* makes clear that the rule it otherwise announced had no application at all to cases (like *Deckert*) to the extent the plaintiff sought equitable relief. "The preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available [when a plaintiff seeks] equitable assistance in the collection of a legal debt."[44]

---

[42] *Grupo Mexicano*, 527 U.S. at 325.

[43] *See generally In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1063 (3d Cir. 1993) (explaining that when a plaintiff seeks to show that cash in a bank account is traceable to particular funds previously deposited, courts employ the "lowest intermediate balance test").

[44] *Grupo Mexicano*, 527 U.S. at 325. *See CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (authorizing an asset freeze in a case brought under the Communications Act where the plaintiffs sought the equitable remedy of the imposition of an accounting and the imposition of a constructive trust). In light of this "equitable exception" to the rule of *Grupo Mexicano*, the Third Circuit had no difficulty dispensing of the argument that *Grupo Mexicano* called into question the authority of a bankruptcy court to substantively consolidate two separate bankruptcy estates upon a proper showing. Because substantive

21

**B.** **While *Granfinanciera* holds that the Seventh Amendment right to a jury trial applies to a fraudulent conveyance action, the decision does not mean that fraudulent conveyance is always purely legal.**

Applying *Grupo Mexicano* to a fraudulent conveyance case requires a court to determine whether the relief sought in such an action sounds in law or in equity. That question was addressed by the Supreme Court in *Granfinanciera, S.A. v. Nordberg*.[45] *Granfinanciera* says, in substance, that it may be both. The claim is equitable to the extent it seeks the return of a specific asset, but legal to the extent it seeks money damages for the value of the asset transferred.

In the case now before this Court, the trustee's request to freeze the real estate is permitted, since the claim to require the return of that real estate sounds in equity. The request to freeze cash, however, is more controversial. The Supreme Court in *Granfinanciera* rejected the suggestion that a suit to recover cash that had been fraudulently conveyed can be described as equitable by seeking the imposition of a constructive trust (an equitable remedy) on the transferred cash. Such equitable relief is not available because adequate relief is available at law through an action for a money judgment.[46] That relief is nevertheless permitted here, however, because in addition to seeking to recover the value of that cash as a fraudulent conveyance, the complaint also includes a claim for an accounting of the disposition of that cash.

---

consolidation is itself an equitable remedy, its availability is unaffected by *Grupo Mexicano*. *In re Owens Corning*, 419 F.3d 195, 208 n.14 (3d Cir 2005).

[45] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

[46] *Id*. at 44-45.

*Granfinanciera* explained that this accounting is an equitable remedy.[47]  And here, because of the incomplete business records and uncertainty about what became of the transferred funds, there appears to be good reason why the plaintiff would invoke this equitable remedy.  For that reason, the trustee's request for a freeze on the defendants' cash is available here.  This Court therefore need not decide whether a prejudgment asset freeze would be available if plaintiff asserted only a claim for damages to recover funds that were fraudulently conveyed.

To elaborate on these principles, the specific holding of *Granfinanciera* is that a party to a fraudulent conveyance lawsuit is entitled, under the Seventh Amendment, to a jury trial.  The question whether the claim was legal or equitable was central to the Supreme Court's analysis, since the Seventh Amendment, by its terms, applies to "suits at common law."  The Supreme Court has long held that this refers to "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."[48]

The Supreme Court's analysis in *Granfinanciera,* however, explains that historically, fraudulent conveyance actions were not *strictly* legal.  They were a hybrid.  Fraudulent conveyance actions "were often brought at law in late 18th-century England."[49]  At the same time, it was also true that "courts of equity

---

[47] *Id.* at 44.

[48] *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830).

