**IN THE UNITED STATES BANKRUPTCY COURTᴛ̶**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| Team Systems International, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | |
| George L. Miller, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC, | |
| Plaintiff, | Adv. Proc. No. 23-50004 (CTG) |
| -against- | |
| Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith, TSI Gulf Coast, LLC, TSI Education & Training, Inc., and Team Systems International Southeast LLC, and | |
| John Does 1-100, | |
| Defendants. | |

**DEFENDANTS' MOTION FOR AMENDED COUNTERCLAIMS AGAINST
TRUSTEE GEORGE L. MILLER**

Defendants Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski, Addy Road LLC, and Team Systems International Southeast LLC (collectively, the "Members" or "Defendants"), the 100% owners of Team Systems International, LLC ("TSI" or "Debtor") and Addy Road LLC, by and through their undersigned counsel, hereby respectfully move this Honorable Court to file the following amended counterclaims against George L. Miller, individually and in his capacity as Chapter 7 Trustee [DC1.1]of TSI ("Miller" or the "Trustee").

In support of this motion and these amended cCounterclaims, the Defendants hereby allege as follows:

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS[DC2.1]**

1.     The Debtor was formed as a limited liability company under the laws of the State of Delaware in 2001. TSI has four members: Deborah Evans Mott, Steven M. Acosta, John S. Maciorowski, and Christopher Mott.

2.     Prior to the Conversion Date (later defined), the Debtor was engaged in the business of serving the United States government as a contractor. The Debtor has performed government projects as a prime contractor and subcontractor in the areas of program development, financial and contacts management, tactical and specialized military training development, naval ordinance engineering, information systems design and integration, and military firearms training. The Debtor was awarded the role of a prime contractor on the US Navy Seaport-E contract, as well as the Uniformed Services University DoD Training and Simulation $51M IDIQ MATOC. TSI has contracted with numerous agencies, including the FBI, U.S. Army, U.S. Navy, U.S. Customs, Border Protection, and Defense Logistics Agency and the Federal Emergency Management Agency ("FEMA"). The Debtor followed all regulations of the National Industrial Security Program Operating Manual for sensitive contracts and cleared Members, and maintained a cost accounting system that has been approved by the Defense Contract Audit Agency.

3.     After TSI received an adverse judgment on an illegal contract claim in Florida, the LLC filed for Chapter 11. On January 18, 2022 (the "Petition Date"), TSI commenced its voluntary case under Chapter 11 of the Bankruptcy Code. The Debtor's Chapter 11 case never had the chance to get off the ground. Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor without counsel for several weeks at a critical juncture in its case. Upon

information and belief, Debtor's counsel withdrew because Judgment Creditors ~~improperly~~ threatened her with sanctions.

4.      The plaintiffs in the Florida Lawsuit (collectively, the "Judgment Creditors") sought to dismiss the Debtor's chapter 11 case.  On March 31, 2022 (the "Conversion Date"), following a hearing on dismissal or conversion of the case, an order was entered converting the case from chapter 11 to chapter 7.

5.      The Chapter 7 case is solvent and, not surprisingly, a trustee election ensued.

6.      Miller sought appointment as chapter 7 trustee for the Estate, asserting that he was qualified to administer the estate of a government contractor, and to administer this Estate specifically.

7.      Upon information and belief, then-counsel for the Members informed Miller that Miller was not qualified to serve as Trustee for this Estate, because Miller lacks security clearance sufficient to administer the affairs of the Debtor.

8.      The Debtor historically has had a "facilities clearance," which is a security clearance of "Secret" or higher.  The National Industrial Security Program Operating Manual ("NISPOM") and Federal regulations requires that anyone managing the Debtor hold a security clearance that equals or exceeds that of the Debtor's security clearance. *See* NISPOM 1-302.g.(3) (requiring facility clearance holders to notify the Cognizant Security Agency ("CSA") that oversees the pertinent facility clearance concerning changes in the company's management, and to confirm that new manager either possesses a personal security clearance at the appropriate level, or has been excluded from access to cleared information possessed by the company).

9.      Upon information and belief, Miller does not have, and did not have at any relevant time, a security clearance of "secret" or higher.  Upon his appointment as Trustee, Miller was

3

unable to confirm to the Debtor's CSA that Miller, who was now responsible for management of the Debtor, possessed a personal security clearance at a level appropriate for the Debtor, which held a facilities clearance.

