**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG) |
| GEORGE L. MILLER,<br><br>Plaintiff,<br><br>v.<br><br>DEBORAH EVANS MOTT, *et al.*,<br><br>Defendants. | Adv. Proc. No. 23-50004 (CTG)<br><br>**Related Docket Nos. 37, 614** |

**MEMORANDUM OPINION**

# TABLE OF CONTENTS

MEMORANDUM OPINION ........ i

Introduction and summary ........ 1

Jurisdiction ........ 6

Factual and procedural background ........ 11

1. Background of the debtor and its business ........ 13
2. The Florida litigation ........ 15
3. The transfers at issue ........ 25
4. The bankruptcy filing and conversion of the case to chapter 7 ........ 29

A. The chapter 11 petition and first-day motion ........ 29

B. Discovery disputes surrounding judgment creditors' motion to dismiss ........ 32

C. Judgment creditors' motion for sanctions ........ 35

D. Disposition of the motion to dismiss ........ 36

5. The preliminary injunction ........ 40
6. Imposition of sanctions on Randall Mott ........ 46
7. Failure to cooperate in discovery and spoliation ........ 51
8. The settlement of the judgment creditors' claims ........ 54
9. The motion seeking abandonment of the alleged receivables ........ 56
10. Mott's indictment and this Court's decision to stay proceedings, in part ........ 60
11. Violation of preliminary injunction ........ 61
12. Events leading up to trial ........ 64
13. Trial and post-trial matters ........ 69

Analysis ........ 69

I. The motion to reconsider the denial of the motion to recuse will be denied. ........ 69

II. Each of the challenged transactions was made with the actual intent to hinder, delay or defraud creditors and is thus avoidable as an intentional fraudulent conveyance. ........ 70

A. The record shows that the transfers made after May 2018 were made with the actual intent to hinder, delay or defraud creditors. ........ 72

B. For the transfer made in April 2018, the Court will infer intent to hinder, delay or defraud creditors from the defendants' spoliation and Mott's failure to cooperate in discovery. ........ 75

C. The remaining elements necessary to avoid and recover the transfer are satisfied. ........ 82

III. The record supports a finding that Mott and Acosta are liable for breaches of fiduciary duty. ........ 83

IV. The record does not support piercing the corporate veil between the debtor and Mott but does support piercing the veil between the debtor and Addy Road ........ 89

V. The trustee is entitled to some of the equitable relief he seeks; the Court will not award attorneys' fees. ........ 93

A. Protection against the dissipation of assets is most appropriately sought on a postjudgment basis; to avoid creating a gap that would permit dissipation, the Court will leave the preliminary injunction in place pending consideration of a Rule 69 motion. 95

B. The Court will order an accounting. ........ 98

C. The trustee is entitled to a constructive trust over the identified real properties; the Court will not impose a constructive trust over the funds held by the Government. ........ 99

VI. None of the defendants' other arguments has merit. ........ 101

A. The defendants may not relitigate the allowance of the Florida judgment creditors' claims. ........ 101

B. Defendants' various arguments grounded in principles of governmental secrecy are unsuccessful. ........ 104

C. There is no basis to exclude debtor's emails obtained by a third-party subpoena. ........ 105

D. The Court properly precluded Mott and Acosta from testifying at trial. ........ 106

E. The single-recovery rule applies. ........ 108

Conclusion ........ 110

Exhibit A

Exhibit B

Exhibit C

## Introduction and summary

This Memorandum Opinion marks the culmination, if not the conclusion, of nearly five years of active litigation before this Court in the *Team Systems International* bankruptcy case. The debtor was a government contractor.[1] It supplied bottled water, under a contract with the Federal Emergency Management Agency, to Puerto Rico in response to Hurricane Maria. It also apparently provided fuel to the U.S. military. The debtor's former principals, now defendants in this adversary proceeding, also contend that the debtor provided components and logistical support to other military and intelligence agencies.

The bankruptcy filing, originally a chapter 11 case that the debtor filed in January 2022, followed the entry of judgment against the debtor in a lawsuit filed by two of the companies that supplied the debtor with the water that it delivered in Puerto Rico.[2] Those judgment creditors moved to dismiss the bankruptcy case, alleging that the bankruptcy was just a ploy to frustrate their efforts to collect on

---

[1] Team Systems International, LLC is referred to as "Team Systems" or the "debtor." The defendants who remain parties to this action are Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC (referred to as "Addy Road"), Team Systems International Southeast LLC (referred to as "Southeast") and Brent Road, LLC (referred to as "Brent Road"). When this Memorandum Opinion refers to Deborah Evans Mott, she is typically referred to as "Mott," except where the use of the full name is necessary to avoid ambiguity. When referring to Christopher Mott (her son) or Randall Mott (her ex-husband, and counsel for the defendants), the Court will use their full names. Mott, Steven Acosta, Christopher Mott, and Maciorowski are also referred to collectively as the "members." The Court previously entered default judgments against TSI Education & Training, Inc. (referred to as "Education") and TSI Gulf Coast, LLC (referred to as "Gulf Coast").

[2] Those creditors, GPDEV, LLC and Simons Exploration, Inc., are referred to as the "judgment creditors." The litigation in Florida was captioned *GPDEV, LLC and Simons Exploration Inc. v. Team Systems International, LLC*, N.D. Fla. No. 18-cv-00442. That lawsuit is referred to as the "Florida litigation."

their judgments. The hearing on that motion to dismiss unearthed substantial evidence of wrongdoing by the debtor and its principals, both before and after the filing of the bankruptcy case. At the behest of another creditor, and with the acquiescence of the moving parties, the Court converted this case to one under chapter 7, rather than dismiss it. George Miller was appointed as chapter 7 trustee. In January 2023, he filed this adversary proceeding against the defendants, asserting claims of fraudulent conveyance, breach of fiduciary duty, and veil piercing, among other claims.

The Court heard witness testimony on July 6, 7, and 8 of 2026. The parties cleaned up some evidentiary issues on the morning of July 9, 2026.[3] The Court heard closing arguments on July 10, 2026. The parties filed their principal posttrial briefs on July 24, 2026, though additional briefing regarding post-trial matters continued through August 24, 2026. The trial record in this case is extensive and includes hundreds of exhibits. There is much in the nearly five years of procedural history of the dispute in this Court, from the conduct of the main bankruptcy case through the motions practice in this adversary proceeding, that provides important background and context to the evidence presented at trial in the adversary proceeding. As a result, this Memorandum Opinion is lengthy.

[3] The Court attaches, as Exhibit A, a chart that identifies each item that was admitted into evidence. Citations in this Memorandum Opinion to the evidentiary record point to the respective PX (plaintiff's exhibit) or DX (defendants' exhibit) numbers.

Part I of this Memorandum Opinion addresses a motion filed by the individual defendants to reconsider a prior ruling denying a motion to recuse the undersigned judge. That motion is denied.

Part II addresses the fraudulent conveyance claims. The dates and amounts of the transfers are not contested. The only meaningful dispute is whether those transfers were made with an intent to hinder, delay, or defraud creditors. The Court concludes that the trustee has met his burden of proving that the transfers were made with that intent. For most of the transfers, the trustee carries that burden based on the evidence admitted into the record at trial. For the one transfer the debtor made before the time at which the evidentiary record establishes the debtor's fraudulent intent, the Court relies on a negative inference it draws based on Mott's refusal to comply with this Court's discovery rulings.

Specifically, the record before the Court shows that, to disguise the nature of certain of the transfers at issue and to thwart creditors' ability to discover them, the defendants: (1) failed to make disclosures that were legally required; (2) refused to produce documents they were required to produce; (3) falsified business records; (4) fabricated evidence; (5) destroyed evidence; and (6) testified falsely. These are not findings of fact the Court makes lightly. But a fair-minded assessment of the evidence permits no other conclusion. These badges of fraud lead the Court to find that the debtor made these transfers with the actual intent to hinder, delay, or defraud creditors.

As the record shows, the defendants' efforts to conceal the fraud often left readily identifiable evidence of the deception. Mott used whiteout on the debtor's bank statements so that creditors would not see that she was the recipient of certain transfers, but in doing so left a blurred splotch. The trustee then obtained the originals by serving a subpoena on the bank, thus revealing what the defendants had sought to conceal. In an effort to cover up that fraud (by suggesting that the debtor's former counsel, rather than Mott, had applied the whiteout), Acosta filed a sworn declaration falsely claiming that the debtor produced a copy of the bank statement without the whiteout (implying that someone else must have added the whiteout). But Acosta's use of an incorrect Bates number on the fabricated document that he attached to his declaration gave away his scheme.

Part III addresses the claims of breach of fiduciary duty. The Court finds that for each transfer found to be a fraudulent conveyance, both Mott and Acosta breached their fiduciary duties to the debtor. That determination is clear with respect to Mott, who had day-to-day financial responsibilities. It is a closer question for Acosta, whose principal responsibilities were more operational. But as further described below, the Court concludes that the record evidence, together with inferences drawn from spoliation and the failure to meet discovery obligations, supports that conclusion.

Part IV addresses the trustee's veil piercing claims. The Court concludes that the trustee has not met the high burden necessary to pierce the veil between Mott and the debtor, which existed as a government contractor for nearly two decades before the events at issue here. The trustee has, however, met his burden on the

claim that Addy Road was the debtor's alter ego. In Part V, the Court concludes that the trustee is entitled to some but not all of the equitable relief he seeks. And finally, in Part VI, the Court addresses a number of additional points that the defendants have raised, concluding that none of them provides a basis to deny the trustee the relief sought in this action.

As described in the conclusion, the Court has prepared a draft form of judgment, which it has attached as Exhibit C to this Memorandum Opinion. The intent is for this to be a final judgment that permits the parties to appeal to the district court as a matter of right. But appreciating the complexity of the proceedings, the Court believes it appropriate to give the parties the opportunity to comment on the proposed form of judgment before it is entered.

Finally, one additional point warrants mention at the outset. The Court is aware that in an opinion dated October 1, 2026, the United States District Court for the District of Delaware found Mott guilty of making two false statements in the debtor's Statement of Financial Affairs filed in this bankruptcy case, and not guilty of various other claims with which she had been charged.[4] The trial in that criminal case, which took place before Judge Noreika only weeks before the trial in this adversary proceeding, involved some number of overlapping witnesses, and many of the same factual issues as those presented here. This Court's findings and judgment, however, rest solely on its independent assessment of the evidentiary record

[4] *United States v. Mott*, No. CR 24-77, 2026 WL 2958605 (D. Del. Oct. 1, 2026).

presented in this adversary proceeding. The Court does not rely on the findings in the criminal case or give them preclusive effect.

## Jurisdiction

The trustee's fraudulent conveyance claims "arise under" the Bankruptcy Code and are thus within the district court's "arising under" subject-matter jurisdiction provided in 28 U.S.C. § 1334(b).[5] The remaining claims fall within the district court's "related to" jurisdiction under § 1334(b) because of their potential effect on the bankruptcy estate.[6] Those claims have been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

The question whether this Court has the authority to enter final judgment with respect to these claims, while not addressed expressly by the parties in their briefing, warrants a word of discussion. This Court explained in opinions in two separate adversary proceedings in the *Cyber Litigation* bankruptcy case that claims for fraudulent conveyance, while designated as "core" matters under 28 U.S.C. § 157(b)(2)(H), are effectively "*Stern*" claims – ones that cannot be treated as "core matters" consistent with Article III of the Constitution.[7] Under the reasoning

---

[5] 28 U.S.C. § 1334(b); *see also In re Resorts Int'l, Inc.*, 372 F.3d 154, 162–163 (3d Cir. 2004) (describing the three categories of bankruptcy jurisdiction: "arising under," "arising in," and "related-to").

[6] *See Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

[7] *See In re Cyber Litig. Co.*, No. 22-50439, 2023 WL 6938144, at *5 n.41 (Bankr. D. Del. Oct. 19, 2023); *In re Cyber Litig. Co.*, No. 24-50180, 2026 WL 2333223, at *5 (Bankr. D. Del. Aug. 11, 2026). *See also Stern v. Marshall*, 564 U.S. 462 (2011).

of *Executive Benefits*, these claims must be treated as non-core matters.[8] The trustee's fiduciary duty, veil-piercing and alter-ego claims are statutorily non-core claims.

With respect to all of these claims, therefore, the role of the bankruptcy court, absent the consent of the parties, would typically be to make proposed findings and conclusions under Bankruptcy Rule 9033 that would be subject to the district court's *de novo* review.[9]

The trustee, in his amended complaint, expressly "consents to the entry of final orders or judgments by a bankruptcy judge."[10] The defendants have not given express consent. Indeed, in their amended answer, filed in December 2023, they said that they were withholding such consent. "Defendants … do not consent to the issuance by the Bankruptcy Court of findings of fact, conclusions of law, or final orders or judgments."[11]

But since the filing of that paper nearly three years ago, the defendants have otherwise conducted themselves as if they agreed that this Court would hear and determine the claims in this action and have never made any suggestion that the Court's role should be limited to making proposed findings and conclusions. When the defendants filed a counterclaim against the trustee, for example, their prayer for

---

[8] *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 39–40 (2014).

[9] *See* 28 U.S.C. § 157(c)(1).

[10] D.I. 37 ¶ 12.

[11] D.I. 115 at 27.

relief said that they "respectfully ask this Court to enter judgment" on their counterclaim.[12]

The defendants never moved the district court to withdraw the reference over this dispute. Instead, they proceeded to litigate before this Court, including conducting a week-long trial in July. Rather than suggesting that the Court's role was limited to making proposed findings and conclusions, the defendants filed a post-trial brief expressly asserting that "[j]udgment should be entered in favor of the Defendants on all counts."[13] And a post-trial reply brief that defendants filed makes the same point, arguing that "judgment should be entered for the Defendants."[14]

The Supreme Court's *Wellness* decision makes clear that a party's consent to the bankruptcy court's entry of judgment need not be express – implicit consent may suffice.[15] As the Third Circuit explained in *Tribune*, "a party may impliedly consent through his actions rather than his words, and that a litigant's consent gives bankruptcy courts the constitutional authority to enter a final judgments on claims that ordinarily require a ruling by an Article III court."[16] In *Tribune*, the Third Circuit emphasized that when a party asks the court to enter judgment in its favor, it is impliedly consenting to that court's authority to hear and determine the action.

---

[12] D.I. 115-1 at 48 of 49. Defendants later voluntarily dismissed their counterclaims. *See* D.I. 241.

[13] D.I. 646 at 10.

[14] D.I. 652 at 2.

[15] *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–684 (2015).

[16] *In re Tribune Media Company*, 902 F.3d 384, 394 (3d Cir. 2018) (internal quotation, citation, and brackets omitted).

Citing the decision of the Northern District of California in *True Traditions,* the Third Circuit explained that a party seeking summary judgment "in its favor without ever mentioning consent … had impliedly consented to the bankruptcy court's authority to enter final judgment."[17]

The defendants' actions in this case constitute such implied consent. One concern that animated the Court's decision in *Wellness*, "checking gamesmanship," is fully applicable here.[18] Permitting a party to seek the entry of judgment if the court were to rule in its favor, but to require proposed findings and conclusions subject to a district court's *de novo* review if the court were to rule against that party, is a paradigmatic example of the kind of gamesmanship with which the *Wellness* Court was concerned. And that principle fully explains why the Third Circuit commented in *Tribune* that a party's seeking the entry of judgment in its favor constituted its consent to the entry of judgment – regardless of how the court ultimately decided the case.

In fairness, however, there is a difference between the record before this Court and the facts of *Tribune* or the cases on which the *Tribune* court relied. That difference is the defendants' express statement, even if included in an answer filed nearly three years ago, that they were withholding their consent. It is one thing to say that actions can imply consent. But it goes a step further to say that the party's actions can *override* a statement it made expressly and in writing.

---

[17] *Id.* at 395 (citing *True Traditions, LC v. Wu*, 552 B.R. 826, 838 (N.D. Cal. 2015)).

[18] *Wellness*, 575 U.S. at 685.

This Court has not identified Third Circuit authority directed to this question. The Fifth Circuit's decision in *Serta Simmons*, however, addressed exactly this issue. In that case, the so-called Excluded Lenders expressly insisted, in their pleadings, on an Article III adjudication.[19] But because those lenders had themselves filed a motion seeking summary judgment and proceeded to trial without insisting that the court's role was limited to making proposed findings and conclusions, the bankruptcy court held that they had consented to the entry of judgment. "The Excluded Lenders have also impliedly consented to this Court's authority to enter final judgment in the Adversary Proceeding by requesting summary judgment from this Court. The Court questions the Excluded Lenders' lack of consent arguments regarding the Adversary when (i) no objection was made at the summary judgment stage; (ii) the parties proceeded to trial while voicing no objection; and (iii) the only basis for nonconsent is found in a pleading filed prior to one or both of the foregoing."[20]

The Fifth Circuit, while reversing the bankruptcy court's ruling on the merits, did not disturb the bankruptcy court's finding that the Excluded Lenders had consented to the entry of judgment. "[T]he Excluded Lenders failed to object at the summary judgment stage, before trial, and at trial."[21] The court noted that "in light of considerations like judicial efficiency and checking gamesmanship, the bankruptcy

---

[19] *See* Answering Defendants' Answer to the Amended Adversary Complaint, Counterclaims and Third-Party Claims at 8, *In re Serta Simmons Bedding, LLC*, Adv. No. 23-9001 (Bankr. S.D. Tex. June 6, 2023), Dkt. No. 68 ("In submitting this Answer, the Excluded Lenders do not consent to the entry of final orders or judgments by the Court.").

[20] *In re Serta Simmons Bedding, LLC*, No. 23-90020, 2023 WL 3855820, at *8 (Bankr. S.D. Tex. June 6, 2023) (citation omitted).

[21] *In re Serta Simmons Bedding, LLC*, 125 F.4th 555, 574 (5th Cir. 2024).

court did not err when it found that the Excluded Lenders implicitly consented to non-Article III adjudication."[22]

This Court is persuaded by the Fifth Circuit's analysis of this issue. On the facts, this case is at least as strong a case for consent as was *Serta*. The defendants here not only failed to raise the question at any point after the filing of their answer, but their *post-trial* submissions expressly sought the entry of judgment. While the *Tribune* court called that a form of implied consent, one could, in fairness, also describe that statement as a form of express consent. In either case, for the reasons the Third Circuit explained in *Tribune* and the Fifth Circuit described in *Serta*, this Court is satisfied that the defendants consented to this Court's entry of judgment, as the Supreme Court described it in *Wellness*.

To the extent the district court on appeal were to disagree with this conclusion, however, that court could of course proceed to treat this Memorandum Opinion as proposed findings and conclusions issued pursuant to 28 U.S.C. § 157(c)(1), and engage in *de novo* review as provided in Bankruptcy Rule 9033. In view of the conclusion set forth above, however, this Court will enter judgment in favor of the trustee rather than issuing proposed findings and conclusions that recommend the entry of such a judgment by the district court.

**Factual and procedural background**

The matters now before the Court are somewhat unusual (though by no means unprecedented) in that the subject of the litigation includes the conduct of the

[22] *Id.* (citations and quotations omitted).

litigation itself. Most prominently, the trustee argues that the defendants engaged in the fabrication of evidence, both in this bankruptcy case and in the prior Florida litigation. The trustee points to those alleged fabrications as evidence that, among other things, certain of the underlying transfers that the alleged fabrication was designed to conceal were made with the intent to hinder, delay, or defraud creditors. As a result, lawyers who were involved in earlier stages of this case, and the Florida litigation, testified either at trial or by deposition.

For this reason, in describing the events at issue, the Court believes it is most helpful to walk through the events in roughly chronological order, rather than (as might be more customary) setting forth the procedural posture of the bankruptcy case and this adversary proceeding separately from the Court's factual findings.

In addition, the defendants acknowledged during closing argument that they were not contesting the fact that the transfers were made on the dates and to the persons or entities alleged by the trustee.[23] Accordingly, in the interest of simplicity, a chart setting out those transfers is attached as Exhibit B to this Memorandum Opinion. That exhibit lists the 202 transfers at issue in chronological order, identifying the date, amount, transferor, transferee(s), and the persons or entities for whose benefit the transfers were made. The first 199 transfers were transfers from the debtor to an initial transferee. The last three transfers are subsequent transfers from an initial transferee to a subsequent transferee.

[23] July 10, 2026 Hr'g Tr. at 90 (noting that those issues were essentially "stipulated to" and that the only issue was the one of the intent of the transferor).

### 1. Background of the debtor and its business

The debtor was organized as a Delaware limited liability company in 2001.[24] Its members were Deborah Evans Mott, Steven Acosta, Christopher Mott, and John S. Maciorowski, with Deborah Evans Mott owning a 75 percent interest; Acosta owning 20 percent; Christopher Mott owning four percent and Maciorowski owning one percent.[25]

The debtor was a government contractor. The work of the company was performed by its members – it had no employees.[26] Most of the evidence in the record regarding the nature and scope of the debtor's prepetition business comes from the testimony of Christopher Mott. As will be further described below, the Court harbors reservations about the credibility of Christopher Mott as a witness. In addition, the Court is sensitive to the fact that the defendants in this case have sought, at various times, to hide behind the veil of secrecy associated with governmental military secrets to prevent the detection of their own misconduct. That said, for the purpose of providing the background of the debtor's business, the Court will set forth the facts as Christopher Mott described them, assuming (for the purpose of providing this background) that this testimony was true.

Before Christopher Mott joined the debtor, its business was primarily focused on general contracting for military construction, with some commercial design

[24] PX 4.

[25] PX 4, Schedule 3.2.

[26] Main Case D.I. 3 ¶ 19.

work.[27] The business of the debtor changed over time, and after Christopher Mott joined, the debtor shifted more of its activity into government contracting.[28] The debtor identified opportunities to work with the federal government, including through agencies such as the Federal Emergency Management Agency, the Defense Logistics Agency, the Naval Sea Systems Command, the Army Missile Command, and various intelligence agencies.[29]

For the Federal Emergency Management Agency, the debtor had a contract to deliver water to Puerto Rico in response to Hurricane Maria.[30] For the various military branches and agencies, the company's opportunities "included 30 or 40 different contracts for weapon systems and … drawings for components for radar systems, weapon systems, aircraft missiles, and a lot of weapon tech."[31] Beyond these weapons systems and component drawings, the debtor provided fuel to an assortment

[27] July 8, 2026 Hr'g Tr. at 176 ("[P]rior to [Christopher Mott's] work [TSI] was a general contractor that did military construction and … did some commercial stuff, too, commercial design work."); *id.* at 144 ("TSI … was doing military construction and projects with … a [security] clearance.").

[28] *Id.* at 145 ("[Christopher Mott] hooked into suppliers because [he] had become friends with them over the years and [TSI] started doing military work as a contractor.").

[29] *Id.* at 145–146 ("[The debtor] work[ed] with the federal government and work[ed] with the customers, with the intelligence agencies, the DLA, the Navy," the Naval Sea Systems Command and the Army Missile Command at Redstone Arsenal).

[30] July 6, 2026 Hr'g Tr. at 33 ("The [debtor's FEMA] contracts primarily involve … the sourcing, supply, and delivery of bottled water to certain locations that have experienced natural disasters."); July 8, 2026 Hr'g Tr. at 159 (describing the "FEMA contract" as in response to "the disaster in Puerto Rico").

[31] July 8, 2026 Hr'g Tr. at 144–145; *see also id.* at 161 ("We had some contracts for some missile tech and some guidance systems and some stuff.").

of military branches and federal agencies.[32] Christopher Mott testified that his personal contacts were critical to the company's development of its fuel supply business.[33]

Christopher Mott also testified that the debtor was the nation's only small business that could provide fuel to military customers in "every single port of the world."[34] He said that the company had "locked up the fuel in the Persian Gulf and the Gulf of Oman for five years," and therefore "had first right of refusal for every drop of fuel that would have gone to the blockade of Iran."[35] He asserted (and again, the Court makes no finding that this statement is true) that had it not been for the conversion of the debtor's voluntary chapter 11 case to chapter 7, the company would have obtained contracts that would have earned it "probably in the hundreds of millions" of dollars in revenue.[36]

**2. The Florida litigation**

In 2017, the debtor obtained a contract from FEMA to provide bottled water during emergency operations. Pursuant to the contract, the debtor delivered bottled

---

[32] July 6, 2026 Hr'g Tr. at 33 ("The contracts primarily involve[d] the … deliver[y] [of] fuel to … the U.S. military."); July 8, 2026 Hr'g Tr. at 145 ("[F]rom there, [TSI] went into fuel.").

[33] July 8, 2026 Hr'g Tr. at 145 ("[TSI] went into fuel because [Christopher Mott] used the fuel vendors that [he] had established in the Middle East and [he] had established from working for Royal Caribbean and for the undisclosed government agency…."); *id.* at 188 ("[Christopher Mott] had a network developed from working with Royal Caribbean and working with the intelligence agencies.").

[34] *Id.* at 188.

[35] *Id.* at 188–189.

[36] *Id.* at 189.

water to Puerto Rico in response to Hurricane Maria.[37] In connection with that contract, the debtor entered into agreements with two entities – GPDEV and Simons – who were to supply the water bottles that the debtor would deliver to Puerto Rico.[38] The contract entitled GPDEV and Simons to a 25 percent commission on the net income TSI actually realized from amounts paid by the government agencies.[39] But the contract was, according to the district court judge who presided over the Florida litigation, "astonishingly cryptic" about the scope of the services and payments that would be subject to the 25 percent commission.[40]

The first evidence in the record of a payment dispute arising between Team Systems and GPDEV and Simons is correspondence from May 2018 when the judgment creditors apparently took issue with the manner in which Team Systems was calculating their commission.[41] GPDEV and Simons ultimately filed suit against Team Systems in September 2018.[42]

As noted above, Exhibit B lists, in chronological order, all of the transfers Team Systems made to or for the benefit of any of the defendants in the four years before the petition date that are challenged on fraudulent conveyance grounds. Based on the correspondence described above, the Court concludes that as of May 2018,

---

[37] Main Case D.I 3 ¶ 9.