[49] *Granfinanciera*, 492 U.S. at 43.

sometimes provided relief in fraudulent conveyance actions."[50]  The Supreme Court went on to explain that in cases in which a plaintiff sought the return of a specific asset that had been fraudulently conveyed, that relief was traditionally equitable, but where the plaintiff seeks "the recovery of a fixed sum of money," the action was one at law.[51]  The Bankruptcy Code, of course, authorizes both forms of relief in a fraudulent conveyance action – recovery of "the property transferred, or, if the court so orders, the value of such property."[52]

The Supreme Court in *Granfinanciera* went on to explain that where equity is invoked simply to recover cash that had been transferred, the complaint should be viewed as a legal claim on the ground that equitable relief (such as the imposition of a constructive trust on specific cash) is unavailable when an adequate remedy is available at law.[53]  The Supreme Court indicated, however, that where the plaintiff seeks an accounting in order to locate the transferred assets, the claim may be seen as equitable.[54]

---

[50] *Id.*

[51] *Id.* at 45.

[52] 11 U.S.C. § 550(a).

[53] *Granfinanciera*, 492 U.S. at 48-49.

[54] *Id.* at 44.  Of course, under longstanding principles, when an action asserts claims both in law and in equity, Seventh Amendment principles entitle a party to a trial by jury on factual issues that are common to both claims. *Dairy Queen v. Wood*, 369 U.S. 469, 479 (1962) ("Since [the issues relevant to the legal claims in the case] are common with those upon which respondents' claim to equitable relief is based, the legal claims involved in the action must be determined prior to any final court determination of respondents' equitable claims.").  But the reverse is true of the authority to impose an asset freeze. So long as one of the plaintiffs' viable claims sounds in equity, the case would fit within *Grupo Mexicano*'s equitable exception even if that equitable claim is joined with a legal claim.

24

Accordingly, where a plaintiff in a fraudulent conveyance action seeks *either* to recover a specific asset (such as real estate) *or* requires an accounting, such a claim would be viewed as sounding in equity, and thus fit within the equitable exception described in *Grupo Mexicano*. In such a case, a court has the authority to impose an asset freeze if such relief is otherwise appropriate. And because the plaintiff here seeks an accounting, this Court concludes that it has the authority to impose an asset freeze in this case.[55]

## II.  A preliminary injunction is warranted in this case.

### A.  The trustee has met the standards for a preliminary injunction.

Federal Rule of Civil Procedure 65, as made applicable to this proceeding by Bankruptcy Rule 7065, allows a court to issue preliminary injunctions after appropriate notice and a hearing. Caselaw sets out the standards a moving party

---

[55] *See* D.I. 1 at 37, 51-52. The authority to impose a prejudgment asset freeze in support of a fraudulent conveyance claim seeking only money damages may present harder questions. One decision of this Court suggested that *Grupo Mexicano* has no application to bankruptcy courts. *See, e.g., In re EHT US1 Inc., et al.*, No. 21-10036 (CSS), 2021 WL 3828556 (Bankr. D. Del. Aug. 27, 2021) ("I also conclude that the *Grupo Mexicano* decision holding that district courts cannot grant preliminary injunctions to freeze a defendant's assets if a plaintiff had no legal claim to those assets, does not apply to bankruptcy courts in general or, more specifically, to fraudulent transfer actions in bankruptcy."). Other courts have found (without mentioning *Granfinanciera*) that fraudulent conveyance claims sound in equity. *See In re Focus Media, Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004) ("where, as here, a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, *Grupo Mexicano* does not bar the issuance of a preliminary injunction freezing assets"); *Larosa v. Pecora*, 2009 U.S. Dist. LEXIS 38060, 12 (N.D.W. Va. Apr. 29, 2009) (*Grupo Mexicano* does not bar an asset freeze in a fraudulent conveyance case because "plaintiffs seek mostly equitable relief"). Still other cases have (less controversially) granted asset freezes where the plaintiff asserted an interest in a particular asset. *See United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496-497 (4th Cir. 1999) (authorizing an asset freeze because the plaintiff asserted a claim on specific assets). Because the issue before this Court is properly resolvable on the narrow basis that this complaint seeks traditional equitable relief, the Court has no occasion to opine on the broader assertions set forth in these opinions.

25

must meet to obtain an injunction. In the Third Circuit, a court may issue a preliminary injunction if the moving party demonstrates:

> "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured. . . if relief is not granted. . . (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."[56]

Only the first two factors are necessary.[57] "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[58] For the reasons detailed below, the Court finds that the trustee has met his burden of proving the first two factors, and that the balance of all factors weighs in favor of granting the requested relief.