10.     Miller therefore ~~falsely~~ inaccurately represented to this Court, the Creditors, and all interested parties, that he was qualified to administer the Estate, when in fact he was not qualified.  Miller should have known that he lacked an adequate security clearance when he campaigned to be elected Trustee and, upon information and belief, Miller did know that he was not qualified to administer the Estate, because the Member's then-counsel alerted Miller to that fact.

11.     Miller's lack of an adequate security clearance also served, in part, to render him unable to access government-administrated services necessary to the Debtor's business, a circumstance that Miller attempted to use to ~~hurl~~ make inaccurate~~false~~ accusations against the Members.

12.     Only seven creditors (collectively, the "Creditors") have filed proofs of claim in this case, two of which were filed by the Judgment Creditors. The aggregate amount of filed proofs of claim is $8,878,066.67 before the objection-allowance process. It is likely that amounts paid to the creditors will be significantly less than the $8,878,066.67 in aggregate proofs of claim.

13.     During the trustee election, Miller made statements concerning the claims against the Estate, and statements favoring pursuit of the Debtor's appeal of the Florida Judgments.  Once elected, those statements went forgotten, and as Trustee, Miller has done almost nothing to reduce claims against the Estate, and has attempted to extinguish the Debtor's appeal of the Florida Judgments. TSI equity owners have opposed all the claims.

14.      In April of 2022, Miller, his counsel, Miller Coffey Tate LLP, and an attorney for

the Judgment Creditors, held a "strategy telephone call."

15. It therefore appears that the Judgment Creditors either persuaded Miller that he could administer the Estate through fee-intensive litigation against the Members, or at least gave him information and advice for doing so.

16. Later in the case, Miller rewarded the Judgment Creditors by agreeing to pay over 90% of their claims against the Estate.

17. Miller ignored the fact that payment of this claim is unlawful under federal procurement law and the False Claims Act.

18. *Miller's Retention of His Own Accounting Firm and Other Professionals:* During the course of his Trusteeship, Miller retained professionals, including the law firm Archer & Greiner, P.C. ("Archer") and the accounting firm Miller Coffey Tate LLP ("MCT"). According to MCT's website, MCT "is the successor to Miller, Tate & Co. which was founded in 1980 by George L. Miller." In addition to being MCT's sole credited founder, Miller, upon information and belief, has a significant equity interest in MCT and derives significant income from fees generated by MCT.

19. Indeed, MCT holds itself out as being intertwined with Miller himself. MCT's website contains a page devoted entirely to Miller as "Chapter 7 Bankruptcy Trustee," which includes examples of cases in which Miller has served as trustee, and sets out Miller's contact information. Multiple pages within MCT's website prominently link to the page devoted to Miller. Thus, MCT itself serves to promote Miller's individual interest in serving as trustee in chapter 7 bankruptcy cases.

20. The Handbook for Chapter 7 Trustees (effective October 1, 2012) dictates that a "trustee must immediately open a separate account for each estate as soon as funds are received.

The accounts must be maintained under the direction and control of the trustee at all times."

21. Upon information and belief, and in direct contravention of the Handbook for Chapter 7 Trustees, Miller did not establish a separate bank account for the Estate.

22. Miller's desire to direct the Estate's resources to himself and MCT explains his decision to administer the Estate through fee-generating litigation instead of simply collecting the Debtor's receivables, which is simpler and therefore less fee-intensive.

23. Trustee George Miller (personally) has repeatedly acted outside his official capacity, causing millions of dollars in damage to Defendants in this case.

24. When the case began, Miller offered to "settle" the case by selling Members their accounts receivable for $6 million. However, he was also objecting to all the creditors' claims at that point. The proposal required Members to forgo any accounting rights and to release Miller for all claims. When Members asked where the money was going, Miller hung up the phone shouting that they did not understand "how this works."

25. In the instance of collecting TSI receivables, the law firm pursuing the claim (Venable LLP) had been virtually paid for all of the work pre-petition. Yet Miller ~~falsely~~ incorrectly told the Court that they were seeking a contingency fee arrangement. Initially this would have created over $6 million in a payment if the matter was successful. Defendants' objections reduced this to $1.8 million. But this amount was not a contingency fee and both Venable LLP and the Trustee produced no contingency fee agreement or proposal.

26. Miller also ~~misrepresented~~ incorrectly referenced a hearing date on the CBCA proceedings i~~o~~n order to push the Court to approve the alleged contingency fee agreement.

27. Miller also instructed his accountant (William Homony) to direct the TSI Members not to discuss fee arrangements with Venable LLP. The ~~false~~ inaccurate $1.8 million

was intended to produce extra cash that could be redirected to the Trustee and his conspirators in this scheme.