[38] *Id.* GPDEV, LLC is referred to as "GPDEV." Simons Explorations Inc. is referred to as "Simons." GPDEV and Simons are referred to collectively (following the district court's entry of judgment in their favor) as the "judgment creditors."

[39] PX 184, Ex. 1 ¶ 1.

[40] PX 194 at 2 of 10.

[41] PX 247; PX 248; PX 249.

[42] PX 183.

Deborah Mott was aware that GPDEV and Simons were taking issue with the manner in which Team Systems had calculated the amounts owed to them under their contract.

As described below, Team Systems committed fraud in the Florida litigation by claiming that amounts paid by the company that were just for the benefit of its members were actually costs associated with delivering water. The fact of that fraud demonstrates that Mott knew that if the contractual obligations were calculated honestly, Team Systems would owe a sizeable debt. And there is in fact substantial evidence that Mott fraudulently overstated Team Systems' expenses in an effort to reduce the amount owed to GPDEV and Simons. The Court thus finds by a preponderance of the evidence that Mott was aware that the debtor owed GPDEV and Simons a substantial sum. That liability, in the end, drove the company into bankruptcy. The Court accordingly finds that those transfers made to the defendants (all of whom were owners or affiliates of the debtor) after that point in time (which is indicated by the blue line in the chart appended as Exhibit B and includes all of the transfers listed in Exhibit B except for the first one) were made with the knowledge and intent that the transfers would put the funds outside the reach of the company's creditors. These transfers were thus made with the actual intent to hinder, delay, or defraud creditors.

More specifically, the Court finds that transfers made after that point cannot be described as ordinary distributions of profits made by a limited liability corporation to its members, which profits could properly be distributed to the

members while leaving the limited liability corporation with sufficient capital to meet its expected operating expenses. Rather, after that point, the Court finds that the transfers were made for the purpose of frustrating creditors' collection efforts.

The record before this Court reveals that Team Systems first defrauded GPDEV and Simons in how it calculated their commissions and then committed fraud on the court in the conduct of the Florida litigation. In connection with the motion to dismiss the bankruptcy case, for example, it came to light that the debtor had inflated the expenses that it said were associated with the delivery of water under the contract. Team Systems had contended that certain amounts that it paid to a company called "All Aqua" were incurred in connection with the contract to provide water to hurricane victims. All Aqua, however, does not supply bottled water. Rather, the $70,000 that the debtor paid to All Aqua was for a custom swimming pool and spa that it installed at the home that Mott and Maciorowski owned in Ormond Beach, Florida.[43]

In its proposed findings of fact, the trustee points to a number of other expenses that the trustee alleges the debtor falsely claimed were related to the contract.[44] The preponderance of the evidence does indeed indicate that at least some of these claims were in fact fraudulent. As one example, PX 203 is an email that debtor's counsel in the Florida litigation sent to the plaintiffs, purporting to show expenses associated

---

[43] *In re Team Sys. Int'l LLC*, 640 B.R. 296, 313 (Bankr. D. Del. 2022).

[44] D.I. 647 ¶ 242.

with the contract. The spreadsheet attached to that exhibit lists a March 20, 2018 payment of $112,228.80 as such an expense.[45]

The record in this case also includes a cancelled check, drawn on one of the debtor's bank accounts, dated March 19, 2018, in the amount of $112,228.80, payable to Mercedes-Benz of Florida, a car dealership.[46] The record is undisputed, however, that the debtor does not own a car and listed no such vehicle as among its assets. And the record makes clear that this purchase was not for an expense related to the delivery of water to the victims of Hurricane Maria, as the debtors contended in the Florida litigation. The trustee points to many other examples of alleged fraud. For purposes of resolving the current dispute, however, the Court does not believe it necessary or appropriate to address each instance of alleged fraud. For the purpose of this adversary proceeding, it is sufficient to find that Team Systems engaged in fraud in the Florida litigation, and that these acts of fraud reveal that Mott was aware that the company in fact owed substantial amounts to GPDEV and Simons.

In addition, and at least equally relevant for current purposes, it is clear that Team Systems engaged in egregious litigation misconduct in the Florida litigation. Not long after that lawsuit began in earnest, the district judge presiding over it began to grow impatient with Team Systems' failure to meet its discovery obligations. In a May 2021 order described as an "Order Addressing Late and Incomplete Document

---

[45] PX 203 at 5, sixth entry from the bottom.

[46] *See* PX 179; *see also* July 7, 2026 Hr'g Tr. at 106–107.

Production," the court reviewed the history of the dispute.[47] It explained that the parties' disagreement centered on whether Team Systems' obligation to pay a commission was limited to a particular "contract line item number," or instead included all amounts paid under the contract.[48]

At first, Team Systems produced documents that only related to the contract line item that it asserted was the subject of its obligation to pay a commission.[49] Even so, the district court explained that Team Systems "provided a summary of revenue and expenses that was plainly incorrect, substantially understating revenue."[50]

After the district court denied Team Systems' partial summary judgment motion on the claim that the contract covered only a single line item, it ordered the company to produce documents showing its expenses related to the plaintiffs' entire claim.[51] In what the district court described as an "egregious flouting of the court's orders," Team Systems refused to do so.[52] The district court explained that the plaintiffs thereafter filed an *in limine* motion to preclude Team Systems from presenting evidence of expense for which documentation had not been provided.[53] In response, Team Systems' counsel reported to the court that no such documents

---

[47] PX 192.

[48] *Id.* at 2.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 2–3.

[52] *Id.* at 3.

[53] *Id.*

existed.[54] Thereafter, however, after Team Systems' prior counsel withdrew and new counsel appeared, Team Systems produced documents that it "had said earlier did not exist."[55] At an evidentiary hearing sought by the plaintiffs for the purpose of establishing that "the documents were fraudulent," the district court explained, "[t]he plaintiffs made a strong showing that something was amiss."[56]

Discovery taken in this adversary proceeding has shed further light on what transpired there. In a deposition taken by the chapter 7 trustee that was admitted into evidence here, Team Systems' original counsel in the Florida litigation (Hal Litchford from Baker Donelson) acknowledged that he had produced information to the plaintiffs and made representations to the court that he later learned (upon receiving documents from the plaintiffs) were false.[57] Specifically, Litchford testified that documents produced by Team Systems showed that it had received a total of $27.3 million in payments from FEMA under the contract.[58] Thereafter, however, the plaintiffs obtained discovery from FEMA itself that showed that FEMA had paid Team Systems approximately $37.5 million under the contract.[59] When he learned of

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] PX 535 at 101–102. It is settled law that in the context of a chapter 7 bankruptcy, the trustee succeeds to the debtor's attorney-client privilege and is therefore authorized to waive the privilege by disclosing otherwise privileged communications. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985).

[58] *See* PX 535 at 77. *See also* PX 203 at 1 (email from counsel for Team Systems to plaintiff's counsel stating that "TSI has received just over $27M under the [contract]"); *id.* at 2 (chart purporting to show approximately $27.3 million in payments).

[59] PX 215.

Team Systems' false statements, Litchford made clear, in an email he sent to Mott, that he was required to take corrective action.

> As lawyers, we have an absolute professional duty to disclose and rectify any incorrect discovery or any untrue or misleading statement we have made to the Court upon discovery of the problem. In order to comply with this obligation as officers of the Court, we are required not only to inform the Court and opposing counsel but take all steps necessary to fully rectify the situation.[60]

Mott responded to that email by firing Baker Donelson. "Please be advised that after reading your letter, the TSI LLC Management Committee has concluded that Baker Donelson does not fully comprehend the facts and intricacies of this case."[61] The last paragraph of her email underscored her point. "You are hereby formally terminated."[62]

The Smith Law Firm thereafter replaced Baker Donelson as counsel to Team Systems. After the district court set a March 18, 2021 deadline for Team Systems to produce documents, Mott sent three documents to Wayne Smith (the lead lawyer from the Smith Law Firm) that are described as "transaction reports."[63] Upon receiving these documents, Smith asked Mott whether the documents were "produced by your accounting system."[64] She responded that they were not, but that the documents "were downloaded from the bank servers. I just saved it as a PDF to email it."[65]

---

[60] PX 220 at 4.

[61] *Id.* at 1.

[62] *Id.*

[63] PX 235; PX 236; PX 237.

[64] PX 239.

[65] *Id.*

That statement, however, was false. In fact, the so-called transaction reports show payments having been made to entities such as "Dart" and "TRBR," with notations indicating that the payments were made for "transport." Team Systems' underlying bank statements, however, show transfers out of its bank accounts, on the same dates and the same amounts as those in the "transactions reports," with the payments being made to Deborah Mott and Christopher Mott.[66] Mott also failed to provide Smith with any of the underlying source documents demonstrating the expenses reflected in the "transaction reports," despite his requesting those documents.[67]

Significantly, Smith's notes of an April 9, 2021 telephone call with Mott and Acosta indicate that Mott claimed that Baker Donelson was responsible for the falsified documents. "Debbie thinks Baker Donelson altered TSI docs," Smith wrote in his handwritten notes.[68]

In light of the defendants' claims (discussed in detail below) that falsified documents produced in this bankruptcy case were altered by the debtor's counsel without Mott's knowledge, this accusation is a significant one, in that it establishes an unmistakable pattern. Based on this Court's review of Litchford's deposition

---

[66] *Compare* PX 236 at 9 (first entry) (transaction report, showing $100,000 payment to DART on Sept. 10, 2018), *with* PX 56 at 50 (bank statement, showing wire transfer of $100,000 to Deborah Mott on Sept. 10, 2018); *compare* PX 237 at 10 (first entry) (transaction report, showing $51,000 payment to Dart on Oct. 22, 2018), *with* PX 56 at 57 (bank statement, showing $51,000 wire transfer to Christopher Mott on Oct. 22, 2018); *compare* PX 237 at 12 (first entry) (showing $20,000 payment to TRBR on Dec. 3, 2018), *with* PX 56 at 92 (bank statement, showing $20,000 wire transfer to Christopher Mott on Dec. 3, 2018).

[67] PX 244 at 2–3.

[68] PX 242.

testimony and the documents at issue, this Court has little doubt (and hereby finds by a preponderance of the evidence) that in a conversation with Smith, Mott falsely accused Baker Donelson of having altered documents that she had, in fact, fabricated herself.

Four days later, Smith wrote to Mott to say that he intended to move to withdraw as counsel.[69] He later relented, however, and proceeded to try the case. In the middle of the trial, Team Systems sought to amend its answer to add an affirmative defense that the consulting agreement was an illegal contract on the theory that the commission related to procuring the contract, making it (in effect) an illegal kickback.[70] The district court denied the motion for leave to amend the answer, both on the ground that the defense is not "well-founded as a matter of law" and because "the amendment comes way too late."[71]

A jury ultimately returned a verdict in favor of GPDEV for $2,770,885 and in favor of Simons for $2,483,722.[72] The court entered judgment in favor of the plaintiffs, adding $527,140.32 in prejudgment interest for GPDEV and $464,358.46 for Simons.[73]

[69] PX 244 at 3–4.

[70] PX 254 at 419–420.

[71] PX 255 at 524.

[72] *Id.* at 620.

[73] PX 183, docket entries 305, 306; Main Case D.I. 3 ¶ 12.

Team Systems thereafter appealed the judgments to the United States Court of Appeals for the Eleventh Circuit.[74] The district court's docket, however, shows that the district court denied Team Systems' motion for a stay pending appeal, and that GPDEV and Simons immediately thereafter began to exercise creditor remedies, including obtaining writs of garnishment.[75]

**3. The transfers at issue**

The story of the transfers at issue covers the four-year period leading to the bankruptcy filing and accordingly does not fit neatly with a chronological description of events. The transfers themselves are set forth, in chronological order, in the chart appended as Exhibit B to this Memorandum Opinion. The Court finds that the voluminous record evidence supports the conclusions set forth on that chart regarding the dates and amounts of the transfers, and the identify of those defendants for whose benefit the transfers were made. Indeed, defendants do not challenge any of those conclusions.[76] The Court accordingly finds that in the four years before the bankruptcy filing, the debtor transferred: $10,115,923.68 to or for the benefit of Deborah Mott; $5,507,428.01 to or for the benefit of Maciorowski; $4,910,470.10 to or for the benefit of Christopher Mott; $1,788,665.69 to or for the benefit of Steven

[74] PX 183, docket entry 311.

[75] PX 183, docket entries 319–322, 325–328, 343–344.

[76] *See* July 10, 2026 Hr'g Tr. at 90 (acknowledging that defendants do not "dispute the fact of the transfers as alleged" and that "the only question on the fraudulent conveyance claim is a question of intent").

Acosta; $4,006,343.10 to or for the benefit of Addy Road; and $2,293,091.63 to or for the benefit of Southeast.[77]

Five sets of transfers, however, warrant specific mention.

*First*, in April 2018, Team Systems transferred $319,849.91 to Southern Title Holdings. (This is the first transfer on the chart.) As described above, this transfer occurred before Mott became aware that GPDEV and Simons took issue with the way in which Team Systems had calculated the amounts due under the parties' contract.

In the Florida Litigation, Team Systems identified that payment as having been made "for delivering water to Puerto Rico," and therefore as an expense that operated to reduce the commission due to GPDEV and Simons.[78] In truth, Southern Title Holdings was the company that handled the closing on the purchase of a home acquired by Mott and Maciorowski in Ormond Beach, Florida.[79] The fact that Team Systems sought to make a fraudulent use of the transfer, however, is not the same as establishing that the transfer was made with the intent of hindering, delaying, or defrauding creditors. As further described below (in Part II.B of this Memorandum Opinion), the conclusion that this transfer is avoidable as an actual fraudulent conveyance accordingly depends on the negative inference that the Court will draw from Mott's failure to comply with her discovery obligations.

---

[77] As further described below, Addy Road was also a subsequent transferee of $2,208,519.03 in transfers originally made to Southeast. Accordingly, the total transfers received by Addy Road come to $6,214,862.13.

[78] PX 213 at TSI 452 (twelfth entry from the top).

[79] PX 132.

*Second,* in June and July of 2019, Team Systems made three transfers (nos. 60, 67, and 69 on the chart) to the law firm of Tunnell & Raysor, totaling approximately $950,000, that were used to purchase a house on Addy Road in Bethany Beach.[80] Defendant Addy Road was formed as a Florida limited liability company in May 2019, just after the property in question was listed for sale.[81] Addy Road acquired the real property in question in July 2019.[82]

*Third*, on February 27, 2020, Team Systems made two transfers, totaling $3,050,000 to Addy Road.[83] (These transfers are nos. 107 and 108 on the chart.) Defendants produced a one-page document that purports to be an invoice dated January 4, 2019 issued by Addy Road LLC, in the amount of $2,999,998.60, which purports to be for "logistics and fuel services."[84] Addy Road, however, was not formed until May 2019. The record therefore shows, and the Court finds, that the invoice in question was fabricated.

*Fourth*, in mid-2020, while the Florida litigation was ongoing, Team Systems made a series of transfers, totaling approximately $416,000, that were used to acquire

---

[80] PX 57 at P0002384; PX 58 at P0002405, P0002411.

[81] PX 78 at P0004490.

[82] PX 74.

[83] PX 59 at P0002556, P0002559.

[84] PX 83.

real property in Blue Springs, Missouri.[85] (These transfers are nos. 129, 136, and 137 on the chart.) The property was titled in Mott's name.[86]

*Fifth*, in May 2021, Mott closed Team Systems' bank accounts and withdrew $1,822,336.37 from one account and $470,583.01 from another.[87] (These are transfers nos. 170 and 171 on the chart.) These amounts were deposited into new bank accounts held by defendant Southeast.[88] Then, on November 12, 2021, Mott closed Southeast accounts and withdrew the amounts in those accounts – $385,536.01 in one account and $1,822,955.55 in another, in cashier's checks.[89] (These are transfers 200 and 202 on the chart.) Significantly, the issuance of these cashier's checks occurred at the same time that, as the Florida district court docket reveals, GPDEV and Simons were seeking to exercise creditor remedies and seize Team Systems' assets.[90] The record accordingly shows, and the Court hereby finds, that Mott moved these funds for the express purpose of frustrating creditors' legitimate efforts to collect on a valid judgment.

---

[85] These payments are reflected on the bank statements and other documents in the record at PX 142 at P0002623, PX 143, PX 144, PX 145 at P0002670, PX 146 at P0002676, and PX 148 at P0004553.

[86] PX 147 at P0004572.

[87] PX 65 at P0004020; PX 66; PX 67 at P0003916; PX 68.

[88] PX 95; PX 96; PX 99; PX 100.

[89] PX 97 at P0003819; PX 98; PX 101 at P0003835; PX 102; PX 103 at P00010036–P00010039, P0010042–P0010049.

[90] *See* PX 183, docket entries 325–328.

### 4. The bankruptcy filing and conversion of the case to chapter 7

For the purposes of the trustee's actual fraudulent conveyance claim, the intent of the transferor that bears on the claim is the intent at the time of the transfer. And while the transfers that are the subject of the trustee's claim were made in the period *before* the bankruptcy filing, the Court nevertheless believes it necessary and appropriate to relate, in some detail, conduct that occurred thereafter, during the bankruptcy case itself. That is so for two principal reasons. *First*, it is settled law that a party's actions, after it makes a transfer, to conceal or cover up the transfer may constitute a "badge of fraud" that supports an inference that the party made the transfer with actual fraudulent intent. Here, despite the obligations of the debtor to conduct its affairs in a transparent manner and the obligations of defendants in civil litigation to cooperate in discovery, the defendants engaged in extensive efforts to hide many of the transfers from the trustee. And *second*, the Court has determined that it is appropriate to draw certain inferences against the defendants as a result of their failure to meet their discovery obligations and refusal to comply with this Court's orders.

#### A. The chapter 11 petition and first-day motion

On January 18, 2022, with the debtor having failed to respond to the judgment creditors' post-judgment discovery requests issued in the Florida lawsuit, the judgment creditors moved the district court for an order to show cause as to why

Team Systems and Mott should not be held in civil contempt.[91] That same day, the debtor sought bankruptcy protection in this Court.[92]

Mott was the first-day declarant. She asserted that the chapter 11 "breathing spell" would give the debtor time it needed to appeal the judgment in the Florida litigation and collect on two receivables due to it from FEMA, which she said were worth a combined $20.3 million.[93] Mott asserted that the first receivable the debtor was owed pertained to FEMA's nonpayment of a $13.5 million invoice Team Systems sent to FEMA.[94] The invoice was, Mott claimed, for a reduction in the quantity of bottled water FEMA ordered, and the claim was pending before the U.S Civilian Board of Contract Appeals.[95] Mott said in the declaration that she expected a decision in that case in two to four months.[96]

The second receivable, estimated at $6.8 million, was for a separate change order claim that had not yet been filed by the debtor.[97] Mott's declaration stated that the debtor could not bid on new government contracts in light of the Florida judgment, but that once it collected the proceeds due to it from FEMA it could resolve

---

[91] PX 183, docket entry 345.

[92] Main Case D.I. 3.

[93] *Id.* ¶¶ 16–17.

[94] *Id.* ¶ 16.

[95] *Id.*

[96] *Id.*

[97] *Id.*

the judgment creditors' claims (regardless of the outcome of the Florida litigation's appeal) and resume its business activities.[98]

The only first-day relief the debtor sought was the continued use of its pre-petition cash management systems.[99] The judgment creditors objected to the cash management motion, arguing that the debtor had engaged in "egregious bad faith," and said that they would promptly file a motion to dismiss the bankruptcy under § 1112(b).[100] Following the January 24, 2022 first-day hearing, the Court granted Team Systems' motion to maintain its prepetition cash management systems on an interim basis, with only minor modifications.[101]

In response, however, to the contention by the judgment creditors that the bankruptcy filing was an effort to circumvent an order in the Florida litigation that would require the debtor to provide financial information to the judgment creditors, the Court noted that it was prepared to hear the judgment creditors' motion to dismiss the bankruptcy on an expedited basis. The Court accordingly set the hearing on the motion to dismiss for February 9, 2022, subject to the judgment creditors filing the motion by January 27, 2022.[102] In addition, the Court permitted discovery on that motion to begin immediately.[103]

---

[98] *Id.* ¶¶ 15, 17.

[99] Main Case D.I. 4.

[100] Main Case D.I. 12 at 5.

[101] *See* Main Case D.I. 33.

[102] Main Case D.I. 39, Jan. 24, 2022 Hr'g Tr. at 63.

[103] *Id.* at 64.

On January 26, 2022, the debtor filed its Statement of Financial Affairs, which was signed by Mott.[104] Section Four of the Statement of Financial Affairs required the debtor to list all "[p]ayments or other transfers of property made within 1 year before filing this case that benefited any insider."[105] The debtor's statement reported payments of $42,352, $10,000, and $119,804 to Christopher Mott, John Maciorowski, and Steven Acosta respectively.[106] The statement made no mention, however, of any transfer to Mott or to Southeast.[107] Additionally, Section 18 of the Statement of Financial Affairs required the debtor to list debtor bank accounts closed within one year of filing.[108] The debtor's statement failed to disclose the two bank accounts that Mott had closed on May 24, 2021.[109]

### B. Discovery disputes surrounding judgment creditors' motion to dismiss

On January 26, 2022, only two days after the first-day hearing, the judgment creditors requested an emergency hearing on a discovery dispute because, they contended, the debtor was refusing to produce documents that were critical to their forthcoming motion to dismiss the bankruptcy.[110] At that hearing, the Court directed the debtor to produce bank statements, tax returns, government contracts, and other

---

[104] Main Case D.I. 29 at 9.

[105] *Id.* at 3.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 5.

[109] *Id.*

[110] Main Case D.I. 30.

information pertaining to the debtor's financial condition.[111] The debtor ultimately did produce certain bank statements and tax returns on February 4, 2022.

On February 7, 2022 the judgment creditors took Mott's deposition as a Rule 30(b)(6) witness.[112] At the time, Team Systems was represented by Curtis Crowther, a partner at law firm, Robinson Cole.[113] Crowther was ultimately called as a witness at the trial in this adversary proceeding.[114] There, he testified that during Mott's deposition, he became concerned about the truthfulness of Mott's deposition testimony. Specifically, Mott testified at her deposition that a payment made to Tunnel & Raysor (the second transfer described under point 3, above) was for work that the law firm had performed on a "memo on the diversity issues in the Florida case."[115]

As Crowther testified at trial, he knew that testimony had to be false.[116] Immediately before Crowther testified at trial, the trustee had called Jamie King, who is the managing partner of Tunnell & Raysor.[117] King had testified that his firm's practice was "primarily real estate" and that he had performed work for Team Systems in connection with the acquisition of real estate located on Addy Road in

[111] *See* Main Case D.I. 43, Jan. 26, 2022 Hr'g Tr. at 15–18.

[112] PX 530 at P0001458–P0001460.

[113] *Id.* at P0001442; *see also* July 7, 2026 Hr'g Tr. at 182–183.

[114] *See* July 7, 2026 Hr'g Tr. at 182.

[115] PX 530 at P0001470.

[116] July 7, 2026 Hr'g Tr. at 246.

[117] *Id.* at 157–158.

Bethany Beach, Delaware.[118] King acknowledged that his firm "does a lot of real estate work in Sussex County [Delaware], particularly at the beach."[119]

When Crowther testified immediately thereafter, he recalled that during Mott's deposition "things were not … appearing correct … or something was not adding up."[120] He explained that "just so you know, I know Tunnell & Raysor …. [T]hey've been practicing in Delaware for a long time…. [I] know what their primary lines of practice are [real estate work, focused on Delaware beach houses]. It's very well known in the local community."[121] He added that when he heard Mott's deposition testimony in which she said that they conducted research into questions of diversity jurisdiction for the Florida litgation "I [was] certainly having some issues about what's going on."[122] While this Court's March 2022 opinion left open the possibility that Mott's deposition testimony may have been merely mistaken, the full context available now persuades this Court, by a preponderance of the evidence, that Mott falsely testified that Tunnel & Raysor had done legal work related to the Florida litigation in order to conceal the fact that Team Systems' funds were used to purchase the Bethany Beach property.

---

[118] *Id.* at 158, 163–165, 163–165.

[119] *Id.* at 173.

[120] *Id.* at 246.

[121] *Id.*

[122] *Id.*

Following Mott's deposition, the judgment creditors asked the Court to defer the hearing on the motion.[123] The debtor agreed to the adjournment and a new hearing date was set for March 9.[124] In the meantime, Robinson Cole moved to withdraw from its representation of the debtor, pointing to the "[f]ailure of the Debtor to fully cooperate" with counsel, the "[f]ailure of the Debtor to promptly communicate necessary information" to counsel and the "existence of significant differences of opinion between Debtor and the Firm that makes continuing the representation unnecessarily difficult."[125] This Court granted the motion to withdraw.[126]

### C. Judgment creditors' motion for sanctions

Just before Robinson Cole moved to withdraw as counsel, the judgment creditors sought discovery sanctions against the debtor, pointing to delays in producing documents and various alleged fabrications.[127] In connection with its order granting Robinson Cole's motion for leave to withdraw, the Court set a February 25, 2022 deadline for the debtor to respond to that motion.[128]

While the debtor failed to file a response by that deadline, Bering Straits, a creditor claiming to be owed approximately $1.5 million in prepetition claims against the debtor, filed a pleading opposing the sanctions motion.[129] Bering Straits argued

---

[123] Main Case D.I. 78.