### 1. Reasonable probability of success

The trustee has demonstrated a reasonable probability of success on the merits of its claim. "To satisfy the first factor. . . a plaintiff need only establish a *prima facie* case, not that it certainly will ultimately prevail on the merits."[59] This, the Third Circuit has held, "requires a showing significantly better than negligible but not necessarily more likely than not."[60] Here, in order for the trustee to succeed in its

---

[56] *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-920 (3d Cir. 1974)).

[57] *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975); *In re Arthur Treacher's Franchisee Lit.*, 689 F.2d 1137, 1143 (3d Cir. 1982).

[58] *Reilly*, 858 F.3d at 179.

[59] *In re DBSI, Inc.*, 409 B.R. 720, 731 (Bankr. D. Del. 2009).

[60] *Reilly*, 858 F.3d at 179; *see also Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011).

fraudulent conveyance claim, he must prove that these transfers made to purchase the real properties and the cash transfers were made with actual intent to hinder, delay, or defraud creditors. As the trustee correctly notes, for purposes of fraudulent transfers, courts may infer intent if sufficient "badges of fraud" are present.[61] Based on the evidence presented at the preliminary injunction hearing, and as detailed in the discussion of the facts above, those badges of fraud are amply present here:

- All the funds allegedly transferred were for the benefit of the defendants, which are either insiders of the debtor or close family members and entities owned by such insiders.

- Defendants attempted to conceal the transfers by redacting the name of the recipient of various transfers and by falsifying business records to suggest that these transfers were actually payments for business expenses.

- The Debtor's Statement of Financial Affairs, signed by Mott under penalty of perjury, fails to disclose transfers made to her – transfers which were themselves concealed through the redaction of information on the debtor's bank statements.

- While the Court makes no finding in this regard, the record before the Court at least suggests the possibility that the debtor's insiders may have had the debtor's computer hard drive wiped in order to prevent the trustee from obtaining original business records.

---

[61] D.I. 3 at 16 n.5; *see also In re MTE Holdings LLC,* No. 19-12269 (CTG), 2022 WL 3691822, at *3 (Bankr. D. Del. Aug. 24, 2022).

27

None of the defendants' responses to these arguments is persuasive. *First*, defendants argue that the debtor did not have any creditors at the time of the transfers, which took place between early 2018 and September 2021.[62] The key to that argument is the contention that the judgment creditors' claims did not arise until they had obtained their judgments.[63] But that contention is incorrect. As a matter of state law, a claim for breach of contract arises at the time of the breach.[64] And the point of the expansive language of § 101(5) of the Bankruptcy Code, of course, is to provide a broad meaning to a "claim" in bankruptcy – not to limit it to those that have been reduced to judgment.[65] Here, the jury in the Florida Litigation concluded that the obligation to pay a 25 percent commission to the judgment creditors included the payments the debtor's received from FEMA on the sale of water procured from Nestle. The claim thus arose when the debtors received those payments. The Court therefore does not believe it likely that the defendants will prevail in the fraudulent conveyance action on the ground that the debtor did not have creditors at the time of the transfers.

---

[62] D.I. 14 at 17-20.

[63] *Id.* at 8 & n.2.

[64] *In re Flight Management, Inc.*, 99 B.R. 477, 479 (Bankr. M.D. Fla. 1989) ("Under Florida law, damages for breach of contract are generally measured as of the date of the breach. . . [a]ccordingly, the Court finds that the right to payment arises upon breach of contract.") (citations omitted).

[65] *See generally In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc) (noting that the legislative history suggests that Congress intended to provide the "broadest possible definition of the term 'claim.'") (internal brackets omitted).