28.     Miller started the case by ~~misrepresenting~~ micharacterizing his credentials to the Court. He lacked security clearances necessary to fully administer an estate that included classified activities. This was an underlying case of his refusal to consider allowing TSI to fulfill hundreds of profitable fuel orders that would have added value to the estate.

29.     TSI Members regularly apprised him of these orders and they were ignored and then waived off. These fuel orders included the Red Sea and Centcom at a time of major U.S. naval operations in those areas.

30.     Miller's lack of requisite security clearances also prevented him from engaging with TSI's classified contracts and defense-sector counterparties, which constituted a significant portion of TSI's business and estate assets. Rather than disclosing this limitation to the Court and seeking appropriate relief, Miller ~~concealed~~ did not disclose it and took affirmative steps to access classified systems without authorization.

31.     Miller aggressively ordered his accounting firm, Miller Coffee Tate, to try to find fraudulent transactions, but suppressed their findings that contradicted his posture in court, violating his fiduciary duties.

32.     In his relentless effort to try to undermine TSI's viability, he attempted to obtain federal credentials to enter the SAM system, which requires security clearances he lacked.

33.     ~~Miller retained an IT company that created a false email using the TSI name and claiming that he "owned" TSI. This violated federal law and went off outside his fiduciary duties.~~

34.     ~~Miller further retained consultants who apparently used a hacking tool to attempt to access TSI's emails in possible violation of federal law.~~

35.    Miller consistently falsely represented himself as "federal law enforcement" to third-parties as he pursued avoidance claims. . He used this false claim to threaten third-parties into not just providing discovery, but in a concerted efforts to stop TSI business partners from future dealing with the TSI Members.

36.    Miller's calls to third-parties frequently accused TSI Members of being fraudsters and crooks, while he also had knowledge that his own accounting firm had found no fraud in their investigation.[DC3.1]

37.33.  Miller has exceeded his authority as panel Trustee to prolong these proceedings after his accountants had found no fraudulent transactions or insolvency solely for the purpose of his own personal gain.

38.34.  Miller proceeded with an adversary case knowing that his accounting firm found no support for his fraudulent transactions. He did this to seek fees for himself and his law firms.

39.35.  Miller's actions have also injured the Members specifically by forcing them to spend legal fees defending against baseless claims, and by the reputational damage caused by those baseless claims.  This is not merely a matter of an aggressive litigant pursuing long-shot claims. Miller has pursued claims against the Members based on intentional inaccurate characterizationsmisrepresentations made to this Court, as part of a willful and deceitful strategy.

40.36.  The adversary case was not brought in goodbad faith and was not justified on the merits. Miller directed his counsel to ignore the accounting results adverse to his position.

41.37.  Miller has admitted that the Debtor is not insolvent.  But, by pretending in his actions that the Debtor is insolvent, Miller knowingly creates the fiction that Creditors can be paid only through claims against the Members, and not through the Debtor's receivables. This fiction thean justifies the pursuit of litigation, to the financial benefit to Miller and MCT. No valid

business interest is served by the extensive litigation and other fees.

42.38. Miller pushed for a criminal referral of Deborah Mott that alleged fraudulent transactions, knowing that they were not supported by his own accounting firm.

43.39. The actions by Miller described above were intended to destroy TSI Members' ability to earn income and to starve them of the cash needed to defend this case.

44.40. As a result of Miller's actions that exceeded his authority and role as a panel Trustee, TSI Members have lost business opportunities for new contracts, particularly in the defense sector, in an amount exceeding $1300 million or more. This includes fuel sales to the U.S. Department of Defense and subcontracts to supply components for Department of Defense new weapons systems from major U.S. contractors.

45.41. TSI Members have often been told by major companies that they cannot work with Members until this case is cleared up, solely on the grounds of the bad reputation created by George Miller's actions and false inaccurate allegations.

## COUNTERCLAIM 1
### (Breach of Fiduciary Duty)

46.42. Defendants incorporate by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

47.43. To state a claim for breach of fiduciary duty by a bankruptcy trustee, a plaintiff must allege: (a) the existence of a fiduciary relationship; (b) the trustee's breach of a duty arising from that relationship; (c) that the breach was the proximate cause of the plaintiff's injury; and (d) damages resulting from the breach. *See* 11 U.S.C. § 704 (describing a trustee's duties);

48.44. Miller owed fiduciary duties to the estate, creditors, and interested parties, including Defendants, by virtue of his appointment as Chapter 7 Trustee in Case No. 23-50004 under 11 U.S.C. § 704. These duties include the duties of loyalty, care, and candor to the Court.