[124] Main Case D.I. 82 at 1.

[125] Main Case D.I. 91 at 2.

[126] Main Case D.I. 92.

[127] Main Case D.I. 87.

[128] Main Case D.I. 92.

[129] Main Case D.I. 98. Bering Straits Logistics Services, LLC is referred to as "Bering Straits."

that the imposition of sanctions would harm other creditors by reducing the value of the estate and thus creditors' recoveries.[130] The Court ultimately held (in connection with its ultimate disposition of the motion to dismiss the bankruptcy) that while the accusations leveled against the debtor were serious, the evidentiary record presented was insufficient to warrant the imposition of sanctions.[131]

### D. Disposition of the motion to dismiss

In addition to opposing the judgment creditors' sanctions motion, Bering Straits argued in connection with the judgment creditors' motion to dismiss the bankruptcy that it was "in the best interests of creditors and the estate" to convert the chapter 11 case to a chapter 7 case rather than to dismiss it.[132] The judgment creditors ultimately agreed, stating, in response to this Court's order to show cause for why the case should not be dismissed or converted, that they were "begrudgingly recommend[ing] that [the] case be converted to a case under Chapter 7 of the Bankruptcy Code."[133] The U.S. Trustee also argued that the chapter 11 case should be dismissed or converted.[134]

On March 8, 2022, Gellert Scali Busenkell & Brown, LLC (as that firm was then known) entered an appearance on behalf of the debtor as replacement counsel.[135]

---

[130] *Id.*

[131] *Team Sys. Int'l LLC*, 640 B.R. at 321.

[132] Main Case D.I. 65.

[133] Main Case D.I. 105 at 3–4.

[134] Main Case D.I. 102.

[135] Main Case D.I. 115.

That same day, the debtor filed its opposition to the motion to dismiss the bankruptcy.[136]

The Court held an evidentiary hearing on the motion to dismiss on March 9, 2022, which continued on March 14, 2022, with closing argument taking place on March 16, 2022.[137] The Court issued a written opinion on March 30, 2022.[138]

As the opinion explains, the Court found that there was cause to dismiss or convert under § 1112(b) of the Bankruptcy Code, and that (as all of the moving parties requested) conversion to chapter 7 was more appropriate than dismissal.[139] The Court's finding of cause was based on five specific factors.

The *first* was the evidence of the debtor's prepetition misconduct, specifically the fraudulent claim in the Florida litigation (that first came to light in connection with the motion to dismiss) regarding a payment made to All Aqua – a company that installed a custom pool and spa at the home that Mott and Maciorowski owned in Ormond Beach, Florida (described above on p. 18).[140]

The *second* was the evidence of substantial transfers made to insiders in the period before the bankruptcy filing. While the Court now of course has a far more detailed record of those transfers than it did in March of 2022, the Court did hear evidence at the motion to dismiss about Mott's deposition testimony that the payment

---

[136] Main Case D.I. 119.

[137] Main Case D.I. 123, 134, 135.

[138] *Team Sys. Int'l LLC*, 640 B.R. 296.

[139] *Id.* at 320–322.

[140] *Id.* at 313–314.

of $928,843.10 to Tunnell & Raysor was for "a memo on diversity issues in the Florida case."[141] Other evidence in the record, however, made clear that the payment related to the acquisition of the beach house on Addy Road in Bethany Beach.[142] The Court concluded (without ruling out the possibility that Mott had made a mistake, rather than having knowingly given false testimony) that Mott's deposition testimony was not credible and concluded that this factor counseled against a finding of good faith.[143]

The *third* factor was what the Court described as serious questions about the debtor's conduct in the bankruptcy case. Specifically, the debtor was directed to produce in discovery three years' worth of tax returns.[144] The debtor said that it had not yet filed its 2020 tax returns, but produced what purported to be tax returns for 2018 and 2019.[145] The Court noted, however, that the IRS' proof of claim had stated that those tax returns had not been filed.[146] While the Court stopped short of finding that the tax returns the debtor produced had been fabricated, it concluded that in view of the debtor's burden to establish its good faith, these serious unanswered questions counseled against such a finding.[147]

*Fourth*, the Court found that evidence regarding the debtor's impending receipt of substantial payments from FEMA was highly uncertain. The debtor

---

[141] *Id.* at 314. *See also* PX 530 at P0001470 (Mott's deposition testimony).

[142] *Team Sys. Int'l LLC*, 640 B.R. at 314–315.

[143] *Id.*

[144] *Id.* at 315.

[145] *Id.*

[146] *Id.* at 315–316.

[147] *Id.* at 316.

contended at the outset of the case that it had two outstanding FEMA receivables – a $13.5 million receivable for a "restocking fee" that was pending in the Civilian Board of Contract Appeals and a further $6.8 million receivable for a "change order" that the debtor intended to file.[148] The Court noted that if the evidence suggested that the debtor were likely to receive these payments, which would generate sufficient cash to satisfy all creditor claims, it would counsel in favor of permitting the debtor to remain in chapter 11.[149] Without making a finding that the estate was not entitled to recover these amounts, the Court found based on the evidence presented that the debtor had failed to show that payments on either of these alleged receivables was likely.[150]

*Finally*, the Court concluded that the debtor had failed to show that its remaining business was likely to provide a basis around which it could propose a confirmable plan of reorganization.[151]

For these reasons, the Court found cause to dismiss or convert existed under § 1112(b).[152] The opinion went on to conclude, as each of the moving parties urged, that the interest of creditors and the estate would be better served by conversion than by dismissal.[153] Specifically, the Court concluded that a trustee pursuing any viable

---

[148] *Id.* at 316–317 (citing Main Case D.I. 3 ¶ 16).

[149] *Id.* at 317.

[150] *Id.* at 317–318.

[151] *Id.* 319–320.

[152] *Id.* at 320.

[153] *Id.* at 320–322.

claim against FEMA, pursuing estate causes of action, and retaining control of the debtor's assets would be preferable to the members retaining control of the debtor while leaving creditors to seek state-law remedies.[154] The Court accordingly entered an order providing for the conversion of the case that directed the debtor to turn over all records to the chapter 7 trustee.[155]

The U.S. Trustee appointed George Miller as the interim trustee.[156] Following a dispute in which the judgment creditors sought unsuccessfully to elect a trustee of their choosing, the Court determined that George Miller would become the trustee on a final basis.[157]

**5. The preliminary injunction**

Issues regarding the debtor’s cooperation in providing the company’s books and records to the chapter 7 trustee arose soon after the entry of the order converting the case. The trustee accordingly moved the Court, in June 2022, to find the debtor and its members in contempt and issue sanctions for failing to turn over books and records in violation of the Bankruptcy Code and this Court’s order providing for the conversion of the case.[158] The trustee further asked the Court to enjoin the debtor’s members from transferring or encumbering the real properties the trustee believed were acquired using assets of the debtor.[159]

---

[154] *Id.* at 320–321.

[155] Main Case D.I. 151.

[156] Main Case D.I. 152.

[157] *In re Team Sys. Int’l LLC*, No. 22-10066, 2022 WL 2792006 (Bankr. D. Del. July 15, 2022).

[158] Main Case D.I. 186 ¶¶ 5, 9, 11.

[159] *Id.* ¶ 27–28.

After a hearing, the Court declined to impose sanctions, but, pursuant to Bankruptcy Rule 9001(5)(A), designated Mott and Acosta as having the duties of the debtor, thus requiring them to comply with all obligations imposed on the debtor by the Bankruptcy Code.[160] The Court specifically ordered Mott and Acosta to turn over a computer containing original business records the trustee had previously requested, but that the debtor refused to provide.[161] In addition, based on evidence that real property had been acquired by certain of the defendants using estate property whose transfer the debtor had sought to conceal, the Court granted the trustee's motion to prevent the encumbrance or transfer of those parcels of real property for a period of six months, which restriction would be lifted upon the trustee's certification that Mott and Acosta had produced the required documents.[162]

The defendants' compliance with that order was the subject of extensive testimony during the trial in this adversary proceeding. Specifically, William Homony, a partner at the accounting firm Miller Coffey that had been retained by the chapter 7 trustee, testified that on July 14, 2022, Kevin Mann, who was then serving as counsel to Mott and Acosta, delivered three boxes of bank statements, ledgers, tax returns, manuals, and contracts to his office.[163] Mann represented that those boxes were the original documents that the trustee requested and the Court

---

[160] Main Case D.I. 222 ¶ 1.

[161] *Id.* ¶ 2(b).

[162] *Id.* ¶ 3, 4; Main Case D.I. 224 at 124–127; *In re Team Sys. Int'l, LLC*, No. 22-10066, 2023 WL 1428572, at *5 (Bankr. D. Del. Jan. 31, 2023).

[163] July 6, 2026 Hr'g Tr. at 50–51; Main Case D.I. 245 ¶ 4.

ordered the debtor to produce.[164] Contending that this satisfied their obligations under the order, on August 18, 2022 the defendants filed a motion to compel the trustee to confirm his receipt of all requested documents as the Court had required.[165]

The trustee objected to the defendants' motion on September 1, 2022, claiming that copies, not original documents, were produced, certain documents were redacted, and certain emails were produced without related attachments.[166] The trustee further argued that certain documents required by the Court's order had not been produced, including documents that could support member distributions and travel expenses, Tax Form 1099s, payments to subcontractors, and payments for professional services, among other documents.[167] The hearing on the defendants' motion seeking to compel the trustee's certification was then adjourned by agreement of the parties.[168] As far as the Court can discern from its review of the docket, the defendants thereafter effectively abandoned their pursuit of that motion, as it does not appear that the motion was ever again set for a hearing.[169]

As Homony explained during his trial testimony, having been unable to obtain a complete set of debtor records, the trustee undertook to rely on Bankruptcy Rule 2004 to subpoena documents directly from the debtor's banks and other relevant third

[164] July 6, 2026 Hr'g Tr. at 51

[165] *Id.* at 55–57; Main Case D.I. 239.

[166] Main Case D.I. 245 ¶¶ 14–16.

[167] *Id.* ¶¶ 17–22.

[168] Main Case D.I. 255 at 3.

[169] *See* July 6, 2026 Hr'g Tr. at 54 (Homony testified that "my understanding is [the motion] still remains unresolved to this day").

parties.[170] The information obtained via those subpoenas strongly suggested that the debtor had fabricated business records and concealed transfers to insiders. For example, Homony testified at trial that the debtor had produced to the trustee bank statements showing transfers of $3 million and $50,000 in February of 2020 and $150,000 and $100,000 in May of 2021.[171] Those statements, however, did not identify the recipient of the transfer.[172] Homony testified at trial that when he reviewed the same statements subpoenaed from the bank, those statements listed the transfer recipients as Addy Road, LLC for the February 2020 transfers and Mott herself for the May 2021 transfers.[173]

On January 10, 2023, the trustee initiated this adversary proceeding by filing a complaint and at the same time moved for a preliminary injunction seeking to enjoin the defendants from selling, assigning, transferring, encumbering or otherwise disposing of the real properties acquired using debtor funds and prepetition payments to insiders.[174] The Court conducted an evidentiary hearing on the motion for a preliminary injunction on January 23, 2023.[175]

In connection with that motion, the trustee revealed that he had "recently uncovered" additional payments for the purchase of a $1.8 million Bethesda,

---

[170] *Id.* at 68; Main Case D.I. 265, 268.

[171] July 6, 2026 Hr'g Tr. at 102–104, 110–111, 112–113 (discussing PX 545, PX 546, and PX 547, each of which are the statements the debtor had produced to the trustee).

[172] *Id.*

[173] *Id.* at 118–120; PX 59 at P0002556, P0002559; PX 61 at P0002821.

[174] D.I. 1 ¶ 251; D.I. 3 ¶ 63.

[175] D.I. 17.

Maryland home by Mott's daughter and son-in-law, Jessica and Benjamin Smith.[176] From May to August of 2018, the debtor transferred approximately $1.8 million to Shulman Rogers, the law firm for which Benjamin Smith works, for what it falsely described as legal services provided to Team Systems.[177] The Smiths (who were named as defendants in this adversary proceeding) quickly settled with the trustee for $1 million before being required to respond to the complaint.[178]

In addition to the evidence suggesting that the debtor had produced bank statements to the trustee that had been altered by whiting out the name of the recipient of the transfer, the evidence presented at the preliminary injunction hearing also indicated that the debtor's computer containing original business records had its hard drive wiped clean before it was produced to the trustee.[179] This Court's January 31, 2023 Memorandum Opinion on the motion for a preliminary injunction sets forth (with screen shots of the original and whited out bank statements) in greater detail the evidence that supported the entry of a preliminary injunction.[180]

On January 31, 2023, satisfied that the trustee had demonstrated a reasonable probability of eventual success in the litigation and that an injunction was the only

---

[176] D.I. 3 ¶¶ 4, 36(d).

[177] *Id.* at ¶ 36(d); *Team Sys. Int'l, LLC*, 2023 WL 1428572 at *6.

[178] D.I. 86. Defendant Brent Road is the entity that formally held title to real property in Bethesda, MD. The clerk entered an order of default against that entity. D.I. 122. It does not appear that the trustee is seeking further relief against Brent Road. The proposed form of order attached as Exhibit C therefore provides that those claims will be dismissed as moot. To the extent the trustee disagrees with that disposition, he may set forth his view in the letter addressing the form of judgment.

[179] *Team Sys. Int'l, LLC*, 2023 WL 1428572 at *6, *10.

[180] *Id.* at *6–*7.

means of protecting the plaintiff from irreparable harm, the Court issued three separate injunction orders, though on terms that were narrower than the "sweeping injunction" the trustee sought.[181]

The first enjoined Mott, Maciorowski, and Addy Road from "selling, assigning, transferring, encumbering, mortgaging, or otherwise disposing of any portion or all of their respective interests" in specific real property assets.[182] The Court specifically listed the addresses of the Ormond Beach Property, the Bethany Beach Property, and the Blue Springs Property.[183] The fifth paragraph of that order prohibited and enjoined all of the defendants and Addy Road "from using, selling, transferring, assigning, encumbering, mortgaging, or otherwise disposing of any cash or other assets, except to the extent necessary to pay ordinary household and living expenses or ordinary business expenses, as applicable."[184]

The second injunction stated that Gulf Coast and its agents "shall not transfer, encumber, or otherwise dispose of $766,062.50 or assets of equivalent value."[185] The third injunction approved a stipulation between the trustee and the Smiths resolving the trustee's motion with respect to the Smiths.[186]

---

[181] *Id.* at *1, *10–*14.

[182] D.I. 25 ¶ 2.

[183] *Id.*

[184] *Id.* ¶ 5.

[185] D.I. 26 ¶ 2.

[186] D.I. 27.

Section 3057(a) of title 18 provides that "[a]ny judge … having reasonable grounds for believing that any violation … [of any] laws of the United States relating to insolvent debtors … has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case…."[187] In view of the evidence presented at the preliminary injunction hearing and set forth in the Court's Memorandum Opinion, the Court concluded that it was required by statute to make such a report. Accordingly, on February 2, 2023, the Court wrote a letter that attached its Memorandum Opinion, and stated that, for the reasons set forth therein, the Court had concluded that it was required to refer the matter for the consideration of the United States Attorney.[188]

**6. Imposition of sanctions on Randall Mott**

The question of who was responsible for obscuring the names of the recipients of the transfers on the debtor's bank statements then became something of a subplot in the story of the bankruptcy case. Recall that (a) the documents in question were produced by the debtor, and (b) the white out concealed information that the debtors were required to disclose – but did not – on statements signed by Deborah Mott. That is at least circumstantial evidence suggesting that the defendants (and Mott, in particular) were responsible for obscuring the bank statements. The defendants' history of fabricating evidence (as described above) and then pointing the finger at

---

[187] 18 U.S.C. § 3057(a).

[188] D.I. 292.

others is consistent with such a conclusion. It is, however, the defendants' unsuccessful efforts in this bankruptcy case to shift the responsibility onto others that leads the Court to find that they were responsible for obscuring the bank statements.

The first of those efforts took place just more than one year after the Court entered the preliminary injunction, when the defendants moved to vacate it.[189] The brief filed in support of that motion accused the judgment creditors of having made the white-out alterations to the bank statements.[190] That brief, which was supported by a declaration filed by Acosta, asserted that the bank statements Acosta provided to Robinson Cole, then debtor's counsel, "had no obscuring redactions."[191]

Acosta's declaration, however, contained a key error. The versions of the bank statements that were produced to the trustee, and that were admitted at trial as Plaintiff's Exhibits 545, 546, and 547, had been whited out. They bear the Bates numbers TSI 000180, TSI 000034, and TSI 000138, respectively, which Robinson Cole affixed before the documents were produced.[192] Crowther credibly testified that Robinson Cole produced the documents in the form in which it received them from Mott.[193]

---

[189] D.I. 140.

[190] D.I. 141 at 10, 13.

[191] *Id.* at 10; D.I. 143 (Acosta's declaration).

[192] Crowther testified at trial that, consistent with ordinary practice, his firm would have affixed the Bates numbers to documents before producing them. *See* July 7, 2026 Hr'g Tr. at 217–218 ("we Bates stamped documents and we produced them").

[193] July 7, 2026 Hr'g Tr. at 234-235.

Acosta's declaration nevertheless attached versions of those same statements that were not whited out, and swore that they are the documents that Robinson Cole had actually produced in the case.[194] That cannot be true. The record makes clear that the documents that Robinson Cole actually produced – the documents admitted into evidence as exhibits 545, 546, and 547 – were produced *with* the whited out information.

Moreover, the Bates numbers on the documents that Acosta attached to his declaration reveal that the documents he attached were *not* the documents that Robinson Cole produced. Two of the three documents attached to Acosta's declaration (TSI 000180 and TSI 000034) match the numbers on the versions that Robinson Cole actually produced. The third, TSI 000038, however, does not match the number on the produced page, TSI 000138.[195] The only reasonable explanation for that discrepancy is that the attachments to Acosta's declaration were documents prepared by Acosta after the fact. The mismatch of the Bates number shows that he copied the production numbering from the produced set and made an error on one page. The Court accordingly finds by a preponderance of the evidence that Acosta's sworn declaration was false, and that the documents attached to it were created after the fact to look like the documents Robinson Cole produced. The purpose of the exercise was to shift responsibility for the white-out away from Mott and the defendants.

---

[194] PX 376; D.I. 143 ¶ 3, 4; *see also id.*, Exhibit C.

[195] D.I. 143, Exhibit C.

The Court, however, did not rely on Acosta's deception in concluding, at the time it addressed the motion for sanctions, that the whited-out documents had been produced by the debtors.[196] Rather, the Court credited Homony's testimony that this was the form of the documents at the time they were produced by the debtors in response to the trustee's request for their financial records.[197] The Court accepted the testimony of two of the defendants' then-lawyers (who have since resigned from the representation) that they had minimal involvement in the filing, and that Randall Mott was the principal draftsperson.[198] To make matters worse, Randall Mott went a step further and filed a bar complaint against counsel for the judgment creditors, accusing the judgment creditors' counsel of having fabricated evidence.[199] The Court found sufficient evidence to conclude that Randall Mott acted "vexatiously" when he filed the motion to vacate in this Court, and on that basis imposed monetary sanctions under 28 U.S.C. § 1927.[200]

To close the loop on this issue, at trial in this adversary, the defendants offered a new, but equally unsuccessful theory about who might have obscured the documents. This time, their claim was that Robinson Cole must have applied the white out to the documents before producing them in discovery.[201] To that end, they

---

[196] D.I. 256 at 10–11.

[197] *Id.* at 9.

[198] *Id.* at 11–12.

[199] *Id.* at 12–13.

[200] *Id.* at 22; D.I. 268 (order resolving sanctions motion); D.I. 325 (final order re: sanctions – including fee award). Randall Mott appealed this Court's sanctions order to the district court, which affirmed. *In re Team Sys. Int'l, LLC*, 680 B.R. 506 (D. Del. 2026).

[201] July 6, 2026 Hr'g Tr. at 93.

called Jason Davidson as a witness, who testified as an expert in document security.[202] The substance of his testimony was that certain of the documents produced by Robinson Cole had metadata as to which there were "anomalies."[203] The documents as to which Davidson identified as anomalies, however, were not the bank statements that had been whited out.[204]

Moreover, Curtis Crowther of Robinson Cole testified at trial (consistent with the contemporaneous emails that were admitted into evidence) that after Acosta had uploaded a number of documents on February 1, 2022, in response to the Court's prior order, Acosta told Crowther that the uploaded documents were incorrect and ought to be deleted.[205] Later that day, Mott uploaded a number of bank statements.[206] James Merrifield, who is Robinson Cole's Chief Data Officer, testified at deposition that the bank statements were whited out when they were uploaded to the Robinson Cole system on February 1, 2022.[207] The evidence accordingly shows, and the Court finds by a preponderance of the evidence, that the documents Mott uploaded were the documents that had been whited out.[208] Indeed, this evidence strongly suggests, and the Court finds, that Mott was herself responsible for whiting out the documents.

---

[202] July 8, 2026 Hr'g Tr. at 216–222.

[203] *Id.* at 232.

[204] *Id.* at 257.

[205] PX 305; PX 306; PX 307; July 7, 2026 Hr'g Tr. at 193–211.

[206] PX 307.

[207] PX 536 at 80–94; PX 277; PX 279; PX 281.

[208] There is also some suggestion in the record that handwritten notes on the bank statements had been whited out. *See* D.I. 647 ¶¶ 304, 308, 309, 313, 326, 362. Without addressing the propriety of such alterations as a technical matter under the Federal Rules of Civil Procedure,

### 7. Failure to cooperate in discovery and spoliation

In addition to the improprieties described above, the record demonstrates that the defendants more generally failed to produce relevant documents to the trustee and, indeed, destroyed relevant evidence. Homony testified at trial that the debtor never provided the trustee with a general ledger, a trial balance, or the like.[209] Nor did the debtor ever turn over any original business records.[210]

The defendants did, however, turn over a laptop computer, that they referred to as the "broken computer."[211] But after meeting with a computer consultant, the trustee learned that the computer's hard drive was wiped before it had been turned over by the defendants.[212]

At trial Christopher Mott offered an elaborate story about discovering the TSI computer with "smoke coming out from behind it."[213] He explained that his mother had been seeking to update the computer's operating system "but she covered the vent [and] fried the motherboard."[214] He explained that they had taken the computer to a Best Buy store and "I told them to salvage the hard drive if they could."[215] Mott and Acosta produced a document that they described in a declaration as a "work order

---

there is no suggestion that the removal of handwritten marginal notes on the bank statements is material to any issue before the Court.

[209] July 6, 2026 Hr'g Tr. at 40.

[210] *Id.* at 51.

[211] *Id.* at 144.

[212] *Id.* at 145.

[213] July 8, 2026 Hr'g Tr. at 178.

[214] *Id.*

[215] *Id.* at 180.

Ms. Mott filled out when she brought TSI's computer hard drive to the Geek Squad."[216] That document purports to be a "New PC Setup Form" that bears the "Geek Squad" logo.[217] Under the notes section, Mott wrote "SAVE DATA!!"[218]

The Court finds by a preponderance of the evidence, however, that this document was fabricated. That conclusion is based on the testimony elicited during the Rule 30(b)(6) deposition that the trustee took of Best Buy.[219] The deposition notice sought testimony on the issue of whether Best Buy had ever serviced the computer that had been turned over to the trustee (identified by serial number).[220] And the witness produced by Best Buy testified under oath that she had searched Best Buy's files, and that there was no record of Best Buy ever having serviced that laptop computer.[221] The Best Buy witness further testified that she did not recognize the form of "New PC Setup Form" that had been attached to the defendants' declaration.[222] Indeed, when the defendants' counsel asked whether the form is "not a form at all used by the Geek Squad," the witness answered "[c]orrect."[223] Defendants' counsel then sought to clarify, asking whether the form was ever "used

---

[216] PX 33 at P0002082.

[217] *Id.* at P0002134.

[218] *Id.*

[219] *See* PX 532.

[220] D.I. 365.

[221] PX 532 at 17.

[222] *Id.* at 41.

[223] *Id.* at 52.

by Geek Squad for any purpose"? And the witness answered, "[n]ot to my knowledge."[224]

Mott and Acosta had been ordered to turn over the computer to the trustee. The computer they actually produced, however, had been wiped clean. And then Mott and Acosta provided this document that purported to show that they brought the computer in to Best Buy to have it repaired. Based on the Best Buy Rule 30(b)(6) deposition, the Court concludes that this document was a forgery. The logical inference, and this Court's factual finding, is that Mott and Acosta never brought the computer in to Best Buy. The Court further concludes by a preponderance of the evidence that Mott and Acosta intentionally deleted the hard drive that contained the debtor's original business records, and then sought to cover up their spoliation by creating the false impression that they took steps to recover the lost information by bringing the computer in for repair. The Court accordingly rejects, as not credible, Christopher Mott's contrary explanation.

As Homony explained at length in his trial testimony, the debtor's original accounting and business records were never produced to the trustee in the chapter 7 bankruptcy case or this adversary proceeding.[225] Defendants likewise failed to turn over to the trustee the debtor's emails, leading the trustee to obtain certain emails through a third-party subpoena directed to the debtor's email-hosting provider.[226]

---

[224] *Id.*

[225] July 6, 2026 Hr'g Tr. at 51.