28

*Second*, the defendants allege that the trustee will be unable to show badges of fraud.[66]  For the reasons described above,[67] the Court rejects this contention.  A few of the specific points that the defendants make, however, warrant comment:

- Addressing the contention that the tax returns produced by the debtor in connection with the motion to dismiss or convert were falsified, defendants assert that the "Court has already made a determination that the tax returns were not falsified."[68]  But what the Court said in *TSI I* was only that "[b]ased on the record before it, the Court is not prepared to make a finding (as the judgment creditors urge) that the documents the debtor produced and represented to be its tax returns *were* fabricated."[69]  That hardly amounts to a finding that the returns were authentic.  The Court simply found the evidence on this point to be inconclusive and thus did not rest its decision to convert on any finding with respect to the tax returns.

- Defendants take issue with this Court's prior observation that the district court in Florida expressed concern that the documents the debtor produced in the Florida Litigation had been fabricated, contending that this Court's conclusions were "based solely on statements made by [counsel to the judgment creditors]" and that "there

---

[66] D.I. 14 at 20-35.

[67] *See supra* at 12-17.

[68] D.I. 14 at 26.

[69] *TSI I* at 316 (emphasis added).

29

is no evidence in the record showing Judge Hinkle's findings or statements.[70] But that is incorrect. As described above, the Court's prior observations were based on, and cited to, specific rulings that are matters of record in the Florida Litigation.[71]

- Defendants argue that the trustee has failed to show the absence of "reasonably equivalent value" because the transfers made to the defendants were "in place of salary and should be treated as salary for purposes of reasonably equivalent value."[72] The Court disagrees. To be sure, the owners of a closely held corporation are free either to draw a salary or simply to distribute profits to themselves as dividends. But that does not mean that any amount that the company may distribute to its owners is necessarily a reasonable salary and thus constitutes reasonably equivalent value. In light of the magnitude of the transfers at issue here, the Court has little trouble concluding that the trustee is likely to prevail on the question of reasonably equivalent value.

- Defendants assert that the "Members can and will testify that they never altered or redacted any documents that they produced and intend to explore this issue further in discovery, if necessary."[73] Defendants presented no such testimony at the evidentiary hearing on the motion

---

[70] *Id.* at 26-27.

[71] *See supra* at 3-5.

[72] *Id.* at 31.

[73] *Id.* at 34.

for a preliminary injunction.  To the extent the defendants present such testimony at trial, the Court will certainly consider it fairly.  But based on the evidence that is now before it, the Court concludes that the trustee is likely to prevail on this point.

*Third*, the defendants argued vigorously at the preliminary injunction hearing that the fraudulent conveyance actions are essentially beside the point.  They point to the debtor's alleged receivable from FEMA to suggest that the estate is on the verge of receiving tens of millions of dollars.  And they argue that most of the claims against the estate are subject to objections and are likely to be disallowed.

The Court has some sympathy for the contention that it would be unnecessary and disproportionate to freeze assets beyond the amount necessary to satisfy all claims against the estate in full.  After all, once all creditors are paid, any remaining value would be distributed to the debtor,[74] which would presumably dividend that distribution to its equity holders.  But the Court views this issue as bearing on the *scope* of an appropriate injunction, not on whether one ought to be issued.  As described above, the arguments that the debtor is likely to receive tens of millions of dollars from FEMA, and the assertion that the judgment creditors' claims against the estate should be disallowed, are all arguments that this Court has considered and rejected during earlier stages of this bankruptcy case.[75]  None of the points made by the defendants in this adversary proceeding provides a reason to reconsider those

---

[74] 11 U.S.C. § 726(a)(6).

[75] *See supra* at 9.

31

decisions.  In sum, none of the defendants' arguments call into question the Court's determination that the trustee is likely to prevail on the merits of his underlying claim.

### 2.      Irreparable harm

The trustee must also show that he will be irreparably harmed if the relief is denied.  "[E]stablishing a risk of irreparable harm is not enough.  A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'"[76]  This factor, the Third Circuit has explained, is meant to reflect the proposition that the grant of a preliminary injunction is an extraordinary remedy.[77]  As such, a party must prove that the denial of the injunction will result in "harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the only way of protecting the plaintiff from harm."[78]  Additionally, where the harm alleged is purely economic loss, the burden is higher.  As the District Court for the District of Delaware has held, "where the alleged harm is economic, the threshold of peculiarity that the proposed action threatens must be high, because purely economic injuries are generally compensable and do not require injunctive relief."[79]

The reason, therefore, that a party seeking an injunction will face a higher burden when their alleged harm is purely monetary is that money is fungible – as

---

[76] *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Group Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

[77] *United States v. City of Philadelphia*, 644 F.2d 187, 191 n.1 (3d Cir. 1980).