9

49.45. Miller breached those duties by, among other things: (a) ~~misrepresenting~~ mischaracterizing his credentials and security clearance status to the Court; (b) suppressing the exculpatory findings of his own accounting firm; (c) ~~falsely representing~~inaccurately characterizing the nature of professional fee arrangements to the Court; (d) proceeding with an adversary proceeding he knew lacked evidentiary support; (e) pushing for a baseless criminal referral; and (f) prolonging these proceedings solely for personal financial gain.

50.46. Miller's breaches were the proximate cause of Defendants' damages, including lost business contracts and revenues exceeding $1~~3~~00 million.

47. As a direct and proximate result of Miller's breaches, Defendants have suffered actual damages in an amount to be proven at trial, but no less than $1~~3~~00 million, together with interest, costs, and attorneys' fees.

51.

## COUNTERCLAIM 2
### (Defamation – Libel and Slander)

52.48. Defendants incorporate by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

53.49. To state a claim for defamation (libel or slander), a plaintiff must allege: (a) a false and defamatory statement of fact; (b) publication of that statement to a third party; (c) fault on the part of the publisher (at minimum negligence, actual malice where the plaintiff is a public figure); (d) the statement is not protected by privilege; and (e) resulting damages.[DC4.1]

54.50. Miller made false statements of fact to third-party business associates, government entities, and others, mischaracterizing TSI Members as "fraudsters and crooks.~~,~~" ~~and falsely~~

representing himself as "federal law enforcement." These statements were false when made, as Miller's own accounting firm had found no fraud.

55.51. Miller published these false inaccurate statements to numerous third parties, including TSI's existing and prospective business partners in the defense sector and government contracting community.

56.52. Miller acted with actual malice or, at minimum, reckless disregard for the truth, having full knowledge that his accounting firm had found no fraudulent transactions.

57.53. Miller's statements were not protected by any applicable privilege. To the extent any qualified privilege existed by reason of his role as Trustee, that privilege was defeated by Miller's actual malice and abuse of the privilege.

54. As a direct and proximate result of Miller's defamatory statements, TSI Members suffered reputational harm and the loss of existing and prospective business relationships, causing damages in an amount to be proven at trial but no less than $1300 million, together with punitive damages, interest, costs, and attorneys' fees.

58.

**COUNTERCLAIM 3**
**(Tortious Interference with Business Relationships and Prospective Economic Advantage)**

59.55. Defendants incorporate by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

60.56. To state a claim for tortious interference with business relations, a plaintiff must allege: (a) the existence of a business relationship or expectancy with a probability of future economic benefit; (b) the defendant's knowledge of the relationship or expectancy; (c) the defendant's intentional and improper interference with the relationship or expectancy; (d) that the

interference caused the breach or termination of the relationship or expectancy; and (e) resulting damages.[DC5.1]

61.57. TSI Members had existing and prospective business relationships with defense contractors, fuel suppliers to the U.S. Department of Defense, and prime contractors for Department of Defense weapons systems programs, from which Members had a reasonable expectation of economic benefit exceeding $1300 million.

62.58. Miller was aware of Members' existing and prospective business relationships by virtue of his role as Trustee, including TSI's pending profitable fuel orders and defense subcontracts.

63.59. Miller intentionally and improperly interfered with those relationships by: (a) falsely representing himself as "federal law enforcement" to threatening third parties into ceasing business dealings with Members; (b) making false inaccurate and defamatory statements to TSI's business partners; (c) refusing to permit TSI to fulfill profitable fuel orders; and (d) engaging unauthorized hacking activities directed at TSI's email systems.

64.60. Miller's conduct caused major companies to refuse to conduct business with TSI Members until this case is resolved, directly resulting in the loss of contracts and prospective business.

65.61. As a direct and proximate result of Miller's tortious interference, Defendants have suffered damages in an amount to be proven at trial but no less than $1300 million, together with punitive damages, interest, costs, and attorneys' fees.