[226] July 6, 2026 Hr'g Tr. at 71–72.

The Court's ultimate conclusion, however, is that to the extent there remain factual questions that are unanswered by the documentary record in the case, at least part of the reason for those gaps is that the defendants either destroyed relevant evidence (as in the case of the computer) or failed to produce documents in discovery (such as with the debtor's emails).

### 8. The settlement of the judgment creditors' claims

In July of 2023, the trustee reached an agreement with the judgment creditors regarding the allowance of their claims against the estate.[227] As of the filing of the bankruptcy case, those claims had been reduced to judgment by the district court but remained subject to an appeal in the Eleventh Circuit.[228] The trustee reached a resolution with the judgment creditors in which the claims would be reduced by ten percent from the amounts reflected in the judgment.[229] That resolution represented, in effect, a settlement that provided the estate a reduction in the allowed claim in exchange for eliminating the risk the judgment creditors faced if the estate were to pursue an appeal.[230] The trustee explained that the decision to enter into the settlement was informed by the fact that "the Debtor appears to have had credibility issues throughout the Florida litigation, including with respect to the reliability of its documents" that would have made it unlikely for the debtor to succeed on appeal.[231]

[227] Main Case D.I. 335.

[228] PX 183, docket entries 305, 306, 311.

[229] Main Case D.I. 335 at 6.

[230] *Id.* at 6–9.

[231] *Id.* at 7.

The members opposed approval of the settlement.[232] Their principal argument was that the debtor had a high likelihood of prevailing on appeal on its claim that the contract impermissibly provided for a commission in connection with securing a government contract.[233] This Court rejected the members' argument, concluding that the settlement was a reasoned exercise of the trustee's business judgment.[234]

The members appealed that ruling to the district court, which affirmed.[235] The district court found both that the members were not "persons aggrieved" who had standing to appeal the approval of the settlement, and that this Court's decision to approve the settlement was not an abuse of this Court's discretion.[236] On the merits, the district court noted that the debtor's "affirmative defense that the agreement was unlawful was not raised until the trial. The Florida District Court's decision not to allow Appellants to spring this new argument at trial would be reviewed for an abuse of discretion, yet Appellants have offered no argument that the Florida District Court abused its discretion in denying their request to amend an affirmative defense at trial."[237]

---

[232] Main Case D.I. 357.

[233] *Id.* at 9–10.

[234] Main Case D.I. 367. *See also* Main Case Sept. 20, 2023 Hr'g Tr. at 99–105.

[235] *In re Team Sys. Int'l, LLC*, No. 22-10066, 2024 WL 5008854 (D. Del. Dec. 6, 2024), *aff'd,* No. 24-3365, 2026 WL 837287 (3d Cir. Mar. 26, 2026).

[236] *Id.* at *3–*4, *11.

[237] *Id.* at *8.

The members appealed that decision to the Third Circuit. That court affirmed the district court.[238] The court's unpublished decision resolved the appeal on the ground that the members lacked appellate standing.[239] The reasoning was that because they were out of the money equity holders of the debtor, they lacked a stake in the magnitude of the judgment creditors' claims against the estate.[240]

### 9. The motion seeking abandonment of the alleged receivables

Another recurring theme over the course of this bankruptcy case that bears mention is the members' contention that the debtor held valuable receivables from FEMA that the trustee was improperly refusing to collect. This issue bears on the defendants' claim, addressed below in Part VI.A, that there would have been no need to move assets outside the reach of creditors, because funds sufficient to pay creditors in full were due to be received momentarily.

In the debtor's first day declaration, Mott represented that FEMA owed the debtor a "cancellation claim" and "change order claim" totaling $20.3 million.[241] In its March 2022 decision converting the cases to chapter 7, the Court explained that if these claims appeared likely to generate sufficient cash to pay creditors in full, that

---

[238] *In re Team Sys. Int'l, LLC*, No. 24-3365, 2026 WL 837287 (3d Cir. Mar. 26, 2026).

[239] *Id.* at *4.

[240] *Id.* at *3–*4. The portion of the members' Third Circuit brief addressed to their standing never argued that the valid claims against the debtor's estate would effectively cap their own fraudulent conveyance liability, thus giving them a concrete economic stake in the magnitude of those claims. *See* Reply Brief for Appellants, 2025 WL 1805924 (June 20, 2025) at *15–*18 (arguing that there was a "reasonable possibility" that their equity holdings could have value, as a result of the alleged estate receivables, discussed below). The Third Circuit opinion accordingly did not address that argument.

[241] Main Case D.I. 3 ¶ 16.

would have counseled in favor of using chapter 11 to provide the debtor with a breathing spell from collection activity in order to reorganize its business.[242] Based on the evidence presented at that hearing, however, the Court concluded that "neither claim appear[ed] likely, at least in the short term," to do so.[243]

Regarding the $13.5 million cancellation claim, the Court noted that between the filing of the bankruptcy in January and the hearing on the motion to dismiss or convert in March, the Civilian Board of Contract Appeals had denied the parties' cross-motions for summary judgment, holding that a mere decrease in the quantity of water FEMA ordered did not entitle Team Systems' to a restocking fee.[244] Instead, Team Systems had to show that it actually incurred costs attributable to the decreased order.[245]

Following the conversion of the case, the trustee retained the same counsel that had represented the debtor prepetition to pursue this claim.[246] The Civilian Board of Contract Appeals affirmed FEMA's denial of the claim in February 2023.[247] The trustee then appealed that decision to the Federal Circuit, which issued an order

---

[242] *Team Sys. Int'l LLC*, 640 B.R. at 317.

[243] *Id.*

[244] *Id.*

[245] *Id.* at 317–318. "[I]n order for TSI to recover restocking fees, more must occur than FEMA simply decreasing or cancelling the number of liters ordered. There must be proof that the supplies were actually restocked and a fee was charged for that restocking." *Id.* at 317 n.122.

[246] Main Case D.I. 181; Main Case D.I. 217.

[247] *Team Sys. Int'l, LLC v. Dep't of Homeland Sec.*, CBCA No. 7145, slip op. at 4 (Feb. 9, 2023),www.cbca.gov/files/decisions/2023/SHERIDAN_02-09-23_7145_TEAM_SYSTEMS INTERNATIONAL_LLC%20(DECISION).pdf.

summarily affirming the Civilian Board of Contract Appeals in July of 2024.[248] Upon the expiration of the time to file a petition for certiorari, that decision became final and unappealable.

The $6.8 million change order claim has fared no better.[249] In the January 2022 first-day declaration, Mott reported that "TSI intend[ed] to file" the claim.[250] On March 8, 2022 Acosta said in a declaration that the claim would be filed "imminently," and he testified at the March 9 hearing that the debtor would file it "I believe, this week."[251] When asked during cross-examination the next week if the claim had been filed yet, he stated it had not been.[252] Ten days after that, the debtor's counsel corrected Acosta's testimony at the hearing, explaining that the debtor's government contracting lawyers had not even been retained, much less started work on the claim.[253]

In its opinion converting the case, the Court emphasized "that this claim arises out of events that took place in 2017 and 2018. And as of the end of March 2022, TSI, which has suffered a $6.3 million judgment for which it was unable to post a bond, still has not asserted a claim for $6.8 million owed to it dating back more than four

[248] *Team Sys. Int'l, LLC v. Sec'y of the Dep't of Homeland Sec.*, No. 2023-1556, 2024 WL 3407429 (Fed. Cir. July 15, 2024).

[249] This claim was originally estimated at $6.8 million in the first-day declaration, *see* Main Case D.I. 3 ¶ 16, but was estimated at $5.6 million in the motion to compel abandonment, *see* Main Case D.I. 612 ¶ 18.

[250] Main Cased D.I. 3 ¶ 16.

[251] Main Case D.I. 120 ¶ 9; Main Case Mar. 9, 2022 Hr'g Tr. at 207.

[252] Main Case Mar. 14, 2022 Hr'g Tr. at 40.

[253] *See* Main Case D.I. 144.

years. None of that makes much sense."[254] The Court thus found that it "cannot and will not conclude that it is … likely that TSI will recover on the $6.8 million claim."[255]

In February 2025, however, the members moved to compel the trustee to abandon that claim under § 554(b) of the Bankruptcy Code, which would have entitled the members to pursue the claim themselves, for their own benefit.[256] The trustee maintained that he was more than willing to pursue the claim, but that the members had refused to cooperate with his efforts to pursue the claim for the benefit of the estate.[257] The members argued that the trustee had all of the information he needed but simply failed to act.[258]

The Court denied the motion to compel abandonment.[259] In doing so, the Court observed that "the obvious solution, in circumstances such as these, would be for the parties to reach a mutually acceptable arrangement" regarding the pursuit or sale of the claim.[260] In the absence of such an agreement, however, the Court concluded that it should "respect a trustee's decision to continue to administer an asset rather than abandon it" and denied the motion to compel abandonment.[261] In March of 2026, the

---

[254] *Team Sys. Int'l LLC*, 640 B.R. at 318.

[255] *Id.*

[256] Main Case D.I. 612 ¶ 28.

[257] Main Case D.I. 614 ¶¶ 2–9.

[258] *See e.g.*, Main Case D.I. 645 ¶¶ 19–26 (describing the back and forth between the trustee and the movants regarding the change order claim).

[259] *In re Team Sys. Int'l, LLC*, No. 22-10066, 2026 WL 467200, at *5–*6 (Bankr. D. Del. Feb. 18, 2026).

[260] *Id.* at *6.

[261] *Id.* at *5–*6.

movants appealed this Court's decision to the district court, where it is now pending.[262]

### 10. Mott's indictment and this Court's decision to stay proceedings, in part

In July 2024, Mott was indicted in a case brought by the United States in the U.S. District Court for the District of Delaware.[263] The indictment charged her with one count of making false statements under penalty of perjury in a bankruptcy case, and another count of making false statements under oath in a bankruptcy case.[264]

Soon thereafter, the defendants in this adversary proceeding moved this Court to stay all proceedings in this civil action, pending resolution of the criminal case against Mott, in deference to her Fifth Amendment right against self-incrimination.[265] This Court granted that motion in part and denied it in part.[266] The Court stayed this adversary proceeding with respect to Mott.[267] And appreciating that Mott was the principal decisionmaker on behalf of the prepetition debtor, it ordered that "[d]uring the pendency of the criminal case against Deborah Evans Mott, the Court will not consider any dispositive motion or proceed to trial on any claim as to which the intent of the debtor is an element."[268] It otherwise denied the

[262] *In re Team Sys. Int'l, LLC*, No. 26-00213 (D. Del. Mar. 2, 2026).

[263] *United States v. Mott*, No. CR 24-77, 2026 WL 2958605, 1:24CR 00077 (D. Del. Oct. 1, 2026) (the indictment appears at docket entry 3).

[264] *Id.*

[265] D.I. 263.

[266] D.I. 296.

[267] *Id.* ¶ 1.

[268] *Id.* ¶ 2.

motion for a stay.[269] Defendants sought reconsideration of that motion, which this Court denied.[270] The litigation accordingly continued.

**11. Violation of preliminary injunction**

In August 2024, the trustee learned, and reported to the Court, that Mott deposited in an Addy Road bank account the cashier's check for $1,822,955.55 drawn on Southeast's bank account back in November 2021.[271] Those funds had been transferred from a debtor's account to Southeast in May 2021. Although Addy Road was subject to the preliminary injunction and prohibited from dissipating any funds, the record demonstrates that substantial sums were transferred out of the Addy Road account for the benefit of the members.[272]

In addition, in December 2025, the trustee filed a motion contending that the defendants had sold real property whose sale was expressly prohibited by the preliminary injunction.[273] Recall that the preliminary injunction enjoined Mott, Maciorowski, and Addy Road from selling, or otherwise disposing of the real properties located in Ormond Beach, Florida, Bethany Beach, Delaware, and Blue Springs, Missouri.[274] The order also prohibited and enjoined all of the defendants

---

[269] *Id.*

[270] D.I. 307; D.I. 353. Defendants sought to appeal that order to the district court, which dismissed the appeal on the ground that it was an unappealable interlocutory order. *See* D.I. 406.

[271] Aug. 8, 2024 Hr'g Tr. at 48.

[272] D.I. 25 ¶ 2.

[273] D.I. 450.

[274] D.I. 25 ¶ 2.

from otherwise disposing of cash except as necessary to pay ordinary living or business expenses.[275]

In its December 2025 motion, the trustee alleged that notwithstanding that order, the defendants had sold the Blue Springs property for approximately $500,000.[276] In response, the defendants admitted that they had disposed of the property.[277] Their argument in opposition to the motion for sanctions was that, notwithstanding the language of the order that precluded the disposition of the three specified real properties, they were permitted to sell the Blue Springs property because the order permitted the use of "*other* assets … to the extent necessary to pay ordinary household and living expenses or ordinary business expenses."[278]

The Court issued a letter ruling that rejected that argument, finding the terms of the preliminary injunction were "just about as clear as it could be."[279] As a result, in addition to imposing additional reporting requirements, the Court, as a sanction for the violation of its order, lifted the partial stay of the adversary proceeding.[280] Courts commonly defer civil litigation until after a criminal trial to avoid requiring a defendant to choose between prejudicing their civil case and waiving their right

---

[275] *Id.* ¶ 5.

[276] D.I. 450. In the original motion, the trustee contended that the net proceeds were approximately $550,000. *Id.* at ¶ 23. The trustee's post-trial brief, however, points to documents showing (consistent with the defendants' position) that the net proceeds were in fact approximately $500,000. D.I. 647 at ¶ 193.

[277] Main Case D.I. 684 ¶ 2. In that response, the defendants asserted that the sale proceeds were closer to $500.000. *Id.*

[278] D.I. 25 ¶ 5 (emphasis added); Main Case D.I 684 ¶ 1–2.

[279] D.I. 475 at 7.

[280] *Id.* at 8–10.

against self-incrimination. The Court concluded, however, that it was unfair to provide Mott that benefit to the extent she was going to use the delay to dissipate assets that would otherwise be available to the plaintiff if it were to prevail in the case, all in violation of this Court's orders. The Court accordingly lifted the stay of the civil action and set the case for a trial beginning on July 6, 2026, with the expectation that if Mott were to seek to proceed to trial promptly in her criminal case, she could still conclude her criminal trial first and thus avoid being put to the Hobson's choice between her Fifth Amendment rights and the risk of prejudice in the civil lawsuit.[281]

Defendants moved to stay that order.[282] This Court denied that motion but granted a 14-day administrative stay of applicable deadlines for the purposes of permitting the district court to consider whether to grant a stay pending appeal.[283] The district court dismissed the appeal for lack of jurisdiction and found that even "assuming the court had jurisdiction over the appeal, Defendants have failed to carry their burden of showing a likelihood of success on the appeal" from the court's order sanctioning defendants for the violation of the prior injunction.[284] Defendants appealed that determination to the Third Circuit, which dismissed for lack of

---

[281] D.I. 477.

[282] D.I. 480.

[283] D.I. 485.

[284] *In re Team Sys. Int'l, LLC*, No. 23-50004, 2026 WL 734583, at *5 (D. Del. Mar. 16, 2026).

jurisdiction.[285] The Third Circuit thereafter denied a motion for panel rehearing and rehearing en banc.[286]

This Court went on, in the months leading up to the trial set for July, to direct that discovery proceed and to deny defendants' repeated requests to delay the start of the trial, as well as their motions seeking the reconsideration of those decisions.[287]

**12. Events leading up to trial**

The pretrial scheduling order that the Court entered in February 2026 set the final pretrial conference for June 22, 2026.[288] That final pretrial conference was later rescheduled to June 30, 2026.[289] The final pretrial order provided that "[b]y no later than 4 p.m. (Eastern) fourteen days (14) prior to the date of the Final Pretrial Conference, each party shall serve" a list of trial witnesses, a list of exhibits, and any deposition testimony that the party seeks to move into evidence.[290] Because the final pretrial conference was then set for June 22, 2026, the deadline for the submission of

---

[285] *In re Team Systems, LLC*, Third Circuit No. 26-1645 (May 14. 2026). Judge Bove dissented from "this sua sponte dismissal because, in his view, (1) the jurisdictional questions are sufficiently complex to warrant a full round of briefing and evaluation by the merits panel, and (2) the constitutional implications of the challenged decision for the related criminal case are serious and exceedingly difficult to remedy at a later time if determined to be actual violations based on the manner in which the bankruptcy case proceeds." *Id.*

[286] *In re Team Systems LLC*, Third Circuit No. 26-1645 (June 30, 2026).

[287] *See, e.g.,* D.I. 528; D.I. 534; D.I. 596. One of the bases for seeking to delay the trial was the unavailability of one of the defendants' expert witnesses for asserted health reasons. Because that expert had been deposed, the Court concluded that the witness' expert report could be admitted as the witness' direct testimony, along with designated portions of the witnesses' deposition transcript in light of the witness' unavailability. *See* Fed. R. Evid. 804(a).

[288] D.I. 477 ¶ 8.

[289] D.I. 568.

[290] D.I. 477 ¶ 5.

witness lists and exhibits was June 8, 2026. And the parties were required to submit their proposed pretrial orders by June 16, 2026.[291]

On June 13, 2026, defendants again moved to adjourn the trial date.[292] The Court held a hearing on that motion on June 17, 2026, and denied the motion in a ruling from the bench. The Court also addressed the defendants' failure to serve their list of trial witnesses and exhibits, as well as their pretrial order. The Court directed the defendants to file those documents by the end of the day on June 19, 2026, and noted that the failure to do so could constitute a default.[293] Defendants failed to file by the June 19 deadline, leading the trustee to move the Court to bar the defendants from introducing evidence at trial.[294] The trustee separately moved the Court to enter a default judgment or draw adverse inferences against the defendants as a result of their various failures to comply with the Court's discovery rulings and spoliation of evidence.[295]

Those motions were heard by the Court at a pretrial hearing on June 30, 2026.[296] Counsel for the trustee did not hold back in expressing the view that this Court had been overly permissive in declining to impose harsh sanctions despite the defendants' repeated violations of this Court's orders. "You've been giving them—

---

[291] *Id.* ¶ 7.

[292] D.I. 553.

[293] D.I. 560 (audio recording of June 17, 2026 hearing).

[294] D.I. 566 ¶ 21.

[295] D.I. 565 ¶¶ 2–5.

[296] D.I. 583.

you've been bending backwards at—over and over again, giving them opportunities. And they've been basically saying 'I don't care.'"[297]

The Court nevertheless denied the motion to strike the answer.[298] It commented that the argument "in favor of doing so is a serious argument" and that the Court was "not satisfied by the defendants' answers to the questions of why the orders haven't been followed."[299] The Court nevertheless elected not to enter a default. "We're going to have a trial, it's going to start on Monday. The fact that the orders have been violated will result in limiting the evidence that can be presented. And I very much reserve the right to draw adverse inferences and ... make findings on account of the failure to cooperate in discovery."[300] But the Court ruled that "we're going to deal with it that way after a trial that gives the defendants an opportunity."[301]

With respect to the late-filed exhibit list, the Court concluded that to the extent the defendants identified exhibits that were on the trustee's own exhibit list, there was no prejudice suffered by the late filing, and that those exhibits could be admitted.[302] The record suggested that the balance of the exhibits on the defendants' list were items that had not been produced by the defendants in discovery. The Court

---

[297] June 30, 2026 Hr'g Tr. at 18.

[298] *Id.* at 19.

[299] *Id.* at 19–20.

[300] *Id.* at 20.

[301] *Id.*

[302] *Id.* at 27.

precluded the introduction of any such evidence. "[N]o one is presenting a document into evidence that was responsive to a discovery request and not produced, period."[303]

That left the question whether the defendants would be permitted to be called as witnesses at the trial. Mott's criminal trial had recently concluded, with the matter then under advisement before the district court. As noted above, the district court ultimately found Mott guilty of making two false statements and not guilty on various other claims. Mott had chosen to testify at the trial, so the Fifth Amendment concerns were no longer present. In light of that development, the Court indicated that it was willing to permit her to testify as a witness if she would produce to the trustee the relevant documents that the Court had previously ordered her to produce, but that she had not.[304] The Court appreciated that this would put the trustee to a substantial burden, requiring the taking of a deposition over a holiday weekend immediately before the start of trial. But in view of the recently concluded criminal trial, the Court concluded that if Mott produced the necessary documents, principles of fairness counseled in favor of permitting her testimony. Mott, however, refused to produce the documents, and the Court accordingly refused to permit her trial testimony.[305]

The Court similarly concluded that Acosta, who had failed to comply with the Court's discovery orders and similarly took the Fifth Amendment when deposed,

---

[303] *Id.* at 22.

[304] *Id.* at 45–47 (ordering that Mott comply with prior orders compelling the production of documents as a condition to being permitted to testify at trial).

[305] July 6, 2026 Hr'g Tr. at 14–15. *See also* D.I. 629 (certification that Mott had not produced the required documents and that the trustee would cancel the proposed deposition).

would not be permitted to testify at trial.[306] Unlike Mott, whose criminal trial had just ended, nothing had changed for Acosta. The Court accordingly concluded that there was no basis to put the trustee to the burden of taking a rushed deposition on the eve of trial simply because he changed his mind and now wanted to testify at trial. Because Acosta had failed to participate in discovery, the Court concluded that it would be unfair to permit him to offer trial testimony that he had not permitted the trustee to test by submitting to a deposition.[307]

The Court, however, reached a different judgment with respect to Christopher Mott, who asserted the Fifth Amendment only as to a limited number of questions. "Basically, the rule is that to the extent you … fairly made the witness available in discovery he can testify, and to the extent he wasn't made available he can't."[308] In view of that ruling, both Deborah Mott and Acosta (as well as Southeast and Addy Road) submitted proffers explaining what they would have testified to had their testimony been permitted.[309] Those proffers are not admitted into evidence and will not be considered by this Court in connection with this decision. They are available, however, to an appellate court if such court were to conclude that this Court erred in excluding the testimony of witnesses who refused to comply with this Court's discovery orders.

---

[306] July 6, 2026 Hr'g Tr. at 14–15.

[307] *Id.*

[308] June 30, 2026 Hr'g at 59.

[309] D.I. 617; D.I. 618; D.I. 639; D.I. 640; D.I. 641; D.I. 642; D.I. 643.

### 13. Trial and post-trial matters

This Court conducted the trial in this matter in July.[310] The parties submitted helpful post-trial submissions. On July 22, 2026, the defendants, purporting to proceed *pro se* "solely for the purposes this motion" (while still otherwise represented by counsel) filed a motion to recuse the undersigned judge.[311] In an opinion issued on July 27, 2026, this Court concluded that (a) such a "hybrid representation" was not permitted and that the motion would be denied on that basis; and that (b) the motion in any event lacked merit.[312] On August 7, 2026, the defendants, again purporting to act *pro se*, moved for reconsideration of that motion.[313]

## Analysis

### I. The motion to reconsider the denial of the motion to recuse will be denied.

The Court's July 27, 2026 Memorandum Opinion denying the recusal motion explained that federal law generally prohibits a party that is represented by counsel from *also* seeking relief from the Court on a *pro se* basis.[314] The motion for reconsideration suffers from the same defect and will likewise be denied on that basis.

[310] Defendants Education and Gulf Coast did not respond to the complaint. On July 1, 2026, this Court entered default judgments against those defendants. D.I. 593; D.I. 594. The transfers that the debtor made to these defendants are included on the chart set out in Exhibit B because they bear on Mott and Acosta's fiduciary duty liability. The claims against those entities themselves, however, are not addressed herein.

[311] D.I. 635.

[312] D.I. 650; D.I. 651.

[313] D.I 657.

[314] D.I. 650 at 14–15.

In addition to that, and in the alternative, the motion for reconsideration repeats arguments that were considered by the Court when it denied the motion. A motion for reconsideration is not a vehicle for relitigating arguments the Court has already decided. The motion for reconsideration does not identify an intervening change in the law, new evidence, or a clear error that would warrant relief.[315] The Court's Memorandum Opinion addressed the most substantial points raised in the original motion.[316] The reconsideration motion argues that the Court did not separately discuss a number of additional points, ones that the Court concluded were sufficiently insubstantial that they did not warrant separate discussion. Nothing set forth in the motion for reconsideration alters that conclusion. As the Court said in denying the motion, there is no basis for a reasonable observer to question the Court's impartiality. The motion for reconsideration will be denied.

**II. Each of the challenged transactions was made with the actual intent to hinder, delay or defraud creditors and is thus avoidable as an intentional fraudulent conveyance.**

Section 548(a)(1) of the Bankruptcy Code permits a trustee to avoid "any transfer … of an interest of the debtor in property … that was made … within 2 years before the date of the filing of the petition, if the debtor … made such transfer … with actual intent to hinder, delay or defraud" a creditor.[317] Section 544(b) allows the trustee to avoid any transfer that an actual unsecured creditor of the debtor could

[315] *See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

[316] *See* D.I. 650.

[317] 11 U.S.C. § 548(a)(1)(A).

avoid under applicable law immediately prior to the bankruptcy filing.[318] Here, a creditor could have brought suit before the bankruptcy against the recipient of an actual fraudulent conveyance under Delaware's Uniform Fraudulent Transfer Act. Because of that statute's four-year statute of limitation, the trustee standing in the shoes of an actual creditor may challenge any transfer made within the four years before the bankruptcy filing.[319] In substance, however, the state law operates the same way as its federal analogue, permitting the avoidance of a transfer made with actual fraudulent intent.