[78] *In re DBSI*, 409 B.R. at 736.

[79] *Drabbant Enters., Inc. v. Great Atl. & Pac. Tea Co., Inc.*, 688 F. Supp. 1567, 1574 (D. Del. 1988) (citations omitted).

long as the defendant is solvent and there is no risk of assets being dissipated, a plaintiff that obtains a money judgment will be able to satisfy that judgment out of the defendant's assets. Here, however, the factual circumstances detailed above provide cause for concern that without an injunction restraining the use of such transfers, defendants may move or conceal assets. That harm "cannot be redressed by a legal or equitable remedy following a trial," and the requested injunction is therefore "the only way of protecting the plaintiff from harm."[80]

### 3. The remaining factors, on balance, weigh in favor of granting injunctive relief.

The third factor a court should consider before granting a preliminary injunction is whether such injunction will impose unreasonable harm on an interested party, in this case, on the defendants. While the original form of injunction proposed by the trustee gave the Court some pause on this score, the Court is satisfied that the revised form of injunction that the Court has issued is appropriately tailored to avoid unduly prejudicing the defendants.

Finally, the Court believes the public interest (to the extent it is implicated) weighs in favor of granting the injunction. One could, of course, view this dispute as a simple economic dispute between private parties that does not implicate the broader public interest one way or the other. But to the extent the public interest is implicated, one could certainly conclude that "[t]he public interest is served when the

---

[80] *In re DBSI*, 409 B.R. at 736.

33

Court imposes relief [that] maintains integrity in financial and business dealings and protects bankrupt estates from misappropriation of assets."[81]

Having engaged in the "delicate balancing"[82] required by applicable law, the Court finds that, on balance, a weighing of the four factors support the grant of a preliminary injunction.

### B. The revised form of order presented by the trustee is appropriately tailored.

The Court observed at the preliminary injunction hearing that it was inclined to grant some form of injunctive relief but that the form of injunction originally sought by the trustee was more sweeping than the Court thought appropriate. In the Court's view, it would be more appropriate to take a more "surgical" approach to freezing only those assets necessary to satisfy valid claims against the estate. The Court was also concerned that an injunction that prevented the defendants from accessing funds for ordinary course expenses would be unduly punitive. The proposed form of order proposed by the trustee addresses this concern. That order requires that defendants provide appropriate financial information so that a more appropriately tailored injunction may be entered. In the meantime, it provides a broader injunction against the dissipation of assets but contains a carve out for ordinary course expenditures. The Court is satisfied that this form of order appropriately addresses the concerns

---

[81] *In re American Tissue, Inc.*, No. 06-50929 (KG), 2006 WL 3498065, *5 (Bankr. D. Del. Dec. 4, 2006).

[82] *Delaware River Port Auth.*, 501 at 920.

34

the Court expressed about the breadth of the injunction. The Court has accordingly entered that form of order.

### C.   Under the circumstances of this case, a bond is not required.

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[83] Bankruptcy Rule 7065, however, which applies in this adversary proceeding, sets out an exception. Rule 65 of the Rules of Civil Procedure applies in adversary proceedings "except that a … preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."[84] Given the limited assets in the estate, the Court is satisfied that it is appropriate to enter a preliminary injunction in this case without requiring the posting of a bond.

### Conclusion

For the foregoing reasons, the Court has concluded that the entry of a preliminary injunction is appropriate in the circumstances of this case. It has thus entered the orders docketed at D.I. 25, 26 and 27.

Dated: January 31, 2023

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[83] Fed. R. Civ. P. 65(c).

[84] Fed. R. Bankr. P. 7065.