### COUNTERCLAIM 4
### (Civil Fraud / Fraudulent Misrepresentation)

66.62. Defendants incorporate by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

67.63. To state a claim for civil fraud (fraudulent misrepresentation), a plaintiff must allege, with particularity pursuant to Fed. R. Civ. P. 9(b) and Fed. R. Bankr. P. 7009: (a) a false representation of a material fact; (b) knowledge on the part of the defendant that the representation was false when made (scienter); (c) the intention to induce the plaintiff or another to act in reliance on the misrepresentation; (d) justifiable reliance on the misrepresentation; and (e) resulting damages.[DC6.1]

68.64. Miller made the following false representations of material fact to the Court and to third parties, among others: (a) that Venable LLP was seeking a contingency fee arrangement when Miller knew it had been substantially paid pre-petition; (b) that he possessed the credentials and security clearances necessary to fully administer the estate; and, (c) that Members had engaged in fraudulent transactions, which his own accounting firm had found to be unsupported; and (d) that he was acting as "federal law enforcement" when communicating with third parties.

69.65. Miller knew each of these representations was false not accurate when made. His knowledge of the accounting firm's findings, his personal awareness of his own lack of security clearances, and his knowledge of the pre-petition payment of Venable LLP establish scienter.

70.66. Miller made these false inaccurrate representations with the intent to induce the Court to approve excessive professional fees, to damage Defendants' business reputation, to extract improper settlements, and to prolong the proceedings for his personal financial gain.

71.67. The Court, creditors, and Defendants' business partners justifiably relied on Miller's false inaccurate representations in ways that damaged Defendants.

72.68. As a direct and proximate result of Miller's fraudulent inaccurate misrepresentations, Defendants have suffered actual damages in an amount to be proven at trial but no less than $1300 million, together with punitive damages, interest, costs, and attorneys' fees.

13

## COUNTERCLAIM 5
### (Abuse of Process)

73.69.  Defendants incorporate by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

74.70.  To state a claim for abuse of process, a plaintiff must allege: (a) the existence of an ulterior motive or purpose in using a legal process; (b) a willful act in the use of that process not proper in the regular conduct of the proceedings; and (c) resulting damages. *See Donohoe Constr. Co. v. Mount Vernon Assocs*., 235 Va. 531, 539-40 (1988[DC7.1]).

75.71.  Miller used the legal process of the bankruptcy proceeding and the adversary case not for their proper purposes (namely, the orderly administration of the estate and the recovery of legitimate avoidable transfers), but rather for the improper ulterior purpose of: (a) generating excessive fees for himself and his retained professionals; (b) coercing Defendants into unfair settlements; (c) destroying the competitive viability of TSI and its Members; and (d) shielding himself from scrutiny of his own misconduct.

76.72.  Miller committed willful acts not proper in the regular conduct of proceedings, including: suppressing exculpatory accounting findings; making false inaccurate misrepresentations to the Court regarding professional fee arrangements; pursuing a baseless criminal referral against Deborah Mott; and, using unauthorized computer access to interfere with TSI's business operations.; and falsely representing himself as "federal law enforcement" to intimidate third parties.

77.73.  As a direct and proximate result of Miller's abuse of process, Defendants have suffered actual damages in an amount to be proven at trial but no less than $1300 million, together with punitive damages, interest, costs, and attorneys' fees.

### PRAYER FOR RELIEF

**WHEREFORE**, in light of the reasons explained above and any and all other reasons the Court may found relevant, Defendants respectfully request that this Court allow Defendant to pursue this Amended Counterclaim and enter judgment in their favor and against the Trustee George L. Miller, individually and in his capacity as the Trustee for TSI, as follows:

A. Compensatory damages in an amount to be proven at trial, but no less than $10300 million;

B. Punitive damages in an amount sufficient to deter similar misconduct;

C. An accounting of all fees and disbursements paid or approved in connection with this case;

D. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

E. Attorneys' fees and costs; and

F. Such other and further relief as the Court deems just and proper.

Date: May 1, 2026
Wilmington, Delaware

Respectfully submitted,

**JOHN MALIK, ESQ.**
/s/ JOHN S. MALIK
Attorney at Law
100 East 14th Street
Wilmington, DE 19801
Phone: 302-427-2247
Email: jmalik@malik-law.com

**RANDY M. MOTT, ESQ.**
/s/ Randy M. Mott
DC Bar 211037
1627 K St. N.W. Suite 400
Washington, DC 20006
Phone: 202-470-0106
Email: randymott@rmottlaw.com
(admitted pro hac vice)

*Counsel to Deborah Evans Mott,
Steven M. Acosta, Christopher
Mott, and John S. Maciorowski*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Bankruptcy Court for the District of Delaware by using the CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ John S. Malik

John S. Malik

*Counsel to Deborah Evans Mott,*
*Steven M. Acosta, Christopher Mott,*
*and John S. Maciorowski*