The dates and amounts of the transfers that the debtor made in the four years before the bankruptcy filing are not disputed.[320] Nor do the parties dispute the identity of the transferee or for whose benefit those transfers were made. Accordingly, the only question this Court needs to resolve on the trustee's claim for actual fraudulent conveyance is whether the debtor made those transfers "with the actual intent to hinder, delay, or defraud" its creditors.[321] It is the intent of the *transferor,* here, the debtor, that is relevant to the question of intentional fraudulent conveyance. Moreover, the record establishes that Mott was the principal decisionmaker for the debtor throughout the time at issue. There is no dispute that

---

[318] 11 U.S.C. § 544(b)(1).

[319] 6 Del. C. §§ 1304(a)(1), 1309. The trustee relies primarily on Delaware law as the applicable state law and defendants do not take issue with the application of Delaware law.

[320] *See* Part 3 of the Factual and Procedural Background at pp. 25–28 and Exhibit B.

[321] 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1).

her intent is properly attributable to the debtor. The claims for actual fraudulent conveyance thus boil down to the question of Mott's intent at the time of the transfers.

### A. The record shows that the transfers made after May 2018 were made with the actual intent to hinder, delay or defraud creditors.

The paradigmatic case of an intentional fraudulent conveyance is, put simply, a transfer of a debtor's assets designed to hinder creditors' collection efforts by moving those assets outside the creditors' grasp.[322] The defendants' argument here is that these transfers were nothing of the sort. They argue that the debtor was a profitable business; that the members were the owners of that business; and that there is nothing wrong or fraudulent about a profitable legal entity distributing those profits to its owners, who are the rightful recipients of those profits. Rather than an avoidable transfer, they argue that the distributions they received were simply distributions of their own "K-1 money," referring to the form on which a partnership reports the distribution of profits to its partners.

How is one to tell the difference? The caselaw explains that a debtor's intent may be inferred from objective circumstances, traditionally known as "badges of fraud." The cases go on to note that these badges include secrecy, transfers to close relatives, retention of possession after transfer of title, and grossly inadequate consideration.[323] As this Court observed in an earlier opinion, the point of these

[322] See *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 355, 360–362 (2016).

[323] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994). 6 Del. C. § 1304(b) lists additional factors that a court "may" consider "among other factors" in assessing actual intent, including whether the debtor was insolvent or received reasonably equivalent value. No single factor is required, and insolvency is not an element of an actual-fraud claim under § 1304(a)(1).

"badges"—in modern parlance, "tells"— are circumstances from which a court may infer an otherwise concealed fraudulent intent. Proving actual intent by direct evidence can be difficult, "since those who intend to defraud others rarely make public announcements of their intentions."[324] "These 'badges' operate essentially as clues from which [the debtor's] intent might be gleaned."[325] Otherwise put, the "badges of fraud developed in the caselaw are designed to smoke out the circumstances in which a transaction that may on its face appear innocuous or legitimate is in fact an effort by a debtor to put its assets outside the reach of creditors."[326]

This case is replete with badges of fraud. The transfers at issue were to insiders. The transfers were made on account of the members' equity holdings – no consideration was received by the debtor for any of them. One particularly telling "badge," which is present here in some abundance, is that actions by a debtor to cover up or disguise the fact of a transfer suggest that the transfer was made with fraudulent intent. The commonsense insight behind that "badge" is that deliberate efforts to conceal a transfer or misrepresent its nature may suggest that an accurate account of the transfer would reveal it was improper.

---

This Memorandum Opinion focuses on the badges most applicable to the circumstances of this case.

[324] *Drivetrain, LLC v. X. Com., Inc.*, No. 22-50448, 2023 WL 1804627, *3 (Bankr. D. Del. Feb. 7, 2023).

[325] *Id.*

[326] *Id.* at *4.

That is the case here. Mott failed to disclose certain transfers on the sworn statement of financial affairs.[327] Based on the evidence described above, the Court finds that she whited out the transfers from the bank statements before they were produced to the trustee.[328] She falsely described transfers to purchase real estate as payments for legal services.[329] Million-dollar transfers were made by a cashier's check that apparently vanished for years.[330] Funds were moved around to undisclosed bank accounts just as creditors were beginning to exercise remedies that might have permitted them to seize those funds.[331] Although some of these acts of concealment occurred after the transfers, they bear on Mott's purpose in making them. Her efforts to obscure the transfers' existence and true character support the inference that they were not the ordinary profit distributions the defendants assert.

Taken as a whole, the record in this case is a particularly stark example of one in which the badges of fraud strongly support the conclusion that the transfers were made with the actual intent to hinder, delay, or defraud creditors. In May of 2018 GPDEV and Simons emailed Mott to take issue with the way in which Team Systems had calculated what they were owed under the parties' contracts.[332] The record supports the finding, which this Court makes by a preponderance of the evidence,

---

[327] *See supra* notes 104–109 and accompanying text.

[328] *See supra* notes 179–180, 190–208 and accompanying text.

[329] *See supra* notes 176–178 and accompanying text.

[330] *See supra* n.271 and accompanying text.

[331] *See supra* notes 87–90 and accompanying text.

[332] *See supra* n.41 and accompanying text.

that Mott herself understood that GPDEV and Simons were in fact owed more than the debtor had paid them. Indeed, she was required to resort to overt fraud in the Florida litigation to create a false appearance that Team Systems owed less. The subsequent transfers that Team Systems made to its owners and affiliates were made with the purpose and intent of frustrating the efforts of the company's creditors to collect amounts that those creditors were, in fact, owed.

The Court does not infer fraudulent intent merely because the debtor made distributions after learning of a disputed claim. The finding rests on the course of conduct described above: funds were transferred to members and affiliated entities, payments for their benefit were disguised as business expenses, records identifying the recipients were altered, and substantial balances were moved out of the debtor's accounts as the creditors pursued recovery. The Court thus finds that the post-May 2018 transfers were components of that continuing effort to place funds beyond the creditors' reach, rather than isolated, ordinary distributions of profits.

### B. For the transfer made in April 2018, the Court will infer intent to hinder, delay or defraud creditors from the defendants' spoliation and Mott's failure to cooperate in discovery.

As described above, this Court has found that the defendants failed to produce responsive documents and indeed wiped the hard drive containing the debtor's original business and accounting records.[333] And because it would have been deeply unfair and prejudicial to the trustee to permit a party to testify at trial when that party destroyed or refused to produce evidence that might have been used to impeach

[333] *See supra* notes 209–226 and accompanying text.

the testimony they intended to offer, the Court did not permit either Mott or Acosta to testify at trial.[334]

The trustee argued that this sanction was insufficient, and that under the extreme circumstances presented in this case, the entry of a default judgment would have been more appropriate.[335] And while the Court was not without sympathy for the trustee's position in this regard, the Court concluded that prudence counseled in favor of adhering to the "preference that cases be disposed of on the merits whenever practicable."[336] That said, in view of the fact that Mott and Acosta refused to produce documents in discovery, despite having been ordered by the Court to do so, and indeed had destroyed the debtor's original business records by wiping the computer's hard drive, the Court did not believe it could permit either defendant to testify at trial.

Rule 37(b)(2)(A)(ii) expressly authorizes the Court to preclude testimony when a party disobeys an order requiring the production of documents relevant to that testimony.[337] The resulting prejudice is not confined to surprise about what the witness will say; it includes interference with the opposing party's ability to investigate, test, and rebut that account, including through effective impeachment.[338]

---

[334] *See supra* notes 292–307 and accompanying text.

[335] *Id.*

[336] *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984). *See also United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194–195 (3d Cir. 1984) (explaining that defaults and default judgments are disfavored and that doubtful cases should be resolved to permit adjudication on the merits).

[337] *See* Fed. R. Civ. P. 37(b)(2)(A)(ii); *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221–222 (3d Cir. 2003).

[338] *See Ware*, 322 F.3d at 222 (recognizing prejudice from "impeding a party's ability to prepare effectively a full and complete trial strategy").

Relatedly, the Third Circuit has explained that permitting testimony after discovery has been withheld may unfairly disadvantage an opponent because "[t]he opportunity to combat the newly available testimony might no longer exist."[339]

Indeed, as described above, the trustee sought the more severe sanction of a default. Under the Third Circuit's decision in *Poulis*, a case could certainly have been made that such a sanction was warranted here.[340] The Court concluded, however, that the lesser sanction of precluding the testimony of witnesses who refused to cooperate in discovery was more appropriately tailored to the circumstances of the case. In Mott's case, the change of circumstances occasioned by the conclusion of her criminal trial warranted giving her another opportunity to cooperate in discovery. She declined. Nothing in Acosta's case justified providing a new opportunity simply because he now wanted to testify at trial.

To be sure, preclusion must nevertheless be tailored to the actual prejudice rather than imposed automatically.[341] Here, the defendants' continuing refusal to produce court-ordered documents bearing directly on their proposed testimony deprived the trustee of a fair opportunity to examine those documents, pursue appropriate follow-up discovery, and prepare an informed cross-examination. Merely permitting questioning at trial would not restore the investigative opportunity that

---

[339] *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994).

[340] *See Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984) (identifying six factors for a court to weigh before imposing a dismissal or default sanction: (1) the party's personal responsibility; (2) prejudice to the adversary; (3) a history of dilatoriness; (4) whether the conduct was willful or in bad faith; (5) the effectiveness of lesser sanctions; and (6) the meritoriousness of the claim or defense).

[341] *Graystone Nash*, 25 F.3d at 193–194.

the withheld documents should have afforded. Having offered a further opportunity to produce the documents and cure that prejudice, the Court exercised its discretion to preclude trial testimony when the defendants declined to comply, while leaving them free to challenge the trustee's proof through otherwise admissible evidence.[342]

The *Poulis* factors confirm that the sanction imposed was well within the Court's discretion and was a good deal more restrained than the sanction the trustee sought. The responsibility is the defendants' own: it was Mott and Acosta, not counsel, who disregarded the orders compelling production, who refused to be deposed, and who (as found above) wiped the drive and created the false documents. The prejudice to the trustee was real: he never received a general ledger, a trial balance, or the documents bearing on the defendants' account of the transfers, and he could not test their testimony. The history includes repeated disregard of the Court's orders and deadlines. The conduct was willful and, as found above, in bad faith. Alternatives were considered and tried: the Court declined to enter a default, offered Mott a chance to cure, and could not grant a continuance without risking further dissipation of assets. And the defendants' principal defense (that these were ordinary profit distributions) depended on the very records, including Mott's tax returns, that they withheld. The sanction also left the defendants able to cross-examine the trustee's witnesses, present admissible documents, call other witnesses, and argue their case. Their proffers are preserved for appeal. As noted, the Court believes that a colorable case might be made that it ought to have exercised its

[342] *See supra* notes 298–309 and accompanying text.

discretion more harshly in light of the egregious misconduct and risk of prejudice to the trustee. The Court does not see, however, how it could have imposed a lesser sanction than it did.

Separately from the testimony-preclusion ruling, and most directly relevant here, the Court also concludes that an adverse inference concerning the lost electronic accounting records is warranted under Rule 37(e)(2)(A).[343] Rule 37(e) separately governs the loss of electronically stored information. As described above, the Court finds that the debtor's original electronic accounting records should have been preserved for this litigation, and that the defendants failed to take reasonable steps to preserve those records.[344] Indeed, the Court finds that defendants intentionally destroyed them. The record is clear that the missing information cannot be restored or replaced through additional discovery. Although the trustee obtained bank records and certain emails from third parties, those materials did not restore or replace a contemporaneous general ledger, a trial balance, a statement of profit and loss, or other information that would have been contained in the debtor's accounting system. The record further reveals that the destruction was undertaken with the intent to deprive the trustee of that information's use in this litigation. Rule 37(e)(2)(A) therefore permits the Court to presume that the lost information was unfavorable to the party responsible for its loss. In this Court's view, the extreme circumstances of this case compel such an inference.

---

[343] *See* Fed. R. Civ. P. 37(e)(2)(A).

[344] *See supra* notes 209–226 and accompanying text.

The inference arising from deliberate destruction or suppression of evidence is a close cousin of the inference drawn from concealment as a badge of fraud. Both rest on the commonsense recognition that efforts to prevent discovery of the truth may reveal a fear of what the truth would show. In the spoliation context, that principle permits the Court to infer that the suppressed evidence would have been unfavorable to the party responsible for its suppression.[345]

Here, the inference concerns the purpose of the April 2018 transfer. The record shows that there were fraudulent aspects to the transfer. It was a payment made to Southern Title that was used to buy a home in Ormond Beach, Florida.[346] As described above, the debtor falsely claimed in the Florida litigation that these funds were used to purchase water for hurricane victims.[347] But that does not itself mean that the transfer was made for the purpose of interfering with creditors' efforts to collect on a legitimate debt, such that it is avoidable as a fraudulent conveyance.

The missing records bear directly on that distinction. Contemporaneous communications concerning the debtor's obligations to GPDEV and Simons, and accounting records reflecting those obligations and the debtor's financial position, could illuminate whether the April 2018 payment was an ordinary distribution or an effort to place assets beyond creditors' reach. The trustee need not establish the precise contents of information that the defendants intentionally rendered

[345] *See Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994).

[346] *See supra* n.79 and accompanying text.

[347] *See supra* n.78 and accompanying text.

unavailable, but the connection between that information and the disputed issue must be concrete rather than speculative.[348] Although the precise contents of the lost records cannot now be reconstructed, the evidence supports the finding that the computer contained the debtor's original accounting records bearing on its financial condition and obligations at the time of the April 2018 transfer. Those records were relevant to determining whether the payment was an ordinary distribution of profits or was made with the purpose of placing assets beyond creditors' reach. And the Court finds that it was the defendants' deliberate action that rendered that evidence unavailable.

Under these circumstances, the Court will draw the inference that the unavailable information would have been unfavorable to Mott's contention that the April 2018 payment was an ordinary distribution of profits. Considering that inference together with the payment's use to acquire a residence for Mott and Maciorowski and its subsequent false characterization as a business expense, the Court finds that the trustee has established, by a preponderance of the evidence, that the transfer was made with actual intent to hinder, delay, or defraud creditors. The inference is necessary to that finding: without it, the surviving evidence does not establish the requisite intent at the time of the transfer.[349]

---

[348] *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83–84 (3d Cir. 2019).

[349] Because the Court concludes that each of the transfers is avoidable on actual fraudulent conveyance grounds, it need not and does not reach the question whether the same transfers would also be avoidable as constructive fraudulent conveyances.

### C. The remaining elements necessary to avoid and recover the transfer are satisfied.

Under § 544(b) of the Bankruptcy Code, a trustee's ability to avoid a transfer by relying on state law is limited to a transfer that "is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title."[350] The record indicates that the judgment creditors held claims against the debtor before the first of the challenged transfers in April 2018, and defendants have not argued that there is not a valid "predicate creditor" with respect to any of the transfers. This element is accordingly satisfied.

Finally, the trustee may recover under § 550(a)(1) from the initial transferee of each avoided transfer or the entity for whose benefit such transfer was made.[351] The first 199 transfers listed on Exhibit B to this Memorandum Opinion are initial transfers. The exhibit identifies, as to each defendant, which transfers were made to or for the benefit of that defendant. Those amounts (set forth on pp. 25-26 hereof) are recoverable under § 550(a)(1).

In addition, § 550(a)(2) permits the recovery of an avoided transfer not only from the initial transferee, but also from a subsequent transferee.[352] Transfers 200–202 listed on Exhibit B show three subsequent transfers from Southeast (the initial transferee) to Addy Road. These transfers may accordingly also be recovered from Addy Road as a subsequent transferee under § 550(a)(2). Accordingly, in addition to

---

[350] 11 U.S.C. § 544(b).

[351] 11 U.S.C. § 550(a)(1).

[352] 11 U.S.C. § 550(a)(2).

the $4,006,343.10 as to which Addy Road was an initial transferee, the trustee may also recover, from Addy Road, the $2,208,519.03 as to which it is a subsequent transferee.

## III. The record supports a finding that Mott and Acosta are liable for breaches of fiduciary duty.

In addition to his fraudulent-transfer claims, the trustee asserts that Mott and Acosta breached their fiduciary duties to the debtor. To establish a breach of fiduciary duty, a plaintiff must show that (1) a fiduciary duty exists and (2) the fiduciary breached that duty.[353] The manager of a limited liability company owes fiduciary duties to the company.[354] That default rule can be modified – it may be expanded, restricted, or (at least under Delaware law) even eliminated – by provisions in the limited liability company agreement.[355] In the absence of such a modification, the managers owe the traditional fiduciary duties of loyalty and care.[356]

---

[353] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (citations omitted).

[354] *See* 6 Del. C. § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."). *See also Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 850–851 ("[T]he LLC Act starts with the default that managers of LLCs owe enforceable fiduciary duties."). Note that defendants' post-trial brief does not argue that any of the alleged breaches occurred outside the applicable statute of limitations. D.I. 646 at 39–42. Any such defense is therefore forfeited.

[355] *See* 6 Del. C. § 18-1101 ("[T]he member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement.").

[356] *Kelly v. Blum*, No. CIV.A. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("Delaware cases interpreting Section 18-1101(c) have concluded that … in the absence of a contrary provision in the LLC agreement, LLC managers and members owe traditional fiduciary duties of loyalty and care to each other and to the company." (internal quotations and citations omitted)).

The fiduciary duty of loyalty mandates that a fiduciary must not "use their position of trust and confidence to further their private interests."[357] It "demands that there shall be no conflict between duty and self-interest."[358] At bottom, the duty of loyalty requires that the best interests of the entity take precedence over any interest possessed by the fiduciary.[359] A fiduciary's duty of loyalty can be called into question "by showing that the [fiduciary] was interested in the transaction under consideration or not independent of someone who was."[360] A subsidiary element of the duty of loyalty, a breach of the duty of good faith, can be shown through a demonstration that "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[361]

Here, the debtor's LLC agreement contains no such modification of the default rules as it pertains to the duties owed by the managers.[362] The LLC agreement designates Mott and Acosta as managers.[363] As a result, the default rule controls,

---

[357] *Guth v. Loft Inc.*, 5 A.2d 503, 510 (Del. 1939).

[358] *Id.*

[359] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[360] *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch., 2014) (citations omitted).

[361] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

[362] *See* PX 4 at P0000351, P0000381–P0000383. The trustee also contends that Mott and Acosta violated the terms of the operating agreement. D.I. 647 at 84–86. Those allegations may well be correct as a factual matter. This adversary proceeding, however, does not include a claim by the trustee on behalf of the debtor against the members for breach of the operating agreement. *See* D.I. 37. In view of the voluminous evidence presented, the Court does not believe it necessary to address the allegations that the members failed to adhere to appropriate principles of corporate governance in order to adjudicate the claims that have been asserted.

[363] PX 4 at P0000363.

and Mott and Acosta, as managers, owed fiduciary duties to the debtor. As it relates to the transfers at issue in this case, there is no dispute that Mott was a decision maker of the transfers. Mott also stood on both sides of many of the transfers, including those to herself and to the entity defendants.[364] Mott was the sole signatory and exercised exclusive control over the bank transactions of Addy Road, Southeast, Education, and the debtor.[365] Her decisions to approve each of the transfers that the Court has found to be an intentional fraudulent conveyance was therefore a breach of her fiduciary duties to Team Systems.

Acosta's responsibility for the claims of breach of fiduciary duty presents a closer question. On the one hand, the Court appreciates that as a practical matter Acosta may have played more of an operational role, with financial matters handled primarily by Mott. That said, as a member of the company's management committee, he did agree to take on responsibility for the company's "financial policies," for making "loans or advances to any party," and for any "commitment obligating the Company to make … expenditures of more than $25,000 other than in the ordinary course of business of the Company."[366] The evidentiary record also shows actual involvement by Acosta in certain financial decisions, including approving distributions to members. For example, Christopher Mott testified that Acosta was even more permissive than Mott in permitting distributions. As Christopher Mott

[364] *See supra* n.77 and accompanying text; *see also* Exhibit B.

[365] July 7, 2026 Hr'g Tr. at 37–38; 157; 197; 283.

[366] PX 4 at P0000364–P0000365

testified at trial, "I would have to get on the phone with my mom and Steve [Acosta] and I would say, 'hey, I need 40 grand to go to Vegas' and then she would say 'over my dead body' and I would say 'it's my money' and then we would have a discussion and then Steven would say 'give him his money; it's his money'."[367]

The Court also finds that Acosta knowingly participated in efforts to conceal the transfers, including by submitting a declaration attaching fabricated bank statements.[368] Although that concealment occurred after the challenged transfers, the Court considers it together with his participation in distribution decisions and his role as Mott's principal deputy in managing the debtor in determining his knowledge during the relevant period.

Those specific factual findings are also supplemented by the adverse inference arising from the destruction of the debtor's electronic accounting records. As explained above in Part II.B, the Court finds that Acosta was responsible for the loss of records that should have been preserved, that he acted with the intent to deprive the trustee of the use of those records this litigation, and that he thereby rendered relevant information unavailable. That information could not be restored or replaced through additional discovery.[369] Those records bore on the management of the

---

[367] July 8, 2026 Hr'g Tr. at 157.

[368] *See supra* notes 191–196 an accompanying text.

[369] Acosta testified specifically about the existence of an "old accounting computer." Mar. 9, 2022 Hr'g Tr. at 222. He was personally charged by this Court with responsibility for meeting the debtor's obligations to turn over estate property to the trustee. Main Case D.I. 222. He disregarded that duty, failed to turn over the computer to the trustee and thereby permitted it to be destroyed. The Court infers from his failure to comply with the Court's order that he believed compliance with that order would lead to the production of information that would support the trustee's claim of breach of fiduciary duty.

debtor's finances, including Acosta's participation in that management. The Court infers that the unavailable records would have been unfavorable to Acosta's position that financial matters were left solely to Mott and that he lacked knowledge of, or involvement in, the challenged transfers. Considering that inference together with direct evidence of his financial-management responsibilities under the LLC agreement, his actual participation in distribution decisions, and his subsequent knowing concealment, the Court finds that Acosta knew of the improper purpose of the challenged transfers and nevertheless approved them or knowingly permitted them to proceed. His knowing approval of, or conscious failure to intervene in, decisions he understood were improper constitutes a breach of his duty of loyalty. His liability does not rest merely on his managerial title or a negligent failure to discover Mott's conduct.[370]

As explained above, the Court finds that each of the challenged transfers was made with actual intent to hinder, delay, or defraud creditors. Moreover, as distributions of profits to or for the benefit of the company's equity holders, the debtor did not receive any consideration in exchange for any of these transfers. The Court's finding of breach does not rest, however, merely on the absence of consideration. Rather, the transfers were not legitimate distributions of profits but diversions of the debtor's assets for the improper purpose described above. In directing, knowingly approving, or consciously permitting those diversions, the responsible managers

[370] *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

subordinated the debtor's interests to the recipients' private interests. As such, the managers breached their fiduciary duties to the debtor.

As the last column of Exhibit B shows, the total amount of the transfers challenged as fraudulent conveyances comes to almost $14 million (counting each transfer only once, even if multiple defendants may have joint and several responsibility for certain of the transfers). The trustee, however, recognized that there is no margin in seeking to recover from the defendants an amount in excess of the legitimate claims against the estate (including professional fees and trustee commission), since any amount in excess of that would in any event be returned to the members in their capacity as equity holders in the debtor.[371]

During closing argument, the Court asked the trustee to identify the maximum recovery he sought on the fiduciary-duty claims, taking account of his acknowledgment that recovery beyond the amount necessary to satisfy legitimate claims and expenses of administration would serve no practical purpose.[372] The trustee undertook to provide that figure in his posttrial submission.[373] His submission identifies no amount other than "not less than" $12 million.[374] Although that formulation does not, standing alone, express a ceiling, the Court reads it in the context of the specific request to which the submission was responding. The Court accordingly treats $12 million as the damages amount that the trustee accepts will

---

[371] July 10, 2026 Hr'g Tr. at 39–40. *See also* 11 U.S.C. § 726(a)(6).

[372] *Id.* at 41.

[373] *Id.*

[374] D.I. 649 at 4.

pay all valid claims against the estate, including the trustee commission, in full. The claims for breach of fiduciary duty (and the trustee's aggregate recovery from the remaining defendants – the prior settlements, such as the $1 million Smith settlement, are to be excluded from that amount) will accordingly be subject to that cap.[375]

The Court finds that the diversions for which Mott and Acosta are jointly responsible caused the debtor losses exceeding that cap. As Exhibit B shows, the total amount of intentional fraudulent conveyances made by the debtor in the applicable period approaches $14 million. The Court will therefore enter judgment against Mott and Acosta, jointly and severally, in the amount of $12 million on the fiduciary-duty claims. Recoveries on the fraudulent-transfer claims or other claims compensating the same losses shall be credited against that judgment to prevent duplicate recovery.

## IV. The record does not support piercing the corporate veil between the debtor and Mott but does support piercing the veil between the debtor and Addy Road.

The trustee further seeks a declaration that Mott and Addy Road are both "alter egos" of the debtor.[376] Under Delaware law, that relief is a tall order.

---

[375] As the trustee explains in his proposed findings of fact, D.I. 647 at 87, that amount is calculated based on the unpaid prepetition claims filed in the case, which are approximately $8.25 million, plus an estimate of unpaid administrative fees (including professional fees) and the trustee's statutory commission. The defendants argue that the trustee has failed to prove the amount of the administrative claims against the estate. D.I. 646 at 41. But the total estate liability operates as a *cap* on the greater amount of liability that defendants would otherwise owe. Their contention about the burden of proof is therefore misplaced.

[376] D.I. 648 at 36–38.

"Persuading a Delaware court to disregard the corporate entity is a difficult task. In order to … pierce the corporate veil … plaintiffs must [demonstrate] complete domination and control of [the entity]. The degree of control required to pierce the veil is exclusive domination and control ... to the point that [the entity] no longer has legal or independent significance of its own."[377] In appropriate situations, though, "the distinction between the entity and its owner 'may be disregarded' to require an owner to answer for the entity's debts."[378]

In evaluating whether to pierce the corporate veil, courts in Delaware evaluate a number of factors, including "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder."[379] Importantly, courts will only pierce the corporate veil where respecting the corporate form would work an "overall element of injustice or unfairness"[380]

The trustee has not established the requirements for disregarding the debtor's separate existence from Mott. The debtor conducted an actual government-

---

[377] *Wallace v. Wood*, 752 A.2d 1175, 1183–1184 (Del. Ch. 1999) (internal quotations and citations omitted).

[378] *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968)).

[379] *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022) (citation omitted).

[380] *NetJets*, 537 F.3d at 176 (quoting *Harco Nat. Ins. Co. v. Green Farms, Inc.,* 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)).

contracting business for more than 20 years. Mott exercised substantial control over that business and engaged in the misconduct described above, but control and wrongdoing do not, without more, establish that the debtor lacked independent significance or that its separate existence was itself used to accomplish the requisite fraud or injustice. The Court therefore declines to hold Mott liable for the debtor's obligations on an alter-ego theory.

The same cannot be said, however, of Addy Road. As described above, that entity was owned by members of the debtor and appears to have been formed for the purpose of acquiring and holding real property in Bethany Beach, Delaware.[381] The funds it obtained for that purpose, however, were acquired in a transfer from the debtor that the Court has held was made for the purpose of defrauding the creditors of the debtor.[382] In addition, as described above, the record in this case includes a purported invoice from Addy Road, issued before the entity even existed, reflecting the alleged provision of fuel services to the debtor.[383] That invoice was fraudulent, and demonstrates that Addy Road's claimed separate existence was used as a guise to justify otherwise improper transfers. Accordingly, respecting the existence of Addy Road as a legal entity separate from the debtor would only operate to perpetuate the fraud.

---

[381] *See supra* notes 80–82, 171–173 and accompanying text.

[382] *See supra* n.330 and accompanying text.

[383] *See supra* n.84 and accompanying text.

There is no suggestion that Addy Road had assets beyond the Bethany beach house (excluding the cash it received as a fraudulent conveyance from the debtor just as the judgment creditors were seeking to enforce their judgments) or ever conducted any type of business.[384] Even the transfer of the funds it received to acquire the Bethany beach house was itself a fraudulent conveyance. Addy Road therefore existed only as an instrument to facilitate Mott's effort to defraud the debtor's creditors. Respecting the corporate form in these circumstances would thus operate the very type of injustice that the alter ego doctrine is designed to prevent. The Court will therefore declare that Addy Road is answerable, as the debtor's alter ego, for the debtor's prepetition obligations. Under the reasoning of the Third Circuit in *Emoral*, that means that the trustee may recover from Addy Road, on behalf of the estate, the full amount of the debtor's prepetition indebtedness (subject to the recovery limitations described in Part VI.E).[385] This declaration does not itself transfer title to any Addy Road asset. Consistent with the Court's treatment of other post-judgment equitable remedies in Part V of this Memorandum Opinion, the Court reserves

[384] Addy Road's post-trial brief, D.I. 645, seeks to provide evidence that was never produced in discovery in support of its claim of corporate separateness. The Court will not consider any such evidence.

[385] *See, e.g., In re Emoral, Inc.*, 740 F.3d 875, 879–880 (3d Cir. 2014). While the Court is satisfied that this relief is appropriate on the record before it, it notes that the alter ego determination may be of little practical consequence. Addy Road is already liable for a substantial judgment as the recipient of fraudulent conveyances. In addition, as a result of the constructive trust ruling, the Bethany Beach real estate, which the record suggests may be Addy Road's only asset, will be held in constructive trust for the estate. Neither of those recoveries depends on the alter ego determination.

decision on the trustee's separate request under Rule 70(b) that specific assets of Addy Road be vested in the estate.

## V. The trustee is entitled to some of the equitable relief he seeks; the Court will not award attorneys' fees.

In addition to the remedy of veil piercing, the trustee also seeks a potpourri of other equitable relief: a finding that assets are held in constructive trust, an award for unjust enrichment, an accounting, and a permanent injunction against the dissipation of assets.[386] The trustee also seeks an award of legal fees on account of the defendants' bad faith litigation conduct.[387] To the extent the equitable relief the trustee seeks is not duplicative of legal relief already being awarded, and where such equitable relief is warranted by the record, the Court will award it. Bankruptcy Rule 7065 makes Federal Rule of Civil Procedure 65, including Rule 65(d)'s provisions that govern permanent injunctive relief, applicable to injunction requests in bankruptcy proceedings.[388] In addition, § 105(a) of the Bankruptcy Code authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[389] The law is clear that this provision is not a blank check that authorizes bankruptcy courts to override applicable provisions of the

---

[386] D.I. 649 at 4–6.

[387] *Id.* at 6.

[388] Fed. R. Bankr. P. 7065; Fed. R. Civ. P. 65. Following the entry of judgment, the trustee may also avail himself of the postjudgment remedies provided in Fed. R. Civ. P. 69, as made applicable by Fed R. Bankr. P. 7069.

[389] 11 U.S.C. § 105(a).

Bankruptcy Code.[390] It is, however, an express grant of authority to provide traditional equitable remedies that are otherwise warranted by the circumstances of a case.[391]

To obtain permanent injunctive relief, a plaintiff must show success on the merits, that legal remedies are inadequate to avoid irreparable harm, that the balance of equities favors equitable relief, and that the public interest supports the requested relief.[392] Here, as described above, the trustee has prevailed on various of his legal claims against the defendants. As described below, the Court is persuaded that the monetary judgments, standing alone, are inadequate because the defendants have repeatedly moved and concealed assets in a way that would operate to frustrate the trustee's efforts to execute on a judgment. The balance of equities and the public interest thus favor tailored equitable relief.

As described below, to the extent the trustee seeks, as part of the judgment, the type of relief typically provided under Rules 69 or 70 on a postjudgment basis, the Court will not award such relief as part of the judgment. The Court will, however, leave the existing preliminary injunctions in place for a limited period to permit the

---

[390] *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself.")

[391] *See, e.g., In re Cybergenics*, 330 F.3d 548, 567–568 (3d Cir. 2003).

[392] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction").

trustee to seek such specific postjudgment injunctive relief. In addition, as described below, the Court determines that the trustee is entitled to an accounting and the imposition of a constructive trust on certain assets. To the extent the trustee seeks relief, however, that is effectively duplicative of the legal relief awarded, the Court will deny the request.[393]

Finally, the $12 million cap on recovery described above accounts for all legitimate claims against the estate, including administrative expenses such as the trustee's reasonable attorneys' fees. A separate fee award would therefore serve no practical purpose: any recovery beyond the amount necessary to satisfy those claims and expenses would be distributed back to the members as equity holders. The Court will accordingly decline to award attorneys' fees separately.

### A. Protection against the dissipation of assets is most appropriately sought on a postjudgment basis; to avoid creating a gap that would permit dissipation, the Court will leave the preliminary injunction in place pending consideration of a Rule 69 motion.

The trustee asks this Court to enter a sweeping order that would permanently bar the defendants from using or spending any of their assets for any purpose other than paying the judgment, subject to an allowance under which the defendants would be permitted to spend up to $5,000 per month for personal expenses.[394] The Court is disinclined to grant that relief at this time. Rule 69 grants this Court the authority

---

[393] *See id.* at 391 (requiring a showing that remedies at law are inadequate before granting a permanent injunction); *cf. Hogg v. Walker*, 622 A.2d 648, 652–653 (Del. 1993) (recognizing that legal and equitable remedies may be combined when necessary to make the plaintiff whole).

[394] D.I. 649 at 5.

to provide relief in aid of execution of a judgment that is otherwise provided under Delaware state law.[395] Execution and any supplementary proceedings in aid of execution are more appropriately left to the postjudgment process, rather than being awarded as part of the judgment itself.[396]

Preliminary injunctions, however, typically come to an end upon the entry of final judgment.[397] That would appear to leave a gap, between the entry of judgment and the time the court rules on postjudgment motion, when a defendant that had been subject to a preliminary injunction would be free to dissipate assets and thus frustrate the plaintiff's ability to collect on a judgment. That result would be anomalous, and the Court is satisfied that in light of the record before it, it is appropriate to, in effect, maintain the preliminary injunction in place on an interim basis, without prejudice to the defendants' rights to seek relief or the trustee's right to seek additional relief under Rule 69.

While Rule 69 primarily contemplates motions that are filed to enforce an existing judgment, the Court is satisfied that the rule, as well as § 105 of the Bankruptcy Code, which codifies traditional equitable authority, provides a proper basis for this relief. Such interim equitable relief is amply supported by the record, which confirms the findings made in connection with the original preliminary

---

[395] *See* Fed. R. Civ. P. 69 (as made applicable under Fed. R. Bankr. P. 7069).

[396] *See* Fed. R. Civ. P. 69(a); Fed. R. Bankr. P. 7062, 7069; *see also Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134, 138–139 (2014) (describing discovery "[i]n aid of the judgment or execution" under Rule 69(a)(2) as part of "postjudgment execution proceedings").

[397] *United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988).

injunction.[398] The defendants have engaged in improper conduct in an effort to hinder, delay, and frustrate judgment collection activity, including submitting altered documents, providing misleading testimony, routing funds through affiliated entities, and violating a prior preliminary injunction.[399] The trustee has established that, without an asset-preservation injunction, there is a substantial risk that the defendants will again divert or encumber those assets, undermining the trustee's ability to realize on the judgments. That would amount to irreparable injury. The Court will accordingly enter a further injunction that operates to leave in place the January 2023 preliminary injunction through the later of (a) January 31, 2027 or (b) the date on which the Court enters an order resolving the trustee's motion for postjudgment asset-preservation relief, so long as that motion is filed by December 21, 2026. Until such time, the defendants will be prohibited from selling, assigning, transferring, encumbering, mortgaging, or otherwise disposing of any portion or all of their respective interests in the Ormond Beach Property, the Bethany Beach Property, or the proceeds of the Blue Springs Property. The member defendants will be further prohibited and enjoined from using, selling, transferring, assigning, encumbering, mortgaging, or otherwise disposing of any cash or other assets, except to the extent necessary to pay ordinary household and living expenses or ordinary business expenses, as applicable.

---

[398] *See supra* notes 179–181 and accompanying text.

[399] *See supra* notes 327–332 and accompanying text.

### B. The Court will order an accounting.

*Second*, the trustee seeks orders directing the defendants to provide an accounting and reasonable cooperation to identify and trace the fraudulently transferred assets.[400] The evidence shows that, following conversion of the case to chapter 7, defendants continued to resist the trustee's investigation — limiting disclosures, failing to produce ordered documents, and generating or relying on fabricated materials.[401] The equitable remedy of an accounting is therefore warranted. The accounting concerns the disposition of the diverted assets established at trial and is not a general inquiry into all assets potentially available to satisfy the judgments. Requests for additional discovery directed solely to judgment enforcement may be pursued through the applicable postjudgment procedures.

The Court will therefore order the defendants to provide the trustee with a written accounting of the assets and transfers identified in this Memorandum Opinion and to produce, upon reasonable request, bank records (both personal and corporate) and corporate records sufficient to locate and marshal those assets. That accounting should identify the transferees, the flow of funds or property, the entities or accounts used to route the assets, and the location of any remaining property or proceeds. These obligations do not enlarge the substantive scope of the trustee's claims.

---

[400] D.I. 37 ¶ 330–341.

[401] *See supra* notes 158–186 and accompanying text.

### C. The trustee is entitled to a constructive trust over the identified real properties; the Court will not impose a constructive trust over the funds held by the Government.

A constructive trust is an equitable remedy that prevents a person who holds legal title from retaining a benefit that in equity belongs to another.[402] It may be imposed when "fraudulent, unfair or unconscionable conduct" has unjustly enriched the defendant at the expense of another to whom the defendant owed a duty.[403] The remedy is asset-specific: it may reach the property wrongfully obtained or its identifiable proceeds, including money in an identifiable fund to which the claimant can trace its equitable interest.[404] Thus, proof that a defendant received diverted funds does not, without more, justify imposing a constructive trust on the defendant's general assets. The trustee must link the diverted funds to the particular property or fund on which the trust is sought.

In view of the evidentiary record established at trial, the Court is satisfied that a constructive trust may be imposed, for the benefit of the trustee, on the Bethany Beach property and the Ormond Beach property. The record establishes that both of those assets were acquired directly with funds of the debtor that were fraudulently conveyed to the party who had nominal title to those properties.[405] There is no question of whether the funds at issue can be traced to the wrongdoing, and defendants do not suggest that any portion of the funds used to purchase these

---

[402] *Adams v. Jankouskas*, 452 A.2d 148, 152 n.4 (Del. 1982).

[403] *Id.* at 152.

[404] *Hogg*, 622 A.2d at 652–653.

[405] *See supra* notes 329–330, 346–347 and accompanying text.

properties came from any source other than the transfers found to be fraudulent conveyances. It follows from ordinary equitable principles that those properties are held in constructive trust for the bankruptcy estate. This Court's judgment will thus reflect the imposition of a constructive trust on those properties.

The trustee also seeks the imposition of a constructive trust on funds that the trustee says were seized by the Department of Justice from bank accounts held by Addy Road and Southeast.[406] The trustee is correct that the record in this case suggests that those are funds that were fraudulently conveyed by the debtor to Addy Road and Southeast.[407] That said, the trustee has provided the Court with rather little information regarding the nature of the Government's forfeiture proceedings. The trustee's claims against the defendants are distinct from the question whether the estate has an interest in those assets that is superior to the interest claimed by the United States. This Court believes that question is more properly before the court administering the forfeiture under 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(c). This ruling accordingly does not adjudicate the United States' interest or foreclose any relief that remains available to the trustee in the forfeiture proceeding. But without the Government's participation in this adversary proceeding, or further information about that forfeiture proceeding, this Court does not believe it appropriate to impose a constructive trust on assets in the Government's possession.

---

[406] D.I. 649 at 11.

[407] *See supra* n.331 and accompanying text.

Finally, the Court will also deny the relief sought on a theory of unjust enrichment, which would simply duplicate the legal relief awarded.[408]

## VI. None of the defendants' other arguments has merit.

While most of the defendants' principal arguments were considered and addressed in the analysis set forth above, the Court did believe it appropriate to respond to a number of specific points that the defendants make that either are not otherwise expressly addressed above or warrant further emphasis.

### A. The defendants may not relitigate the allowance of the Florida judgment creditors' claims.

The nub of the defendants' argument is that they are fully entitled to distribute the profits of the debtor to its members.[409] Members of a limited liability company (particularly a solvent one) may ordinarily receive lawful distributions of profits.[410] But that does not insulate a transfer made with actual intent to hinder, delay, or defraud creditors.[411] When an entity has unpaid creditors, moving its assets to the entity's owners in order to frustrate creditors' collection efforts is a fraudulent conveyance.

One of the defendants' principal responses to that point is to assert that they do not have any valid unpaid creditors because the Florida judgment was "illegal."[412]

[408] The Court likewise does not address legal theories, such as aiding and abetting liability, where the relief would be wholly duplicative of other relief provided herein.

[409] D.I. 646 at 1.

[410] *See* 6 Del. C. §§ 18-601, 18-607(a).

[411] *See* 6 Del. C. § 1304(a)(1); *see also id.* § 18-607(b) (preserving members' liability under "other applicable law" for the amount of a distribution).

[412] D.I. 646 at 29.

As the defendants put it in their post-trial brief, "a debtor's good-faith refusal to satisfy an unenforceable obligation is not evidence of an intent to defraud."[413] The problem with that argument is, among other things, that the time to make it has long come and gone. The argument was rejected by the courts before which it has been made. And those determinations are now final and non-appealable.

The debtor failed to make this argument in its answer as a defense to the Florida lawsuit. The debtor tried, near the end of the trial, to amend its answer to include the defense.[414] But the district court denied that motion on two grounds.[415] *First*, it held that it failed on the merits. *Second*, it concluded that permitting an amendment at that late stage of the case would have unfairly prejudiced the plaintiffs.

That decision did not reach the Eleventh Circuit on review. Instead, the debtor filed this bankruptcy case which was converted to a chapter 7. The chapter 7 trustee then settled the claims underlying the Florida litigation at a ten percent discount.[416] This Court approved that settlement as a reasoned exercise of the trustee's business judgment.[417] That decision was affirmed by the district court.[418] The Third Circuit found that the members lacked appellate standing to challenge the district court's

---

[413] *Id.* (emphasis in original).

[414] *See* PX 183, docket entry 289.

[415] *See id.*, docket entry 302.

[416] *See supra* n.229 and accompanying text.

[417] *See supra* n.234 and accompanying text.

[418] *See supra* n.235 and accompanying text.

determination.[419] And the Third Circuit's decision became final when the time to seek certiorari expired without any petition having been filed.

The defendants have established no basis in this proceeding to revisit the allowance of those claims. The Florida judgments established the debtor's liability, and this Court's order approving the trustee's settlement fixed the allowance of those claims in this case. That order remains in effect, and its affirmance on appeal is conclusive of the question whether the claims are allowed. The Court therefore need not decide whether the Florida court's ruling rejecting the debtor's proposed illegality defense on the merits is "issue preclusive" of the defendants' effort to relitigate that issue here. Even assuming that Mott genuinely disputed the obligations (whether on the ground that the contract was "illegal," or otherwise), that would not affect the determination, as set forth above, that she made the transfers with the actual intent to hinder, delay, or defraud creditors.

Alternatively, the defendants have suggested at times that they were entitled to make the distributions at issue because the company had tens of millions of dollars in receivables that would be coming in shortly from FEMA, thus ensuring that all creditors would be paid in full. But as described above, those claims were exceedingly weak. The one claim that Team Systems sought to pursue was rejected by every court to consider it. And Team Systems never even made an effort to submit the other. The Court accordingly rejects the suggestion that those receivables undermine the conclusion that the transfers were made with fraudulent intent.

[419] *See supra* notes 238–240 and accompanying text.

### B. Defendants' various arguments grounded in principles of governmental secrecy are unsuccessful.

Defendants have argued throughout the case that because the debtor was a defense contractor, they were precluded from producing documents in discovery that were classified or otherwise contained confidential governmental information.[420] Indeed, the gravamen of the defendants' motion seeking the recusal of the undersigned judge was that the Court did not pay sufficient heed to concerns regarding the need to protect confidential governmental information.[421] This Court addressed those points in its Memorandum Opinion denying the motion to recuse.[422] There, the Court explained that under the principle of *United States v. Reynolds*, only the Government may invoke the state secrets privilege.[423] The Court explained that, consistent with that principle, each time the debtor or the defendants raised a national security question in the case, the Court turned to counsel to the United States to ensure that the Government had an opportunity to protect confidential information consistent with the interests of national security.[424] The Government never raised any such concern over the course of the case. Nor did the defendants identify a governmental assertion of privilege, or other applicable restriction, that justified withholding the documents at issue. Defendants' contention that the Court improperly permitted the trustee to access confidential governmental information, or

---

[420] *See e.g.*, D.I. 635.

[421] D.I. 635 at 2–3.

[422] *See Miller v. Mott*, No. 22-10066, 2026 WL 2168152 (Bankr. D. Del. July 27, 2026).

[423] *Id.* at *7; *see also United States v. Reynolds*, 345 U.S. 1, 7 (1953).

[424] *Miller*, 2026 WL 2168152, at *7.

that they should be excused from complying with their obligation to produce responsive documents, accordingly fails.

### C. There is no basis to exclude debtor's emails obtained by a third-party subpoena.

Defendants moved to exclude evidence that the trustee obtained by a third-party subpoena from the entity that hosted the tsi-us.net domain, including copies of debtor emails.[425] The theory of the motion was that the production violated the Stored Communications Act and that the documents produced exceeded the scope of those sought in the subpoena. The Court expressly denied this motion at trial when the documents at issue were admitted into evidence.[426] The record in the case makes clear that the email domain at issue belonged to the debtor and was therefore subject to the ordinary obligation to turn over to the trustee upon the conversion of the case to chapter 7. The subpoenas in question were filed on the public docket.[427] Counsel for the trustee represented, without contradiction, that these documents were produced to counsel for the defendants.[428]

And the Court likewise rejected the contention that this evidentiary ruling provided a basis for recusal, specifically rejecting the notion that the Stored Communications Act provides a basis for the exclusion of evidence lawfully obtained by subpoena.[429] Indeed, the defendants' argument has even less force in a context in

---

[425] D.I. 614.

[426] July 8, 2026 Hr'g Tr. at 132–139.

[427] D.I. 229; D.I. 441.

[428] July 8, 2026 Hr'g Tr. at 138.

[429] *Miller*, 2026 WL 2168152, at *7 n.54.

which they were themselves under an affirmative obligation to produce these documents, and without justification refused to comply with that obligation. There is no basis to exclude these documents from the evidentiary record.

### D. The Court properly precluded Mott and Acosta from testifying at trial.

Defendants also underscore their objections to this Court's rulings that barred Mott and Acosta from offering trial testimony. While this point is addressed above in Part II.B of this Memorandum Opinion, the Court will address it briefly to avoid any confusion on this point. At trial, Homony testified that neither the debtor nor the defendants produced various documents, including emails, supporting documentation for transactions, certain bank statements and reconciliation documents, among other documents.[430] The Court credits this testimony, which is consistent with the Court's prior conclusions that defendants had disregarded the Court's prior orders compelling the production of certain documents.

In addition, Acosta refused to answer questions at his deposition, invoking his Fifth Amendment right against self-incrimination.[431] That may be his right. But he cannot have it both ways. Having refused to answer substantive questions at his deposition, he cannot announce on the eve of trial that he has changed his mind and then offer testimony that the trustee lacked any opportunity to discover before trial by taking a deposition. That conclusion accords with established law. A party's valid invocation of the Fifth Amendment during discovery (assuming for this purpose that

---

[430] *See supra* notes 163–167 and accompanying text.

[431] *See supra* n.306 and accompanying text.

Acosta's invocation was a valid one) does not confer an unconditional right to waive the privilege at trial and offer testimony that the opposing party lacked a fair opportunity to investigate.[432] The Court may exclude such testimony when necessary to prevent unfair prejudice, provided the exclusion is tailored to that prejudice rather than imposed as a penalty for invoking the privilege.[433] That is the core concern here. The trustee was prejudiced by the inability to depose Acosta, and there was no practical or appropriate way to cure that prejudice. The Court concluded that exclusion was warranted under these circumstances, particularly because—in light of the defendants' improper dissipation of assets in violation of the Court's order—the Court was not prepared to grant a continuance of the trial date that would have risked further dissipation.

The Court reached a different conclusion for Mott. Upon the completion of her criminal trial, the Court was prepared to permit her to testify during this adversary proceeding if she produced the documents that she was previously ordered to produce and sat for a deposition immediately before trial.[434] The Court did not afford this option to Acosta because his desire to testify at trial simply represented a change of heart. Mott, however, presented a different case because upon the conclusion of her criminal trial—at which she waived her Fifth Amendment right and testified—she was facing changed circumstances. This Court concluded (over the trustee's

---

[432] *See supra* notes 306–307 and accompanying text.

[433] *See supra* n.341 and accompanying text.

[434] *See supra* n.304 and accompanying text.

vociferous objection) that in view of those changed circumstances, the Court would permit her testimony so long as the trustee was afforded a fair opportunity to obtain discovery, even if in a hurried fashion.

Mott elected not to produce the relevant documents, which included her personal tax returns. Those returns were highly relevant to matters at dispute in this case, since the defendants' theory was that the transactions challenged as fraudulent conveyances were simply the distribution of the members' profits from the debtor's business. The trustee was thus entitled to see how, if at all, the defendants treated these distributions on their tax returns. Mott was thus ordered to produce her tax returns. She chose to ignore that order. The Court then said that she could testify at trial only if she would produce those documents. She said she would not. The Court thus precluded her testimony. The Court does not see how it could have ruled otherwise under the circumstances. The defendants' objections to those rulings are accordingly overruled.

**E. The single-recovery rule applies.**

Defendants take issue with the suggestion that they should be jointly and severally liable on certain of the trustee's legal theories and argue that the trustee is seeking a duplicative recovery. While that argument is meritless, the Court will out of an abundance of caution explain why that is so. The fundamental theory of liability is one for fraudulent conveyance. The breaches of fiduciary duty for which Mott and Acosta are being held liable are their decisions to authorize those fraudulent conveyances. The trustee has voluntarily accepted a cap on recoveries of $12 million. That cap applies to all recoveries, from all of the defendants except for those who

previously settled, on any and all of the trustee's legal theories. Once the trustee has recovered $12 million from these defendants (including the value recovered through enforcement of the constructive trust), the Court's judgment will have been satisfied in full, and the trustee will be entitled to no further recovery. The cap does not enlarge any defendant's individual liability or make any defendant liable for transfers for which that defendant is not otherwise answerable.

The same rules apply to the default judgments previously entered against Education and Gulf Coast. A defendant's default does not change the amount of the estate's loss, and § 550(d) permits only one satisfaction of each avoided transfer. Amounts recovered from Education or Gulf Coast therefore count toward the $12 million limitation, and any amount recovered from either, on a given transfer, is credited against the liability of every other defendant who is answerable for that transfer, just as recoveries from the other defendants are credited against theirs. Nothing in this Memorandum Opinion or the accompanying judgment enlarges the amounts for which Education and Gulf Coast were held liable.

Satisfaction of any defendant's liability will end collection of the judgment against that defendant without regard to whether the trustee has recovered the full $12 million. Because under § 726 of the Bankruptcy Code, creditors are entitled to be paid interest on a claim before a distribution is made to equity holders, the trustee's right to postjudgment interest shall not be subject to the $12 million cap. The conclusions above accord with § 550(d) of the Bankruptcy Code and ordinary

principles of equity. The defendants' claim that this relief is prejudicial to them is thus incorrect.

## Conclusion

The Court has attached, as Exhibit C, a proposed form of judgment. That judgment details the specific relief being entered with respect to each of the theories of liability described herein. The Court intends that judgment to be a final judgment with respect to the adversary proceeding. Appreciating the complexity of the case, however, the Court believes it appropriate to give the parties the opportunity to comment on the proposed form of judgment to confirm that it correctly reflects the rulings described in this Memorandum and fully resolves all remaining claims in this adversary proceeding (except, of course, for postjudgment matters).

To the extent the parties have comments on the proposed form of order, they should provide them to the Court, in the form of a letter, by 4:00 pm on December 4, 2026. The Court does not expect the parties, in that letter, to seek reconsideration of matters expressly considered in this Memorandum Opinion. Rather, the Court's concern is that the form of judgment accurately capture the rulings made herein and otherwise provides for a final disposition of the claims at issue in the adversary proceeding. To the extent the parties intend to seek reconsideration of the Court's rulings, they may do so following the entry of the judgment. To the extent the Court concludes, after reviewing the parties' letters, that a hearing would be helpful, the Court will set a time for such a hearing. The Court otherwise intends to issue the judgment promptly following its consideration of the points raised by the parties.

The preliminary injunctions entered on January 31, 2023 remains in effect until entry of the judgment.

In addition, to the extent there are outstanding matters in the main bankruptcy case that were set to be heard in connection with the trial in July and that have not been overtaken by this ruling, the parties should reach out to chambers to set a hearing at which any such matters may be taken up.

Dated: November 24, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A – Documents admitted into evidence (subject to limitations as set forth on the record)**

| Plaintiff's Exhibits | Transcript Cite |
|---|---|
| PX-1 | July 6, 2026 Hr'g Tr. at 277; 278; 279. |
| PX-2 | July 8, 2026 Hr'g Tr. at 44. |
| PX-3 | July 8, 2026 Hr'g Tr. at 44. |
| PX-4 | July 6, 2026 Hr'g Tr. at 267. |
| PX-5 | July 6, 2026 Hr'g Tr. at 28. |
| PX-6 | July 6, 2026 Hr'g Tr. at 29. |
| PX-7 | July 6, 2026 Hr'g Tr. at 30. |
| PX-8 | July 6, 2026 Hr'g Tr. at 30. |
| PX-12 | July 6, 2026 Hr'g Tr. at 31. |
| PX-16 | July 6, 2026 Hr'g Tr. at 146. |
| PX-18 | July 6, 2026 Hr'g Tr. at 31; 32. |
| PX-19 | July 6, 2026 Hr'g Tr. at 93; 96; 98. |
| PX-22 | July 6, 2026 Hr'g Tr. at 124; 125. |
| PX-23 | July 6, 2026 Hr'g Tr. at 126. |
| PX-25 | July 6, 2026 Hr'g Tr. at 149. |
| PX-27 | July 6, 2026 Hr'g Tr. at 55. |
| PX-28 | July 8, 2026 Hr'g Tr. at 116. |
| PX-29 | July 8, 2026 Hr'g Tr. at 116. |
| PX-30 | July 8, 2026 Hr'g Tr. at 116. |
| PX-31 | July 6, 2026 Hr'g Tr. at 341; 342. |
| PX-32 | July 8, 2026 Hr'g Tr. at 116. |
| PX-33 | July 6, 2026 Hr'g Tr. at 153. |
| PX-34 | July 7, 2026 Hr'g Tr. at 39. |
| PX-35 | July 7, 2026 Hr'g Tr. at 56. |
| PX-36 | July 7, 2026 Hr'g Tr. at 56. |
| PX-37 | July 7, 2026 Hr'g Tr. at 59. |
| PX-38 | July 7, 2026 Hr'g Tr. at 59. |
| PX-39 | July 7, 2026 Hr'g Tr. at 69. |
| PX-40 | July 7, 2026 Hr'g Tr. at 70. |
| PX-41 | July 7, 2026 Hr'g Tr. at 79; 80. |
| PX-42 | July 7, 2026 Hr'g Tr. at 82. |
| PX-43 | July 7, 2026 Hr'g Tr. at 88. |
| PX-44 | July 7, 2026 Hr'g Tr. at 90. |
| PX-47 | July 7, 2026 Hr'g Tr. at 91. |
| PX-48 | July 7, 2026 Hr'g Tr. at 92; 93. |
| PX-49 | July 7, 2026 Hr'g Tr. at 92; 93. |
| PX-50 | July 7, 2026 Hr'g Tr. at 92; 93. |
| PX-51 | July 7, 2026 Hr'g Tr. at 92; 93. |
| PX-52 | July 7, 2026 Hr'g Tr. at 92; 93. |

| | |
|---|---|
| PX-53 | July 7, 2026 Hr'g Tr. at 99. |
| PX-54 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-55 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-56 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-57 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-58 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-59 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-60 | July 6, 2026 Hr'g Tr. at 108; 109. |
| PX-61 | July 6, 2026 Hr'g Tr. at 108; 109. |
| RX-62 | July 7, 2026 Hr'g Tr. at 37. |
| RX-63 | July 7, 2026 Hr'g Tr. at 37. |
| PX-65 | July 6, 2026 Hr'g Tr. at 139. |
| PX-66 | July 6, 2026 Hr'g Tr. at 140. |
| PX-67 | July 6, 2026 Hr'g Tr. at 141. |
| PX-68 | July 6, 2026 Hr'g Tr. at 142. |
| PX-69 | July 6, 2026 Hr'g Tr. at 165; 166. |
| PX-71 | July 6, 2026 Hr'g Tr. at 167. |
| PX-72 | July 6, 2026 Hr'g Tr. at 168; 169. |
| PX-73 | July 6, 2026 Hr'g Tr. at 170; 171. |
| PX-74 | July 6, 2026 Hr'g Tr. at 172. |
| PX-75 | July 6, 2026 Hr'g Tr. at 172. |
| PX-76 | July 6, 2026 Hr'g Tr. at 174. |
| PX-77 | July 6, 2026 Hr'g Tr. at 175. |
| RX-78 | July 7, 2026 Hr'g Tr. at 162; 163. |
| PX-80 | July 6, 2026 Hr'g Tr. at 176. |
| PX-81 | July 6, 2026 Hr'g Tr. at 177. |
| PX-83 | July 6, 2026 Hr'g Tr. at 158. |
| PX-84 | July 6, 2026 Hr'g Tr. at 178. |
| PX-85 | July 6, 2026 Hr'g Tr. at 179; 180. |
| PX-86 | July 6, 2026 Hr'g Tr. at 181. |
| PX-87 | July 6, 2026 Hr'g Tr. at 181. |
| PX-88 | July 6, 2026 Hr'g Tr. at 183. |
| PX-89 | July 6, 2026 Hr'g Tr. at 184; 185. |
| PX-90 | July 6, 2026 Hr'g Tr. at 186. |
| PX-91 | July 6, 2026 Hr'g Tr. at 188. |
| PX-92 | July 6, 2026 Hr'g Tr. at 200. |
| PX-94 | July 6, 2026 Hr'g Tr. at 201. |
| PX-95 | July 6, 2026 Hr'g Tr. at 202. |
| PX-96 | July 6, 2026 Hr'g Tr. at 203. |
| PX-97 | July 6, 2026 Hr'g Tr. at 204. |
| PX-98 | July 6, 2026 Hr'g Tr. at 207. |
| PX-99 | July 6, 2026 Hr'g Tr. at 208. |
| PX-100 | July 6, 2026 Hr'g Tr. at 210. |

| | |
|---|---|
| PX-101 | July 6, 2026 Hr'g Tr. at 212. |
| PX-102 | July 6, 2026 Hr'g Tr. at 215. |
| PX-103 | July 6, 2026 Hr'g Tr. at 216. |
| PX-104 through PX-110 | July 6, 2026 Hr'g Tr. at 220. |
| PX-111 | July 6, 2026 Hr'g Tr. at 221. |
| PX-112 | July 6, 2026 Hr'g Tr. at 225; 226. |
| PX-113 | July 6, 2026 Hr'g Tr. at 228. |
| PX-114 | July 6, 2026 Hr'g Tr. at 226; 227. |
| PX-115 | July 6, 2026 Hr'g Tr. at 228. |
| PX-116 | July 6, 2026 Hr'g Tr. at 228. |
| PX-117 | July 6, 2026 Hr'g Tr. at 232. |
| PX-118 | July 6, 2026 Hr'g Tr. at 233. |
| PX-119 | July 6, 2026 Hr'g Tr. at 234. |
| PX-120 | July 6, 2026 Hr'g Tr. at 236. |
| PX-121 | July 6, 2026 Hr'g Tr. at 237. |
| PX-122 | July 6, 2026 Hr'g Tr. at 242. |
| PX-123 | July 6, 2026 Hr'g Tr. at 242; 243. |
| PX-124 | July 6, 2026 Hr'g Tr. at 242; 243. |
| PX-125 | July 6, 2026 Hr'g Tr. at 242; 243. |
| PX-126 | July 6, 2026 Hr'g Tr. at 243; 244. |
| PX-127 | July 6, 2026 Hr'g Tr. at 244; 245. |
| PX-128 | July 6, 2026 Hr'g Tr. at 250. |
| PX-129 | July 6, 2026 Hr'g Tr. at 251. |
| PX-130 | July 6, 2026 Hr'g Tr. at 253. |
| PX-131 | July 6, 2026 Hr'g Tr. at 286. |
| PX-132 | July 6, 2026 Hr'g Tr. at 288. |
| PX-134 | July 6, 2026 Hr'g Tr. at 289. |
| PX-135 | July 6, 2026 Hr'g Tr. at 290. |
| PX-136 | July 6, 2026 Hr'g Tr. at 296. |
| PX-137 | July 6, 2026 Hr'g Tr. at 296. |
| PX-138 | July 6, 2026 Hr'g Tr. at 298. |
| PX-139 | July 6, 2026 Hr'g Tr. at 298. |
| PX-140 | July 6, 2026 Hr'g Tr. at 299. |
| PX-141 | July 6, 2026 Hr'g Tr. at 299. |
| PX-142 | July 6, 2026 Hr'g Tr. at 302. |
| PX-143 | July 6, 2026 Hr'g Tr. at 303. |
| PX-144 | July 6, 2026 Hr'g Tr. at 304. |
| PX-145 | July 6, 2026 Hr'g Tr. at 305. |
| PX-146 | July 6, 2026 Hr'g Tr. at 306. |
| PX-147 | July 6, 2026 Hr'g Tr. at 310. |
| PX-148 | July 6, 2026 Hr'g Tr. at 311. |
| PX-149 | July 6, 2026 Hr'g Tr. at 313. |
| PX-150 | July 6, 2026 Hr'g Tr. at 313. |

| | |
|---|---|
| PX-151 | July 6, 2026 Hr'g Tr. at 313. |
| PX-152 | July 6, 2026 Hr'g Tr. at 316. |
| PX-153 | July 6, 2026 Hr'g Tr. at 319. |
| PX-154 | July 6, 2026 Hr'g Tr. at 320. |
| PX-155 | July 6, 2026 Hr'g Tr. at 321. |
| PX-157 | July 6, 2026 Hr'g Tr. at 322. |
| PX-158 | July 6, 2026 Hr'g Tr. at 323. |
| PX-160 | July 6, 2026 Hr'g Tr. at 324. |
| PX-161 | July 6, 2026 Hr'g Tr. at 326. |
| PX-163 | July 6, 2026 Hr'g Tr. at 328. |
| PX-164 | July 6, 2026 Hr'g Tr. at 332. |
| PX-165 | July 6, 2026 Hr'g Tr. at 333. |
| PX-166 | July 6, 2026 Hr'g Tr. at 333. |
| PX-167 | July 6, 2026 Hr'g Tr. at 340. |
| PX-168 | July 7, 2026 Hr'g Tr. at 102. |
| PX-169 | July 7, 2026 Hr'g Tr. at 103. |
| PX-170 | July 7, 2026 Hr'g Tr. at 103; 104. |
| PX-171 | July 7, 2026 Hr'g Tr. at 104. |
| PX-172 through PX-177 | July 7, 2026 Hr'g Tr. at 105; 106. |
| PX-178 through PX-181 | July 7, 2026 Hr'g Tr. at 106. |
| PX-182 | July 7, 2026 Hr'g Tr. at 109. |
| PX-183 | July 7, 2026 Hr'g Tr. at 11. |
| PX-196 through PX-227 | July 8, 2026 Hr'g Tr. at 108. |
| PX-228 through PX-234 | July 8, 2026 Hr'g Tr. at 130. |
| PX-235 through PX-256 | July 8, 2026 Hr'g Tr. at 130 (Memorandum Opinion Part VI.C) |
| PX-257 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-258 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-259 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-260 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-261 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-262 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-263 | July 8, 2026 Hr'g Tr. at 105; 106. |
| PX-265 | July 8, 2026 Hr'g Tr. at 106. |
| PX-266 | July 8, 2026 Hr'g Tr. at 106. |
| PX-267 | July 8, 2026 Hr'g Tr. at 106. |
| PX-268 | July 8, 2026 Hr'g Tr. at 106. |
| PX-269 | July 8, 2026 Hr'g Tr. at 106. |
| PX-270 | July 8, 2026 Hr'g Tr. at 106. |
| PX-271 | July 8, 2026 Hr'g Tr. at 106. |
| PX-272 | July 8, 2026 Hr'g Tr. at 106. |
| PX-273 | July 8, 2026 Hr'g Tr. at 106. |
| PX-274 | July 8, 2026 Hr'g Tr. at 106. |

| | |
|---|---|
| PX-275 | July 8, 2026 Hr'g Tr. at 106. |
| PX-276 | July 8, 2026 Hr'g Tr. at 106. |
| PX-277 | July 8, 2026 Hr'g Tr. at 106. |
| PX-278 | July 8, 2026 Hr'g Tr. at 106. |
| PX-279 | July 8, 2026 Hr'g Tr. at 106. |
| PX-280 | July 8, 2026 Hr'g Tr. at 106. |
| PX-281 | July 8, 2026 Hr'g Tr. at 106. |
| PX-282 | July 8, 2026 Hr'g Tr. at 106. |
| PX-283 | July 8, 2026 Hr'g Tr. at 106. |
| PX-284 | July 8, 2026 Hr'g Tr. at 106. |
| PX-285 | July 8, 2026 Hr'g Tr. at 106. |
| PX-286 | July 8, 2026 Hr'g Tr. at 106. |
| PX-287 | July 8, 2026 Hr'g Tr. at 106. |
| PX-288 | July 8, 2026 Hr'g Tr. at 106. |
| PX-289 | July 8, 2026 Hr'g Tr. at 106. |
| PX-290 | July 8, 2026 Hr'g Tr. at 106. |
| PX-291 | July 8, 2026 Hr'g Tr. at 106. |
| PX-292 | July 7, 2026 Hr'g Tr. at 187. |
| PX-293 | July 7, 2026 Hr'g Tr. at 191. |
| PX-294 | July 7, 2026 Hr'g Tr. at 191. |
| PX-295 | July 7, 2026 Hr'g Tr. at 299. |
| PX-296 | July 7, 2026 Hr'g Tr. at 301. |
| PX-297 | July 7, 2026 Hr'g Tr. at 301. |
| PX-298 | July 7, 2026 Hr'g Tr. at 302. |
| PX-299 | July 7, 2026 Hr'g Tr. at 301. |
| PX-300 | July 7, 2026 Hr'g Tr. at 301. |
| PX-301 | July 7, 2026 Hr'g Tr. at 301. |
| PX-302 | July 7, 2026 Hr'g Tr. at 301. |
| PX-303 | July 7, 2026 Hr'g Tr. at 301. |
| PX-304 | July 7, 2026 Hr'g Tr. at 301. |
| PX-305 | July 7, 2026 Hr'g Tr. at 193. |
| PX-306 | July 7, 2026 Hr'g Tr. at 194. |
| PX-307 | July 7, 2026 Hr'g Tr. at 197; 198. |
| PX-308 | July 7, 2026 Hr'g Tr. at 207. |
| PX-309 | July 7, 2026 Hr'g Tr. at 213. |
| PX-310 | July 7, 2026 Hr'g Tr. at 211. |
| PX-316 | July 7, 2026 Hr'g Tr. at 250. |
| PX-317 | July 7, 2026 Hr'g Tr. at 248. |
| PX-318 | July 7, 2026 Hr'g Tr. at 248. |
| PX-319 | July 7, 2026 Hr'g Tr. at 249. |
| PX-320 | July 7, 2026 Hr'g Tr. at 262. |
| PX-321 | July 7, 2026 Hr'g Tr. at 254. |
| PX-322 | July 7, 2026 Hr'g Tr. at 263. |

| | |
|---|---|
| PX-323 | July 7, 2026 Hr'g Tr. at 268. |
| PX-324 | July 7, 2026 Hr'g Tr. at 270. |
| PX-325 | July 7, 2026 Hr'g Tr. at 271. |
| PX-326 | July 7, 2026 Hr'g Tr. at 274. |
| PX-328 | July 7, 2026 Hr'g Tr. at 276. |
| PX-329 | July 7, 2026 Hr'g Tr. at 277; 278. |
| PX-330 | July 7, 2026 Hr'g Tr. at 280. |
| PX-331 | July 7, 2026 Hr'g Tr. at 286. |
| PX-332 | July 7, 2026 Hr'g Tr. at 290; 291. |
| PX-333 | July 7, 2026 Hr'g Tr. at 304. |
| PX-334 | July 7, 2026 Hr'g Tr. at 304. |
| PX-335 | July 7, 2026 Hr'g Tr. at 304. |
| PX-336 | July 7, 2026 Hr'g Tr. at 304. |
| PX-337 | July 7, 2026 Hr'g Tr. at 304. |
| PX-338 | July 7, 2026 Hr'g Tr. at 304. |
| PX-339 | July 7, 2026 Hr'g Tr. at 304. |
| PX-340 | July 7, 2026 Hr'g Tr. at 304. |
| PX-341 | July 7, 2026 Hr'g Tr. at 304. |
| PX-342 | July 7, 2026 Hr'g Tr. at 304. |
| PX-343 | July 7, 2026 Hr'g Tr. at 304. |
| PX-344 | July 7, 2026 Hr'g Tr. at 304. |
| PX-345 | July 7, 2026 Hr'g Tr. at 296. |
| PX-355 through PX-367 | July 8, 2026 Hr'g Tr. at 134. |
| PX-368 through PX-382 | July 8, 2026 Hr'g Tr. at 135. |
| PX-383 through PX-406 | July 8, 2026 Hr'g Tr. at 136. |
| PX-410 | July 7, 2026 Hr'g Tr. at 30. |
| PX-412 | July 6, 2026 Hr'g Tr. at 48; 49. |
| PX-414 | July 6, 2026 Hr'g Tr. at 44. |
| PX-417 | July 6, 2026 Hr'g Tr. at 155. |
| PX-418 | July 6, 2026 Hr'g Tr. at 78; 79. |
| PX-419 | July 6, 2026 Hr'g Tr. at 74. |
| PX-420 | July 7, 2026 Hr'g Tr. at 26. |
| PX-468 through PX-474 | July 8, 2026 Hr'g Tr. at 116. |
| PX-496 | July 6, 2026 Hr'g Tr. at 63. |
| PX-498 | July 6, 2026 Hr'g Tr. at 254. |
| PX-499 | July 8, 2026 Hr'g Tr. at 117. |
| PX-500 | July 8, 2026 Hr'g Tr. at 117. |
| PX-501 | July 8, 2026 Hr'g Tr. at 117. |
| PX-502 | July 8, 2026 Hr'g Tr. at 117. |
| PX-503 | July 8, 2026 Hr'g Tr. at 117. |
| PX-504 | July 8, 2026 Hr'g Tr. at 117. |
| PX-505 through PX-529 | July 8, 2026 Hr'g Tr. at 118. |
| PX-531 | July 8, 2026 Hr'g Tr. at 112. |

| | |
|---|---|
| PX-534 | July 8, 2026 Hr'g Tr. at 109. |
| PX-535 | July 8, 2026 Hr'g Tr. at 107. |
| PX-536 | July 8, 2026 Hr'g Tr. at 106. |
| PX-539 through PX-541 | July 8, 2026 Hr'g Tr. at 113. |
| PX-542 through PX-544 | July 8, 2026 Hr'g Tr. at 114. |
| PX-545 | July 6, 2026 Hr'g Tr. at 100; 101. |
| PX-546 | July 6, 2026 Hr'g Tr. at 100; 101. |
| PX-547 | July 6, 2026 Hr'g Tr. at 100; 101. |
| PX-548 | July 7, 2026 Hr'g Tr. at 24. |
| PX-549 | July 7, 2026 Hr'g Tr. at 27. |
| PX-551 | July 7, 2026 Hr'g Tr. at 233. |
| PX-552 | July 7, 2026 Hr'g Tr. at 243. |
| PX-553 | July 8, 2026 Hr'g Tr. at 41. |
| PX-555 | July 9, 2026 Hr'g Tr. at 9. |
| **Defendants' Exhibits** | **Transcript Cite** |
| DX-3 | July 9, 2026 Hr'g Tr. at 8. |
| DX-4 | July 9, 2026 Hr'g Tr. at 9-10. |

# Exhibit B — Transfers at issue

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Initial transfers** | | | | | | | | | | | |
| 1 | 04/12/2018 | 319,849.91 | Team Systems International, LLC | Southern Title | 319,849.91 | 319,849.91 | 0.00 | 0.00 | 0.00 | 0.00 | 319,849.91 |
| 2 | 08/21/2018 | 24,232.50 | Team Systems International, LLC | All Aqua Pools | 24,232.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,232.50 |
| 3 | 08/27/2018 | 24,235.00 | Team Systems International, LLC | All Aqua Pools | 24,235.00 | 24,235.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,235.00 |
| 4 | 09/25/2018 | 19,232.50 | Team Systems International, LLC | All Aqua Pools | 19,232.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,232.50 |
| 5 | 09/27/2018 | 30,000.00 | Team Systems International, LLC | Deborah Evans Mott | 30,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |
| 6 | 09/27/2018 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 7 | 10/02/2018 | 17,625.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 17,625.00 | 0.00 | 0.00 | 17,625.00 |
| 8 | 10/05/2018 | 25,000.00 | Team Systems International, LLC | Deborah Evans Mott | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 |
| 9 | 10/11/2018 | 35,000.00 | Team Systems International, LLC | Deborah Evans Mott | 35,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35,000.00 |
| 10 | 10/11/2018 | 2,280.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,280.00 | 0.00 | 0.00 | 0.00 | 2,280.00 |
| 11 | 10/16/2018 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 12 | 10/22/2018 | 51,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 51,000.00 | 0.00 | 0.00 | 0.00 | 51,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 10/22/2018 | 50,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 14 | 10/23/2018 | 80,000.00 | Team Systems International, LLC | Deborah Evans Mott | 80,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 80,000.00 |
| 15 | 10/26/2018 | 3,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,500.00 | 0.00 | 0.00 | 0.00 | 3,500.00 |
| 16 | 11/02/2018 | 4,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,500.00 | 0.00 | 0.00 | 0.00 | 4,500.00 |
| 17 | 11/07/2018 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 18 | 11/09/2018 | 16,875.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 16,875.00 | 0.00 | 0.00 | 16,875.00 |
| 19 | 11/28/2018 | 25,875.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 25,875.00 | 0.00 | 0.00 | 25,875.00 |
| 20 | 12/03/2018 | 30,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 30,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |
| 21 | 12/03/2018 | 30,000.00 | Team Systems International, LLC | Deborah Evans Mott | 30,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |
| 22 | 12/03/2018 | 70,000.00 | Team Systems International, LLC | Deborah Evans Mott | 70,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 70,000.00 |
| 23 | 12/03/2018 | 50,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 24 | 12/03/2018 | 20,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 0.00 | 20,000.00 |
| 25 | 12/03/2018 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | 12/27/2018 | 14,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 14,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,000.00 |
| 27 | 01/07/2019 | 20,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 0.00 | 20,000.00 |
| 28 | 01/09/2019 | 7,750.00 | Team Systems International, LLC | All Aqua Pools | 7,750.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7,750.00 |
| 29 | 01/14/2019 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 30 | 01/15/2019 | 7,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 7,000.00 | 0.00 | 0.00 | 0.00 | 7,000.00 |
| 31 | 01/15/2019 | 7,500.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 7,500.00 |
| 32 | 01/29/2019 | 10,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 10,000.00 |
| 33 | 01/29/2019 | 25,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 |
| 34 | 01/29/2019 | 8,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 8,000.00 |
| 35 | 01/31/2019 | 4,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 |
| 36 | 02/11/2019 | 50,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 37 | 02/11/2019 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 38 | 02/13/2019 | 2,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | 02/13/2019 | 25,000.00 | Team Systems International, LLC | Deborah Evans Mott | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 |
| 40 | 02/13/2019 | 25,000.00 | Team Systems International, LLC | Deborah Evans Mott | 25,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25,000.00 |
| 41 | 02/19/2019 | 10,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 42 | 02/19/2019 | 12,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 12,500.00 | 0.00 | 0.00 | 0.00 | 12,500.00 |
| 43 | 03/01/2019 | 15,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 15,000.00 | 0.00 | 0.00 | 0.00 | 15,000.00 |
| 44 | 03/01/2019 | 12,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,000.00 |
| 45 | 03/05/2019 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 46 | 03/05/2019 | 50,000.00 | Team Systems International, LLC | Deborah Evans Mott | 50,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 47 | 03/20/2019 | 20,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 20,000.00 |
| 48 | 03/21/2019 | 20,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 20,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20,000.00 |
| 49 | 04/03/2019 | 12,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 |
| 50 | 04/08/2019 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 51 | 04/08/2019 | 40,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 40,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 40,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52 | 04/12/2019 | 150,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 150,000.00 | 0.00 | 0.00 | 150,000.00 |
| 53 | 04/12/2019 | 150,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 150,000.00 | 0.00 | 0.00 | 150,000.00 |
| 54 | 04/30/2019 | 4,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,500.00 | 0.00 | 0.00 | 0.00 | 4,500.00 |
| 55 | 05/14/2019 | 50,000.00 | Team Systems International, LLC | Deborah Evans Mott | 50,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 56 | 05/14/2019 | 2,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,500.00 | 0.00 | 0.00 | 0.00 | 2,500.00 |
| 57 | 05/22/2019 | 8,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 8,000.00 |
| 58 | 05/22/2019 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 59 | 05/30/2019 | 2,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,500.00 | 0.00 | 0.00 | 0.00 | 2,500.00 |
| 60 | 06/04/2019 | 25,000.00 | Team Systems International, LLC | Tunnel & Raysor, P.A. | 25,000.00 | 25,000.00 | 25,000.00 | 0.00 | 25,000.00 | 0.00 | 25,000.00 |
| 61 | 06/07/2019 | 12,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 12,000.00 | 0.00 | 0.00 | 0.00 | 12,000.00 |
| 62 | 06/17/2019 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 63 | 06/17/2019 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 64 | 06/24/2019 | 30,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 30,000.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | 07/01/2019 | 45,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 45,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 45,000.00 |
| 66 | 07/01/2019 | 10,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 10,000.00 |
| 67 | 07/10/2019 | 928,843.10 | Team Systems International, LLC | Tunnel & Raysor, P.A. | 928,843.10 | 928,843.10 | 928,843.10 | 0.00 | 928,843.10 | 0.00 | 928,843.10 |
| 68 | 07/12/2019 | 3,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,500.00 | 0.00 | 0.00 | 0.00 | 3,500.00 |
| 69 | 07/19/2019 | 2,500.00 | Team Systems International, LLC | Tunnel & Raysor, P.A. | 2,500.00 | 2,500.00 | 2,500.00 | 0.00 | 2,500.00 | 0.00 | 2,500.00 |
| 70 | 07/19/2019 | 100,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 71 | 07/31/2019 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 72 | 08/05/2019 | 11,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 11,000.00 | 0.00 | 0.00 | 11,000.00 |
| 73 | 08/05/2019 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 74 | 08/07/2019 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 75 | 08/07/2019 | 50,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 50,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 76 | 08/13/2019 | 21,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 21,000.00 | 0.00 | 0.00 | 0.00 | 21,000.00 |
| 77 | 08/23/2019 | 30,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 30,000.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 78 | 09/03/2019 | 2,600.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,600.00 | 0.00 | 0.00 | 0.00 | 2,600.00 |
| 79 | 09/23/2019 | 8,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 8,000.00 |
| 80 | 09/23/2019 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 81 | 10/01/2019 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 82 | 10/01/2019 | 100,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 83 | 10/15/2019 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 84 | 10/15/2019 | 60,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 60,000.00 | 0.00 | 0.00 | 60,000.00 |
| 85 | 10/28/2019 | 13,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 13,000.00 | 0.00 | 0.00 | 0.00 | 13,000.00 |
| 86 | 11/04/2019 | 850.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 850.00 | 0.00 | 0.00 | 0.00 | 850.00 |
| 87 | 11/12/2019 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 88 | 11/14/2019 | 4,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,500.00 | 0.00 | 0.00 | 0.00 | 4,500.00 |
| 89 | 11/20/2019 | 5,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,500.00 | 0.00 | 0.00 | 0.00 | 5,500.00 |
| 90 | 11/29/2019 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91 | 11/29/2019 | 50,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 92 | 11/29/2019 | 30,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 30,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |
| 93 | 12/12/2019 | 100,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 94 | 12/26/2019 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 95 | 12/27/2019 | 75,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 75,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 |
| 96 | 01/06/2020 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 97 | 01/06/2020 | 50,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 98 | 01/21/2020 | 1,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,500.00 | 0.00 | 0.00 | 0.00 | 1,500.00 |
| 99 | 01/23/2020 | 1,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,500.00 | 0.00 | 0.00 | 0.00 | 1,500.00 |
| 100 | 02/03/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 101 | 02/03/2020 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 102 | 02/04/2020 | 20,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 20,000.00 |
| 103 | 02/04/2020 | 20,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 20,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 104 | 02/11/2020 | 5,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 | 5,000.00 |
| 105 | 02/24/2020 | 25,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 25,000.00 | 0.00 | 0.00 | 25,000.00 |
| 106 | 02/24/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 107 | 02/27/2020 | 3,000,000.00 | Team Systems International, LLC | Addy Road LLC | 3,000,000.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 3,000,000.00 | 0.00 | 3,000,000.00 |
| 108 | 02/27/2020 | 50,000.00 | Team Systems International, LLC | Addy Road LLC | 50,000.00 | 50,000.00 | 50,000.00 | 0.00 | 50,000.00 | 0.00 | 50,000.00 |
| 109 | 02/28/2020 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 110 | 03/02/2020 | 10,054.80 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 10,054.80 | 0.00 | 0.00 | 10,054.80 |
| 111 | 03/02/2020 | 4,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 |
| 112 | 03/06/2020 | 3,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,000.00 | 0.00 | 0.00 | 0.00 | 3,000.00 |
| 113 | 03/09/2020 | 3,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,500.00 | 0.00 | 0.00 | 0.00 | 3,500.00 |
| 114 | 03/13/2020 | 50,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 115 | 03/13/2020 | 11,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 11,000.00 | 0.00 | 0.00 | 11,000.00 |
| 116 | 03/13/2020 | 50,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 117 | 03/13/2020 | 50,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 118 | 03/17/2020 | 200,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 200,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200,000.00 |
| 119 | 03/17/2020 | 150,000.00 | Team Systems International, LLC | Deborah Evans Mott | 150,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150,000.00 |
| 120 | 03/18/2020 | 194,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 194,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 194,000.00 |
| 121 | 03/18/2020 | 214,000.00 | Team Systems International, LLC | Deborah Evans Mott | 214,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 214,000.00 |
| 122 | 03/18/2020 | 195,000.00 | Team Systems International, LLC | Deborah Evans Mott | 195,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 195,000.00 |
| 123 | 03/18/2020 | 198,000.00 | Team Systems International, LLC | Deborah Evans Mott | 198,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 198,000.00 |
| 124 | 04/02/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 125 | 04/28/2020 | 10,650.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,650.00 | 0.00 | 0.00 | 0.00 | 10,650.00 |
| 126 | 05/11/2020 | 4,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,500.00 | 0.00 | 0.00 | 0.00 | 4,500.00 |
| 127 | 05/27/2020 | 11,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 11,000.00 | 0.00 | 0.00 | 0.00 | 11,000.00 |
| 128 | 06/08/2020 | 100,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 129 | 06/11/2020 | 75,072.00 | Team Systems International, LLC | McBee Custom Homes | 75,072.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,072.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 130 | 06/12/2020 | 500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 | 500.00 |
| 131 | 06/30/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 132 | 06/30/2020 | 21,500.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 21,500.00 | 0.00 | 0.00 | 21,500.00 |
| 133 | 07/14/2020 | 100,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 134 | 07/24/2020 | 16,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 16,000.00 | 0.00 | 0.00 | 0.00 | 16,000.00 |
| 135 | 07/28/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 136 | 08/10/2020 | 200,000.00 | Team Systems International, LLC | Coffelt Land Title | 200,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200,000.00 |
| 137 | 08/10/2020 | 141,117.04 | Team Systems International, LLC | Coffelt Land Title | 141,117.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 141,117.04 |
| 138 | 08/17/2020 | 2,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,500.00 | 0.00 | 0.00 | 0.00 | 2,500.00 |
| 139 | 08/27/2020 | 8,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 8,000.00 |
| 140 | 08/27/2020 | 10,000.00 | Team Systems International, LLC | TSI Gulf Coast, LLC | 0.00 | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 10,000.00 |
| 141 | 09/01/2020 | 50,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| 142 | 09/01/2020 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 143 | 09/21/2020 | 1,000,000.00 | Team Systems International, LLC | TSI Education & Training, Inc. | 1,000,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,000,000.00 |
| 144 | 09/25/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 145 | 10/13/2020 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 146 | 10/13/2020 | 100,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 147 | 11/02/2020 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 148 | 11/24/2020 | 2,800.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,800.00 | 0.00 | 0.00 | 0.00 | 2,800.00 |
| 149 | 11/30/2020 | 7,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 7,000.00 | 0.00 | 0.00 | 0.00 | 7,000.00 |
| 150 | 12/02/2020 | 100,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 151 | 12/15/2020 | 75,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 75,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 |
| 152 | 12/22/2020 | 3,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,000.00 | 0.00 | 0.00 | 0.00 | 3,000.00 |
| 153 | 12/30/2020 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 154 | 12/30/2020 | 13,972.35 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 13,972.35 | 0.00 | 0.00 | 13,972.35 |
| 155 | 01/05/2021 | 78,000.00 | Team Systems International, LLC | Deborah Evans Mott | 78,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 78,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 156 | 01/05/2021 | 75,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 75,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75,000.00 |
| 157 | 01/14/2021 | 50,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 158 | 01/21/2021 | 100,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 159 | 02/08/2021 | 40,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 40,000.00 | 0.00 | 0.00 | 0.00 | 40,000.00 |
| 160 | 02/16/2021 | 37,500.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 37,500.00 | 0.00 | 0.00 | 37,500.00 |
| 161 | 03/11/2021 | 37,350.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 37,350.00 | 0.00 | 0.00 | 0.00 | 37,350.00 |
| 162 | 03/31/2021 | 4,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 |
| 163 | 04/14/2021 | 3,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,000.00 | 0.00 | 0.00 | 0.00 | 3,000.00 |
| 164 | 04/15/2021 | 35,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 35,000.00 |
| 165 | 04/15/2021 | 50,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 50,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50,000.00 |
| 166 | 04/21/2021 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 167 | 05/10/2021 | 100,000.00 | Team Systems International, LLC | Deborah Evans Mott | 100,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100,000.00 |
| 168 | 05/10/2021 | 150,000.00 | Team Systems International, LLC | Deborah Evans Mott | 150,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 169 | 05/17/2021 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |
| 170 | 05/24/2021 | 1,822,508.62 | Team Systems International, LLC | Team Systems International Southeast LLC | 1,822,508.62 | 0.00 | 0.00 | 0.00 | 0.00 | 1,822,508.62 | 1,822,508.62 |
| 171 | 05/24/2021 | 470,583.01 | Team Systems International, LLC | Team Systems International Southeast LLC | 470,583.01 | 0.00 | 0.00 | 0.00 | 0.00 | 470,583.01 | 470,583.01 |
| 172 | 05/25/2021 | 2,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,500.00 | 0.00 | 0.00 | 0.00 | 2,500.00 |
| 173 | 05/26/2021 | 14,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 14,000.00 | 0.00 | 0.00 | 14,000.00 |
| 174 | 06/01/2021 | 25,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 25,000.00 | 0.00 | 0.00 | 25,000.00 |
| 175 | 06/03/2021 | 8,500.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,500.00 | 0.00 | 0.00 | 0.00 | 8,500.00 |
| 176 | 06/09/2021 | 1,300.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,300.00 | 0.00 | 0.00 | 0.00 | 1,300.00 |
| 177 | 06/16/2021 | 12,804.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 12,804.00 | 0.00 | 0.00 | 12,804.00 |
| 178 | 06/18/2021 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 179 | 06/18/2021 | 3,600.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,600.00 | 0.00 | 0.00 | 0.00 | 3,600.00 |
| 180 | 06/23/2021 | 1,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,000.00 | 0.00 | 0.00 | 0.00 | 1,000.00 |
| 181 | 06/28/2021 | 10,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 182 | 06/30/2021 | 35,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 35,000.00 | 0.00 | 0.00 | 35,000.00 |
| 183 | 07/20/2021 | 1,304.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,304.00 | 0.00 | 0.00 | 0.00 | 1,304.00 |
| 184 | 07/20/2021 | 1,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,000.00 | 0.00 | 0.00 | 0.00 | 1,000.00 |
| 185 | 07/22/2021 | 6,853.54 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 6,853.54 | 0.00 | 0.00 | 6,853.54 |
| 186 | 07/23/2021 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 187 | 07/30/2021 | 8,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 8,000.00 |
| 188 | 07/30/2021 | 7,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 7,000.00 | 0.00 | 0.00 | 7,000.00 |
| 189 | 08/03/2021 | 20,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 20,000.00 | 0.00 | 0.00 | 20,000.00 |
| 190 | 08/03/2021 | 1,752.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 1,752.00 | 0.00 | 0.00 | 0.00 | 1,752.00 |
| 191 | 08/11/2021 | 2,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 2,000.00 |
| 192 | 08/30/2021 | 5,700.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 5,700.00 | 0.00 | 0.00 | 0.00 | 5,700.00 |
| 193 | 08/31/2021 | 10,000.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 10,000.00 | 0.00 | 0.00 | 10,000.00 |
| 194 | 08/31/2021 | 10,000.00 | Team Systems International, LLC | John S. Maciorowski | 0.00 | 10,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 |

| No. | Transfer Date | Transfer Amount | Transferor | Transferee | To or for benefit of Deborah Evans Mott | Tr or for benefit of John S. Maciorowski | To or for benefit of Christopher Mott | To or for benefit of Steven Acosta | To or for benefit of Addy Road LLC | To or for benefit of Team Systems International Southeast LLC | Nonduplicative amount transferred from debtor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 195 | 09/02/2021 | 4,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 4,000.00 | 0.00 | 0.00 | 0.00 | 4,000.00 |
| 196 | 09/07/2021 | 13,606.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 13,606.00 | 0.00 | 0.00 | 13,606.00 |
| 197 | 09/24/2021 | 7,000.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 7,000.00 | 0.00 | 0.00 | 0.00 | 7,000.00 |
| 198 | 09/29/2021 | 3,441.00 | Team Systems International, LLC | Christopher Mott | 0.00 | 0.00 | 3,441.00 | 0.00 | 0.00 | 0.00 | 3,441.00 |
| 199 | 09/30/2021 | 11,500.00 | Team Systems International, LLC | Steven Acosta | 0.00 | 0.00 | 0.00 | 11,500.00 | 0.00 | 0.00 | 11,500.00 |
| **Subtotal** | | **13,965,716.37** | | | **10,115,923.68** | **5,507,428.01** | **4,910,470.10** | **1,788,665.69** | **4,006,343.10** | **2,293,091.63** | **13,965,716.37** |
| **Subsequent transfers** | | | | | | | | | | | |
| 200 | 11/12/2021 | 1,822,955.55 | Team Systems International Southeast LLC | Addy Road LLC | 0.00 | 0.00 | 0.00 | 0.00 | 1,822,955.55 | 0.00 | 0.00 |
| 201 | 11/12/2021 | 27.47 | Team Systems International Southeast LLC | Addy Road LLC | 0.00 | 0.00 | 0.00 | 0.00 | 27.47 | 0.00 | 0.00 |
| 202 | 11/12/2021 | 385,536.01 | Team Systems International Southeast LLC | Addy Road LLC | 0.00 | 0.00 | 0.00 | 0.00 | 385,536.01 | 0.00 | 0.00 |
| **Subtotal** | | **2,208,519.03** | | | **0.00** | **0.00** | **0.00** | **0.00** | **2,208,519.03** | **0.00** | **0.00** |
| **TOTAL WITHOUT DUPLICATION** | | **13,965,716.37** | | | **10,115,923.68** | **5,507,428.01** | **4,910,470.10** | **1,788,665.69** | **6,214,862.13** | **2,293,091.63** | **13,965,716.37** |

**EXHIBIT C**

**PROPOSED FORM OF JUDGMENT**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG) |
| GEORGE L. MILLER,<br><br>Plaintiff,<br><br>v.<br><br>DEBORAH EVANS MOTT, *et al.*,<br><br>Defendants. | Adv. Proc. No. 23-50004 (CTG)<br><br>**Related Docket Nos. 37, 565, 614** |

**FINAL JUDGMENT**

For the reasons set forth in the Memorandum Opinion issued on November 24, 2026 [D.I. __], it is hereby ORDERED, ADJUDGED, AND DECREED that:

1. Judgment is entered in favor of plaintiff George L. Miller, solely in his capacity as chapter 7 trustee of the estate of Team Systems International, LLC (the "trustee"), and against the defendants to the extent set forth below. "Debtor" means Team Systems International, LLC.

2. The initial transfers of the debtor's property identified as transfers 1 through 199 in Schedule A to this Judgment are avoided as against the defendants pursuant to 11 U.S.C. § 544(b) and applicable Delaware law, and, as to transfers within the applicable two-year period, 11 U.S.C. § 548(a)(1)(A).

3. Pursuant to 11 U.S.C. § 550(a), the trustee shall recover from the following defendants the amounts set forth below, subject to the credits and recovery limitations in paragraphs 5 and 6:

| **Defendant** | **Amount** |
|---|---|
| Deborah Evans Mott | $10,115,923.68 |
| John S. Maciorowski | $5,507,428.01 |
| Christopher Mott | $4,910,470.10 |
| Steven M. Acosta | $1,788,665.69 |
| Addy Road LLC | $6,214,862.13 |
| Team Systems International Southeast LLC | $2,293,091.63 |

Addy Road LLC's liability includes $4,006,343.10 as an initial transferee and $2,208,519.03 as a subsequent transferee in transfers 200 through 202. Schedule A to this Judgment identifies the allocation of transfer liability among the defendants. Liability for the same transfer is joint and several to the extent the defendants are answerable for that transfer; the amounts above are not cumulative recoveries for the same transfer.

4. Judgment is entered in favor of the trustee and against Deborah Evans Mott and Steven M. Acosta, jointly and severally, in the amount of $12,000,000 for breach of fiduciary duty, subject to paragraphs 5 and 6. This award is not additional to recoveries compensating the same losses under paragraph 3.

5. The trustee may obtain only one satisfaction of each avoided transfer or other compensable loss. Any payment, property, or proceeds recovered on account of a transfer or

loss shall be credited against each overlapping liability for that transfer or loss, including the fiduciary-duty judgment, to prevent duplicate recovery. No defendant is liable for more than the liability imposed on that defendant, and satisfaction of that liability ends collection against that defendant even if the aggregate recovery limitation has not been reached. These provisions do not make all defendants jointly and severally liable for every transfer. The principles set forth in this paragraph, as well as those set forth in paragraph 6, apply equally to any recovery the trustee may obtain on the default judgments docketed at D.I. 593 and D.I. 594. Those default judgments remain in effect and, together with this Judgment, resolve all claims in the adversary proceeding.

6. The trustee's aggregate recovery from all of the defendants except for those who previously settled (*see* D.I. 86), under all theories adjudicated in this Judgment and including value recovered through enforcement of the constructive trusts, shall not exceed $12,000,000. Recoveries under prior settlements are excluded from that aggregate ceiling, without permitting duplicate satisfaction of any particular transfer or loss. Upon satisfaction of the aggregate recovery limitation, the Trustee shall cease further collection from those defendants under this Judgment. Interest under ¶ 17 accrues on the unsatisfied balance, is not subject to this limitation, and accrues only once on any amount owed under more than one paragraph.

7. Addy Road LLC is declared to be the debtor's alter ego and is liable for the debtor's allowed claims, subject to the applicable credits and limitations stated in this Judgment. The trustee may enforce this declaration on behalf of the estate. The trustee's request to disregard the debtor's separate existence from Deborah Evans Mott is denied.

This paragraph does not itself transfer title to any asset. Nothing herein precludes a postjudgment application under Rule 70(b). The relief provided in paragraph 3 and paragraph 9 hereof is independent of this determination.

8. For purposes of this Judgment, the following property descriptions apply:

(a) "Ormond Beach Property" means the property located at 705 Riverside Drive, Ormond Beach, Florida 32176;

(b) "Bethany Beach Property" means the property located at 20 Addy Road, Bethany Beach, Delaware 19930; and

(c) "Blue Springs Proceeds" means the proceeds of the sale of real property located at 1059 SW Conch Circle, Blue Springs, Missouri 64064.

9. A constructive trust is imposed, for the benefit of the debtor's bankruptcy estate and administered by the trustee, on the Ormond Beach Property and the Bethany Beach Property, subject to valid liens senior in priority. Deborah Evans Mott and John S. Maciorowski hold their respective interests in the Ormond Beach Property, and Addy Road LLC holds its interest in the Bethany Beach Property, subject to those constructive trusts. A certified copy of this Judgment may be filed in the land records of Volusia County, Florida and Sussex County, Delaware. Value recovered through enforcement of either trust shall be credited in accordance with paragraphs 5 and 6. No constructive trust is imposed by this Judgment on funds held by the United States. This Judgment does not adjudicate the United States' interest in those funds or foreclose relief otherwise available to the Trustee in the applicable forfeiture proceeding.

10. Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, and Addy Road shall, within 60 days of the entry of this Judgment, provide the Trustee with a written accounting of the disposition of the diverted assets and transfers identified in Schedule A to this Judgment. The accounting shall identify the transferees, the flow of funds or property, the entities or accounts used to route the assets, and the location of any remaining property or proceeds. They shall produce, upon reasonable request, and within 30 days after receipt of such request, personal and corporate bank records and corporate records sufficient to locate and marshal those assets. These obligations concern the identified diverted assets and do not authorize a general inquiry into all assets available to satisfy the judgments or enlarge the substantive scope of the trustee's claims. These obligations are subject to valid and particularized claims of privilege, if any, that Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, and Addy Road may assert, in writing, within 60 days of the entry of this Judgment. Such claims of privilege shall be subject to the Court's review.

11. The Court finds that the defendants' repeated concealment and diversion of assets, and violation of the prior asset-preservation injunction, establish a substantial risk of further dissipation before appropriate postjudgment protection can be adjudicated. Monetary judgments alone do not adequately protect against that intervening irreparable injury. The balance of equities and the public interest favor the temporary restrictions set forth below, including the stated exceptions for necessary living and business expenses. The Court accordingly imposes the temporary and limited injunctive relief set forth in ¶¶ 12-13,

pending the Court's consideration of a promptly filed post-judgment motion (as provided in ¶ 14).

12. Deborah Evans Mott, John S. Maciorowski, and Addy Road LLC are prohibited and enjoined from selling, assigning, transferring, encumbering, mortgaging, or otherwise disposing of any portion or all of their respective interests in the Ormond Beach Property, the Bethany Beach Property, or the Blue Springs Proceeds.

13. Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski are further prohibited and enjoined from using, selling, transferring, assigning, encumbering, mortgaging, or otherwise disposing of any cash or other assets, except to the extent necessary to pay ordinary household and living expenses or ordinary business expenses, as applicable. This exception does not authorize a disposition prohibited by paragraph 12.

14. The restrictions in paragraphs 12 and 13 take effect upon entry of this Judgment and shall remain in effect through January 31, 2027. If the trustee files a motion for postjudgment asset-preservation relief by the later of December 21, 2026 or 14 days after entry of this judgment, those restrictions shall remain in effect through the later of January 31, 2027, or entry of an order resolving that motion, unless modified or dissolved by further order of the Court. The trustee may seek further relief under Federal Rule of Civil Procedure 69, made applicable by Bankruptcy Rule 7069. Any enjoined defendant may seek modification or dissolution of the interim restrictions.

15. The injunction binds the persons identified in paragraphs 12 and 13 and their officers, agents, servants, employees, and attorneys, and other persons in active concert or

participation with them, who receive actual notice of this Judgment by personal service or otherwise.

16. The request for a permanent asset-preservation injunction lasting until satisfaction of the judgments is denied at this time, without prejudice to an appropriate postjudgment application. The request for a separate recovery on a theory of unjust enrichment is denied as duplicative. The request for a separate award of attorneys' fees based on litigation conduct is denied.

17. The money judgments shall bear postjudgment interest from the date of entry at the rate prescribed by 28 U.S.C. § 1961, computed daily and compounded annually.

18. The default judgments previously entered against TSI Education & Training, Inc. and TSI Gulf Coast, LLC (D.I. 593; D.I. 594) remain in effect and are subject to paragraphs 5 and 6. The trustee does not appear to seek further relief against Brent Road, LLC. The claims against Brent Road, LLC are accordingly dismissed as moot.

19. This Judgment, together with the default judgments described above, resolves all claims asserted in the complaint against all remaining parties, and any claim or request for relief not expressly granted is denied. Any postjudgment application under Federal Rule of Civil Procedure 69 or 70, including any further application for asset-preservation relief, is a proceeding to enforce this Judgment and does not affect its finality. The Court retains jurisdiction to enforce and interpret this Judgment.

20. The motion to exclude [D.I. 614] and the motion to reconsider [D.I. 657] are DENIED.

Dated: December __, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

**SCHEDULE A**

[reproduce Exhibit B to Memorandum Opinion]